No. 24-1399

# United States Court of Appeals for the Fourth Circuit

ASSOCIATION OF AMERICAN RAILROADS,

*Plaintiff–Appellant,*

v.

JEHMAL T. HUDSON, in his Individual Capacity and Official Capacity as a Commissioner of the State Corporation Commission of the Commonwealth of Virginia,

*Defendant–Appellee,*

*and*

STEPHEN BRICH, in his Individual Capacity and Official Capacity as the Commissioner of the Virginia Department of Transportation; MICHAEL ROLBAND, in his Individual Capacity and Official Capacity as the Director of the Virginia Department of Environmental Quality,

*Defendants.*

On Appeal from the United States District Court for the Eastern District of Virginia at Richmond, No. 1:23-cv-815-DJN

## OPENING BRIEF FOR APPELLANT ASSOCIATION OF AMERICAN RAILROADS

Raymond A. Atkins
Gordon D. Todd
Tobias S. Loss-Eaton
Lucas W.E. Croslow
Stephen S. Laudone
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
ratkins@sidley.com
(202) 736-8889

*Counsel for Appellant*

# DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, plaintiff-appellant Association of American Railroads (AAR) discloses that:

1. AAR is not a publicly held corporation or other publicly held entity.

2. AAR has no parent corporations.

3. AAR issues no stock, so 10% or more of AAR's stock is not owned by a publicly held corporation or other publicly held entity.

4. No other publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation.

5. AAR is a trade association. The publicly held members whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity are: Norfolk Southern Railway Company; CSX Transportation, Inc.

6. This case does not arise out of a bankruptcy proceeding.

7. This is not a criminal case in which there was an organizational victim.


July 22, 2024                                  /s/ *Raymond A. Atkins*
                                              Raymond A. Atkins

# TABLE OF CONTENTS

Disclosure statement.................................................................i

Table of authorities ..............................................................iv

Introduction.........................................................................1

Jurisdictional statement .........................................................5

Statement of the issues ..........................................................5

Statement of the case .............................................................6

    A.   Railroads are subject to a comprehensive, preemptive federal regulatory regime. .................................6

    B.   Railroads have effective, established procedures to enable safe utility crossings......................................9

    C.   Virginia adopts a cursory, railroad-specific eminent domain scheme with minimal or no compensation. ............13

    D.   The district court dismisses AAR's challenge to the Virginia statute. ..................................................18

Summary of argument ..........................................................22

Argument..........................................................................26

I.    Standard of review. ...........................................................26

II.   The district court erred by dismissing AAR's ICCTA preemption claim.............................................................27

    A.   Section 56-16.3 is preempted because it discriminates against rail carriers...........................................27

        1.   AAR plausibly alleges that § 56-16.3 discriminates against rail carriers. .............................28

        2.   The district court mistakenly deemed ICCTA's discrimination prong inapplicable.............................30

B.    AAR plausibly alleges that § 56-16.3 is preempted because it unreasonably burdens rail transportation. ......... 38

III.   The district court erred by dismissing AAR's Takings Clause claim. ....................................................................... 46

A.    AAR plausibly alleges that $0 is not just compensation for a permanent, immovable easement across a rail line in a public right-of-way. ....................................................... 49

B.    AAR plausibly alleges that $1,000 is not just compensation for a permanent, immovable easement across legally abandoned track. ............................................. 51

C.    AAR plausibly alleges that the $2,000 default fee for other crossings does not avoid rampant Takings Clause violations, warranting injunctive relief. ............................. 53

D.    The district court mistook the facial-challenge analysis for a pleading standard. ....................................................... 60

Conclusion ............................................................................... 63

Request for oral argument ...................................................... 63

Certificate of compliance

Certificate of service

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&W Props., Inc. v. Kansas City S. Ry.*,
  200 S.W.3d 342 (Tex. App. 2006) ...................................................... 36

*AAR v. Randolph*,
  No. 2:23-cv-1154, 2024 WL 664359
  (E.D. Cal. Feb. 16, 2024) ................................................................... 62

*Adrian Blissfield R.R. v. Vill. of Blissfield*,
  550 F.3d 533 (6th Cir. 2008) ......................................................... 8, 35

*Am. Rocky Mountaineer v. Grand Cnty.*,
  568 F. Supp. 3d 1231 (D. Utah 2021) ............................................... 36

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................... 50, 53

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ......................................................................... 53

*BNSF Ry. Co. v. Hiett*,
  22 F.4th 1190 (10th Cir. 2022) ........................................................ 33

*Britt v. DeJoy*,
  45 F.4th 790 (4th Cir. 2022) (en banc) .............................................. 5

*Carey v. Throwe*,
  957 F.3d 468 (4th Cir. 2020) ........................................................... 53

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ......................................................................... 46

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ......................................................................... 61

*City of Cayce v. Norfolk S. Ry.*,
  706 S.E.2d 6 (S.C. 2011) ................................................................. 44

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
  526 U.S. 687 (1999) ......................................................................... 49

iv

*CSX Transp., Inc. v. Williams*,
  406 F.3d 667 (D.C. Cir. 2005) .............................................. 44

*Deal v. Mercer Cnty. Bd. of Educ.*,
  911 F.3d 183 (4th Cir. 2018).................................... 6, 26, 27

*Delaware v. STB*,
  859 F.3d 16 (D.C. Cir. 2017) .................................... 8, 27, 36

*DeVillier v. Texas*,
  601 U.S. 285 (2024)...................................................... 47, 54

*Di Giovanni v. Camden Fire Ins. Ass'n*,
  296 U.S. 64 (1935)............................................................. 57

*Doe v. Reed*,
  561 U.S. 186 (2010).......................................................... 61

*Edwards v. CSX Transp., Inc.*,
  983 F.3d 112 (4th Cir. 2020)........................ 7, 8, 33, 34, 43

*Green Mountain R.R. v. Vermont*,
  404 F.3d 638 (2d Cir. 2005) ........................................ 36, 45

*Hale v. Allinson*,
  188 U.S. 56 (1903).................................................... 57, 60

*Hennington v. Georgia*,
  163 U.S. 299 (1896)...................................................... 33

*Knick v. Twp. of Scott*,
  588 U.S. 180 (2019)............................................. 47, 54, 56

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024)..................................................... 63

*N.Y. Susquehanna & W. Ry. v. Jackson*,
  500 F.3d 238 (3d Cir. 2007) .................................. 28, 36, 37

*Norfolk S. Ry. v. Dille Rd. Recycling, LLC*,
  94 F.4th 517 (6th Cir. 2024) ............................... 7, 8, 27, 31

*Norfolk S. Ry. v. City of Alexandria*,
  608 F.3d 150 (4th Cir. 2010)...................................... 37, 43

*PCS Phosphate Co. v. Norfolk S. Corp.*,
   559 F.3d 212 (4th Cir. 2009) .................................................... *passim*

*PETA, Inc. v. N.C. Farm Bureau Fed'n*,
   60 F.4th 815 (4th Cir. 2023), *cert. denied*,
   144 S. Ct. 325 (2023) ....................................................................... 61

*PhRMA v. Williams*,
   64 F.4th 932 (8th Cir. 2023), *reh'g denied*,
   No. 21-1731, 2023 WL 3313605 (May 9, 2023) .......................... 57, 58

*S. Pac. Co. v. Arizona*,
   325 U.S. 761 (1945) ......................................................................... 44

*Skidmore v. Norfolk S. Ry.*,
   1 F.4th 206 (4th Cir. 2021) ..................................................... 6, 41, 42

*Station #2, LLC v. Lynch*,
   695 S.E.2d 537 (Va. 2010) ................................................................ 15

*Thorpe v. Clarke*,
   37 F.4th 926 (4th Cir. 2022) ............................................................ 61

*Union Pac. R.R. v. CTA*,
   647 F.3d 675 (7th Cir. 2011) ........................................................... 41

*United Food & Com. Workers Union v. Brown Grp.*,
   517 U.S. 544 (1996) ......................................................................... 62

*United States v. 8.929 Acres*,
   36 F.4th 240 (4th Cir. 2022) ............................................................ 47

*United States v. Colvard*,
   89 F.2d 312 (4th Cir. 1937) .............................................................. 57

*United States v. Hansen*,
   599 U.S. 762 (2023) ......................................................................... 62

*Vt. Ry. v. Town of Shelburne*,
   287 F. Supp. 3d 493 (D. Vt. 2017),
   *aff'd*, 918 F.3d 82 (2d Cir. 2019) ...................................................... 30

*W. Union Tel. Co. v. Pa. R.R.*,
   195 U.S. 540 (1904) ......................................................................... 46

*Webster v. Fall,*
   266 U.S. 507 (1925) ........................................................... 38

*Wis. Cent. Ltd. v. STB,*
   112 F.3d 881 (7th Cir. 1997) ............................................ 52

*Zayo Grp., LLC v. Norfolk S. Ry.,*
   No. 22-1837, 2023 WL 8230499 (4th Cir. Nov. 28, 2023) .................. 43

## Constitution and Statutes

Va. Const. art. I, § 11 ............................................................... 13

28 U.S.C. § 1291 ...................................................................... 5

      § 1331 ........................................................................ 5

49 U.S.C. § 10102(6)(A) ......................................................... 7

      § 10102(9)(A) ..................................................... 7, 29

      § 10501(b) ......................................................... 7, 32

      § 10501(c) (1994) ..................................................... 33

      § 10903 ..................................................................... 51

Va. Code § 12.1-12(A) ........................................................... 17

      § 12.1-13 ........................................................... 16, 17

      § 25.1-102 ............................................................... 29

      § 25.1-201 ............................................................... 13

      § 25.1-206(2) ........................................................... 13

      § 25.1-213 ............................................................... 13

      § 25.1-228 ............................................................... 13

      § 25.1-230(A) ........................................................... 13

      § 56-1 ..................................................................... 17

      § 56-16.3 ................................................................. 28

      § 56-16.3(B) ..................................................... 2, 14, 29

      § 56-16.3(C) .................................................. 14, 15, 40, 42

§ 56-l6.3(D) ................................................................ 45

§ 56-16.3(E) .......................................................... 17, 55

§ 56-16.3(F) ................................................................ 17

§ 56-16.3(G) ..................................................... 14, 29, 54

§ 56-16.3(H) ........................................ 15, 16, 40, 54, 55

§ 56-16.3(I) .................................. 14, 15, 29, 51, 52

§ 56-16.3(K) .................................... 14, 15, 29, 49

§ 56-16.3(L) ................................................................ 17

§ 56-35 ........................................................................ 17

§ 56-128 ...................................................................... 17

## Administrative Decisions

*City of Creede—Pet. for Decl. Order*,
No. FIN 34376, 2005 WL 1024483
(S.T.B. served May 3, 2005) .................................... 41

*CSX Transp.—Pet. for Decl. Order*,
No. FD 34662, 2005 WL 1024490
(S.T.B. served May 3, 2005) .................................... 35

*E. Ala. Ry.—Pet for Decl. Order*,
No. FD 35583, 2012 WL 758259
(S.T.B. served Mar. 9, 2012) ................................... 31

*Friends of the Aquifer*,
5 S.T.B. 880 (2001) ................................................. 35

*Norfolk S. Ry. v. Cox Commc'ns Hampton Roads LLC*,
No. PUR-2024-65 (Va. S.C.C. June 14, 2024) .............. 40, 56

*Pet. of CSX Transp.*,
No. PUR-2024-66 (Va. S.C.C. June 14, 2024) ................. 55

*Pet. of Norfolk S. Ry. for Expedited Decl. Order*,
No. FD 35949, 2016 WL 750944
(S.T.B. served Feb. 25, 2016), *aff'd*,
*Delaware v. STB*, 859 F.3d 16 (D.C. Cir. 2017) ................. 32

*Providence & Worcester R.R.—Pet. for Decl. Order*,
    No. FD 35393, 2011 WL 2076463
    (S.T.B. served May 26, 2011)......................................................27, 34

*Soo Line R.R.—Pet. for Decl. Order*,
    No. FD 35850, 2014 WL 7330097
    (S.T.B. served Dec. 23, 2014)...............................................................34

*Tenth Ave. Neighbors—Pet. for Decl. Order*,
    No. FD 36654, 2024 WL 2105647
    (S.T.B. served May 9, 2024).................................................................38

*Thomas Tubbs—Pet. for Decl. Order*,
    No. FD 35792, 2014 WL 5508153
    (S.T.B. served Oct. 31, 2014), *aff'd*,
    *Tubbs v. STB*, 812 F.3d 1141 (8th Cir. 2015)....................................44

*Town of Smithtown—Pet. for Decl. Order*,
    No. FD 36575(1), 2024 WL 757039
    (S.T.B. served Feb. 23, 2024)..............................................................35

## Legislative Materials

H.R. Rep. No. 104-311 (1995).......................................................7, 33, 34

## Other Authorities

11A Charles A. Wright et al., *Federal Practice and Procedure*
    *Civil* § 2944 (3d ed.) ...........................................................................57

Opening Br., *Norfolk S. Ry. v. City of Alexandria*,
    No. 09-1566(L), 2009 WL 2240583 (4th Cir. July 27, 2009) .............37

Br. of Appellees, *Norfolk S. Ry. v. City of Alexandria*,
    No. 09-1566(L), 2009 WL 2627150 (4th Cir. Aug. 27, 2009)............37

Consol. Resp. to Expedited Mots. to Stay,
    *Norfolk S. Ry. v. Cox Commc'ns Hampton Roads LLC*,
    No. PUR-2024-65 (Va. S.C.C. June 26, 2024) ....................................39

## INTRODUCTION

Federal law preempts any state law that discriminates against or unduly burdens rail transportation, including railroad property. And a government-sanctioned physical occupation of private property is a *per se* taking, requiring just compensation. Yet a new Virginia law allows broadband internet providers to take and permanently occupy railroad property—and only railroad property—with minimal or no compensation. When the Association of American Railroads challenged this law, the district court dismissed the case for lack of standing. That was error. AAR has standing to challenge this law aimed directly at its members.

Utilities—phone companies, power companies, and the like—often need to cross rail lines with their wires or pipes. Railroads thus have established procedures to ensure that crossings can be designed and installed promptly, but also safely and without impeding rail operations. Those procedures include uniform design and safety standards, indemnity and insurance requirements, the ability to relocate crossings if the need arises, and market-rate fees for the right to occupy railroad land.

Unhappy with the railroads' engineering and safety procedures— and especially with having to pay to burden railroad property—

broadband companies lobbied the Commonwealth to adopt a bespoke, supercharged eminent-domain scheme just for them to use against railroads.  Now they can take and occupy railroad property whenever they "deem[ ] it necessary."  Va. Code § 56-16.3(B).

Section 56-16.3 strips away the protections that landowners otherwise enjoy under Virginia's generally applicable eminent-domain law: No jury trial, no need to prove public use or necessity, and no assurance of market-rate compensation.  It also strips away the safeguards of the railroads' existing procedures:  No uniform standards, no indemnity requirements, and no ability to relocate or remove crossings if railroad operations require it.  Indeed, occupations under § 56.16.3 are permanent. And instead of market-based compensation, a broadband provider need pay only a "license fee" of $2,000, $1,000, or nothing at all, depending on the crossing's location.  A railroad's only recourse under this scheme is petitioning the State Corporation Commission for discretionary relief on narrow grounds.

Left unchallenged, § 56-16.3 will be used to cross railroad property hundreds or thousands of times.  AAR thus sued on behalf of its members, alleging that § 56-16.3 is preempted by the ICC Termination Act and

violates the Fifth Amendment's Takings Clause by denying just compensation. The district court, however, held that these claims must be litigated crossing-by-crossing by individual railroads, and dismissed for lack of associational standing. Although the court ruled on standing grounds, its holding turned on its view of the substantive law governing these claims. And on that score, the court made basic errors.

ICCTA expressly preempts state laws that regulate railroads and impliedly preempts laws that discriminate against or unduly burden rail transportation. The statute's preemptive sweep expressly includes railroad property.

AAR alleged that § 56-16.3 discriminates against railroads because it subjects *only* railroads to its novel eminent-domain scheme—a recognized basis for ICCTA preemption. Yet the court never considered the merits of this claim. Instead, it jumbled together ICCTA's separate preemption prongs, wrongly concluding that discrimination is not a standalone basis for ICCTA preemption, but a mere limit on an unwritten "police powers" exception to express ICCTA preemption. The result was a ruling that states can sometimes *regulate rail transportation*—precisely what Congress said they cannot do.

AAR also alleged that § 56-16.3 will, in the aggregate, unreasonably burden rail transportation. Even if each one were minimally intrusive, dozens or hundreds of permanent and immovable crossings will aggregate to hinder railroads' use and development of their property. Yet the court rejected this aggregate analysis and dismissed AAR's claim as "speculative" without discussing or crediting the underlying allegations. The court erred in depriving AAR of the opportunity to prove its claims.

On the Takings Clause, the court similarly held that railroads must seek just compensation on a crossing-by-crossing basis. It concluded that AAR failed to allege an across-the-board denial of just compensation—even for the class of crossings that receive *no compensation at all*. To reach that conclusion, the court lumped together different kinds of crossings, imported (and misunderstood) facts from an amicus brief, drew inferences against AAR, and wrongly assumed that after-the-fact compensation avoids a Takings Clause violation.

When these errors are corrected, no individual railroad's participation is needed. AAR has standing because its preemption and takings theories apply to § 56-16.3 as a whole. But even if that were not so, the court erred by treating this as an all-or-nothing question. The court

4

stacked the facial-challenge standard atop the associational-standing test to conclude that, if even a *single* crossing under § 56-16.3 might be permissible, the whole case must be dismissed. But the facial-challenge standard governs the scope of the remedy, not the pleadings. In any event, a party can prevail on a facial challenge by showing that a law lacks a plainly legitimate sweep, even if it has isolated valid applications. So whether or not AAR alleges that § 56-16.3 is invalid in *every* application, dismissal was improper.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 because AAR's claims arise under federal law and, as explained below, AAR's operative complaint establishes standing. This Court has jurisdiction under § 1291 because the district court dismissed all claims without leave to amend. *Britt v. DeJoy*, 45 F.4th 790, 791 (4th Cir. 2022) (en banc). AAR noticed its appeal on May 1, 2024, fewer than 30 days after the district court's April 15, 2024 final opinion and order.

## STATEMENT OF THE ISSUES

I.     Whether AAR has standing to challenge Virginia Code § 56-16.3 because it discriminates against or unreasonably burdens AAR's member railroads.

5

II.    Whether AAR has standing to challenge § 56-16.3 under the Takings Clause because it either provides no mechanism to secure just compensation or requires repetitive serial litigation to do so.

## STATEMENT OF THE CASE

The facts below come from AAR's operative complaint. These allegations must be taken as true, with all inferences drawn in AAR's favor. *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018).

### A.    Railroads are subject to a comprehensive, preemptive federal regulatory regime.

"Congress recognized long ago that a uniform regulatory scheme is necessary to the operation of the national rail system." *Skidmore v. Norfolk S. Ry.*, 1 F.4th 206, 217 (4th Cir. 2021) (cleaned up). That scheme's modern centerpiece is the ICC Termination Act. Congress passed ICCTA in 1995 to replace the Interstate Commerce Commission with the Surface Transportation Board, establishing a "[f]ederal scheme of minimal regulation for [the] intrinsically interstate" rail industry. H.R. Rep. No. 104-311, at 96 (1995).

ICCTA gives the STB exclusive jurisdiction over (1) "transportation by rail carriers" and (2) "the construction, acquisition, operation,

6

abandonment, or discontinuance of [tracks] or facilities." 49 U.S.C. § 10501(b). "Transportation" includes any "yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail." *Id.* § 10102(9)(A). ICCTA also defines a "Railroad" as including all "ground, used or necessary for transportation." *Id.* § 10102(6)(C). ICCTA's remedies "are exclusive and preempt the remedies provided under Federal or State law." *Id.* § 10501(b). "It is difficult to imagine a broader statement of Congress's intent to preempt state regulatory authority over railroad operations." *Norfolk S. Ry. v. Dille Rd. Recycling, LLC*, 94 F.4th 517, 523 (6th Cir. 2024) (cleaned up).

These sweeping provisions "produce both express and implied preemptive effects." *Edwards v. CSX Transp.*, 983 F.3d 112, 121 (4th Cir. 2020); *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 220–21 (4th Cir. 2009). In analyzing those effects, "courts rely on the Surface Transportation Board's interpretation of" ICCTA. *Skidmore*, 1 F.4th at 213 (cleaned up). The STB and the courts, including this Court, recognize three forms of ICCTA preemption.

First, ICCTA *expressly preempts* all state "regulation" of "rail transportation"—"that is, those laws and actions that may reasonably be said to have the effect of managing or governing rail transportation" as defined in the statute. *Edwards*, 983 F.3d at 121 (cleaned up). Courts and the STB often call this "categorical" preemption because it blocks any state intrusion on the STB's exclusive jurisdiction. *See id.* at 121, 123 n.14; *Delaware v. STB*, 859 F.3d 16, 19 (D.C. Cir. 2017).

Second, ICCTA *impliedly preempts* state laws that "would have the effect of unreasonably burdening or interfering with rail transportation." *See Delaware*, 859 F.3d at 19; *PCS Phosphate*, 559 F.3d at 220–21 (collecting cases). This is generally called "'as applied' preemption." *Edwards*, 983 F.3d at 121 n.12.

Third, ICCTA also *impliedly preempts* state laws that "discriminate against railroads." *Dille Rd.*, 94 F.4th at 526; *accord Delaware*, 859 F.3d at 18–19. This, too, is generally dubbed "as applied" preemption. *See Adrian Blissfield R.R. v. Vill. of Blissfield*, 550 F.3d 533, 540–41 (6th Cir. 2008).

While ICCTA's implied preemption prongs are sometimes called "as applied" preemption, this term does not refer to the scope of a particular

substantive preemption theory.  Thus, this is a different concept from an "as applied challenge" to a law (as opposed to a "facial challenge").

## B.    Railroads have effective, established procedures to enable safe utility crossings.

Broadband fiber conduits and utility services, whether related to water, gas, or power, often seek to cross railroad tracks.  But any utility crossing undertaken without appropriate planning and coordination risks clashing with the railroad's established engineering and safety protocols.  This in turn can interfere with rail operations, threaten the integrity of rail infrastructure, and create avoidable safety hazards.  Unauthorized or improperly installed aerial wires—hung too low or insufficiently spaced—have caused accidents, delays, and shutdowns.  And improperly designed or installed underground installations have caused sink holes beneath roads and railroad tracks and damaged railroad signal facilities and existing utility installations.  Damaged tracks, roadways, and signals pose particular dangers to the public.  JA 23 ¶ 29.

Given these risks, railroads have invested significant resources to develop engineering and safety policies and procedures to enable safe and timely crossings.  JA 20 ¶ 21.  To ensure that each proposed installation meets engineering and safety requirements, a railroad or its outside

9

contractors must conduct an engineering and design review. A flagger or inspector often must be onsite during the installation to protect the work crew and railroad property and operations, including way-side and grade-crossing signal systems. JA 20–21 ¶ 22.

To cover their time and expenses, railroads impose certain reasonable charges. Railroads also ask that applicants agree to standard contractual terms governing future maintenance, indemnification, insurance coverage, and—importantly—relocating crossings. JA 21, JA 33 ¶¶ 23, 64. These terms ensure the safety and integrity of railroad operations, contractors, and the public, today and in the future.

For example, two AAR members in Virginia—Norfolk Southern Railway and CSX Transportation—require applicants to agree that crossings can be moved or removed if necessary to accommodate future rail operations. This requirement protects the railroads' ability to prioritize safe operations along their rights-of-way for as long as the crossing exists, and to develop property for rail operations as they see fit. Recognizing that these installations often remain on railroad property in perpetuity, these agreements also often include ongoing notice, indemnification, and insurance requirements to ensure that future maintenance or

relocation of an installation is properly and safely coordinated with the railroad.  JA 22 ¶ 28.

Norfolk Southern and CSX work cooperatively with utilities, broadband companies, and state and local agencies to timely process crossing applications.  Each railroad maintains an online portal for submitting and processing broadband installation applications.  JA 20 ¶ 21.  They have reviewed and approved hundreds of these applications in Virginia since 2021.  JA 21 ¶ 23.

Reviewing these applications takes time, as the railroad must assess the particulars of each crossing.  And many applications are not properly completed; applications often fail to include appropriate engineering and design plans, proof of acceptable insurance coverage, and other elements necessary to ensure rail safety. These omissions can result in significant delays.  JA 21 ¶ 24.

For example, when the operative complaint was filed, one Virginia crossing application had been pending for more than four months.  The initial application was incomplete, and the applicant took more than three and a half months (and counting) to provide required information. Nor is that an outlier.  For one of AAR's Virginia members, aerial wire

crossing applications spend an average of 28 days in the railroad's hands—while the railroad spends an average of 71 days waiting for the applicant to provide all required information. That same railroad takes an average of 35 days to process an underground wire crossing applications, compared to 104 days for applicants to provide the necessary information. JA 21–22 ¶ 25.[1]

Railroads also need time between approving an application and scheduling the crossing's installation. For one AAR member, this period averages around 60 to 90 days, during which the railroad arranges flaggers, inspection of the crossing site, and marking of existing subgrade railroad-signal and communications lines. A crossing can be installed only with proper safety methods, including trained personnel using the appropriate form of track protection to safeguard the workers, railroad personnel, and the public. JA 22 ¶ 26.

---

[1] Broadband providers complain—and will probably file *amicus* briefs complaining—that railroads take too long and charge too much. *E.g.*, D. Ct. Dkt. 54 at 1. As just explained, the truth is different. This dispute is really about hastening access to billions in federal funding for broadband expansion, regardless of the risks to railroad safety or future rail operations. *See id.* at 4 & n.5.

Some of AAR's members also cannot hire outside contractors to provide inspection and flagging services because of existing collective bargaining agreements. Thus, these railroads must use their own personnel to inspect and flag broadband installations, requiring them to redirect limited resources. JA 22 ¶ 27.

## C. Virginia adopts a cursory, railroad-specific eminent domain scheme with minimal or no compensation.

Virginia's existing, generally applicable eminent domain laws establish a detailed process for taking private property that protects both public needs and landowners' rights. A taking requires a suit in circuit court, potentially including a jury trial. Va. Code § 25.1-201, -213, -228. The would-be condemnor must establish legal authority, necessity, and public use for the taking, *id.* § 25.1-206(2)(a)–(c)—satisfying Virginia's strict definition of public use, *see* Va. Const. art. I, § 11 ("No more private property may be taken than necessary to achieve the stated public use."). And a landowner is entitled to compensation for "the value of the property to be taken," determined based on "everything a buyer and seller in the marketplace would reasonably consider." Va. Code § 25.1-230(A); *see* Va. Const. art. I, § 11.

13

But Virginia's new law, § 56-16.3, jettisons these protections. It gives broadband providers a statutory right to cross and permanently occupy railroad "tracks, bridges, facilities, and all . . . rights of way or easements," for minimal or no compensation. Va. Code § 56-16.3(B). Instead, the statute prescribes an "application" scheme that requires a railroad to either (i) quickly approve any new crossing or (ii) petition the State Corporation Commission for discretionary relief on limited grounds.

"If a broadband service provider deems it necessary in the construction of its systems to cross" railroad facilities, it "shall submit an application for such crossing to the railroad." *Id.* The application must include specified design and construction plans and information about location and the duration and scope of the installation work. *Id.* § 56-16.3(C)(1).

The broadband provider must also pay a "license fee" and reimbursement (capped at $5,000) for direct expenses. *Id.* But for crossings in public rights-of-way—like at a grade crossing with a public road—the license fee is fixed at $0. *Id.* § 56-16.3(K). For crossings of legally abandoned track, "the license fee shall not exceed $1,000." *Id.* § 56-16.3(I). For all other crossings, the fee is $2,000. *Id.* § 56-16.3(G). For the first two categories, these amounts are not just defaults, but hard caps; they

14

cannot be increased even by the Corporation Commission. *See id*. § 56-16.3(I), (K). And these caps apply even though neither the market value nor the highest and best use of any crossing easement of railroad property is valued at $2,000—much less $1,000 or $0. *See* JA 40–41 ¶¶ 105–107, 109. These caps also apply even though takings and occupations under the statute are permanent. *See* JA 27–28 ¶ 43.[2]

Upon receiving a crossing application, the railroad has just 15 days to request additional information or clarification—which, as explained above, is often necessary. Va. Code § 56-16.3(C)(3). After that, the railroad "shall approve" the application "within 35 days" of receipt, *id*. § 56-16.3(C)(4), unless it petitions the Corporation Commission for relief on one of three specified grounds: (1) for a $2,000 crossing, the license fee is not "adequate compensation"; (2) the proposed crossing will impose "undue hardship" on the railroad; or (3) the crossing "will create the imminent likelihood of danger to public health or safety." *Id*. § 56-16.3(H). A petition on the second or third grounds—but not the first—prevents the

---

[2] Though the statute refers to a "license fee," the takings involved are best understood as easements, not licenses. *See Station #2, LLC v. Lynch*, 695 S.E.2d 537, 542–43 (Va. 2010) (an "easement concerns the continuing use of real property" while a license is "[p]ermission merely to enter the real property of another without such continuing use").

15

crossing from going forward during the Commission proceedings.  *See id.*

A broadband provider also "may petition the Commission for relief if the

railroad company does not comply with this section or has otherwise

wrongfully rejected or delayed its application."  *Id.*

In addressing a petition under the statute, the Commission "may,

in its discretion, employ expert engineers, to be paid equally by both com-

panies, to advise [it] . . . in (a) examining the location, plans, specifica-

tions, and descriptions of appliances and the methods proposed to be em-

ployed; (b) hearing any objections and considering any modifications that

the railroad company desires to offer; and (c) . . . rejecting, approving, or

modifying such plans and specifications."  *Id.*  The Commission "shall"

resolve any petition "within 90 days" of filing.  *Id.*  The agency has "sole

jurisdiction" over disputes between railroads and broadband providers

"concerning crossings and this section."  *Id.*

The Commission also has enforcement authority over the entire

statutory scheme.  It has authority over "the administration and enforce-

ment of all laws within its jurisdiction."  *Id.* § 12.1-13.  That includes "the

power . . . of regulating the rates, charges, services, and facilities of all

public service companies"—which include railroads, *id.* § 56-1—and "the

16

duty of administering the laws made for the regulation and control of corporations." *Id.* § 12.1-12(A); *see also id.* § 56-35.  The agency can implement these authorities by imposing fines or injunctions.  *Id.* § 12.1-13.  And the Commission has specific authority (to the extent not preempted) over railroad companies.  *Id.* § 56-128.

If a crossing goes forward under § 56-16.3, the railroad and the broadband provider "shall coordinate to schedule the crossing date, which shall be within 30 days of the approval" unless they agree on a later date.  *Id.* § 56-16.3(E).  The provider "shall be responsible for all aspects of the implementation of the physical crossing, including the construction and installation" of any equipment.  *Id.* § 56-16.3(F).  It must maintain "a commercial general liability insurance policy or railroad protective liability insurance policy" only while "construction is actually occurring"—not for the duration of the permanent occupation.  *Id.* § 56-16.3(L).

A railroad cannot reject a proposed crossing under § 56-16.3 for failing to comply with its safety requirements.  Nor can it require the broadband company to agree to other standard conditions, like preserving the right to relocate the crossing in future if necessary.  And the statute does not distinguish between transverse and longitudinal occupations,

17

between crossing a rural siding or an urban rail bridge, or between cross-
ing a single track or dozens of tracks in a yard—each of which entails
unique considerations and costs.  JA 38 ¶ 89.

### D.  The district court dismisses AAR's challenge to the Vir-ginia statute.

On behalf of its members, AAR sued Jehmal T. Hudson, then the
Corporation Commission's only member, and the heads of two other Vir-
ginia agencies.  As relevant, AAR's operative complaint alleged that § 56-
16.3 is preempted by ICCTA (Count I) and violates the Takings Clause
by denying just compensation (Count II).  The defendants moved to dis-
miss, raising merits arguments and various threshold issues.

The district court rejected a number of those threshold defenses.  It
held that Commissioner Hudson is not immune from suit under *Ex Parte*
*Young* because the Commission is "the key administrative agency with
respect to the challenged statute's implementation" and the agency's role
under the statute is not "judicial."  JA 153–154.  The court also had "ju-
risdiction to enter a declaratory judgment," JA 156, and AAR's claims are
ripe, JA 103.  (The court held that *Young* does not allow the claims
against the other defendants, JA 139–146, which AAR does not dispute
here.)

But the court dismissed AAR's preemption and takings claims on associational-standing grounds—though ultimately for reasons going to the merits. Applying the usual three-prong associational-standing test, the district court held that AAR's members would have Article III standing to sue in their own right (prong one). JA 107, JA 120. And these claims are undisputedly germane to AAR's purpose (prong two).

The court's decision thus turned on prong three—"the necessary participation of individual members." JA 107. The court held that, to state a facial challenge, AAR needed to plead "that no set of circumstances exists under which [§ 56-16.3] would be valid." JA 107 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Otherwise, individual railroads would have to litigate their claims on a crossing-by-crossing basis. JA 110.

AAR's standing to bring Count I thus turned on "the underlying merits of the facial ICCTA preemption challenge." JA 107. The court noted that case law often refers to "categorical" and "as-applied" ICCTA preemption. JA 115; *see supra* p. 6. Conflating these substantive preemption doctrines with the "facial" and "as-applied" labels used to describe the breadth of relief sought by a litigant, the court rejected AAR's

claim that § 56-16.3 is preempted as discriminatory: "[W]hether a state law 'discriminates against rail carriers' invokes 'implied' or 'as-applied' preemption," which supposedly "cannot support a facial challenge." JA 115; *see* JA 116–117.

But the court went further. It said the STB had "construe[d] utility easements as not 'discriminatory' against railroads," though it cited no such authority. JA 115–116. So, it reasoned, "broadband easements" also cannot be "discriminatory." JA 116.

Then the court went further still. It concluded that ICCTA actually has no standalone discrimination prong. It said the discrimination test applies only "to police-power 'regulations' of railroad transportation," and "§ 56-16.3 does not appear similar to" such regulations. JA 117 & n.10. Thus, the court never considered whether § 56-16.3 singles out or burdens railroads compared to other landowners.

The court next rejected AAR's claim that § 56-16.3 is preempted because it unreasonably burdens rail transportation in the aggregate. JA 118. The court deemed such a cumulative analysis incompatible with the unreasonable-burden prong's "fact-intensive inquiry." *Id.* And even if

20

such an analysis were proper, the court said, the complaint's allegations on this point (which it did not discuss) are "speculative." JA 119.

The court thus held that AAR lacked standing to pursue its ICCTA preemption claims in Count I; "individual member railroads" would have to raise any "as-applied" preemption claims themselves. JA 119–120.

As to Count II—takings without just compensation—the court likewise dismissed the claim because it "requires the participation of individual members." *See* JA 121, JA 124–125. Because "railroad property comes in all shapes and sizes, subject to differing ownership rights and varying valuations," the court said, "determining just compensation" would require "a fact-specific inquiry." JA 122. The court also read the complaint to "implicitly concede[]" that sometimes "the statutory caps suffice to provide just compensation." JA 123–124.

The court acknowledged that, if the statutory fee is not enough, a railroad will have to seek greater compensation from the Corporation Commission for each such crossing. JA 123. But it assumed that this procedure could avoid a Takings Clause violation—even if the railroad's property is taken in the meantime. JA 123–124. And the court brushed

21

aside AAR's argument that having to engage in such serial proceedings is not an adequate legal remedy.  JA 124 n.14.

The court also acknowledged that, for the $0 and $1,000 crossings, the fee is "fixed" and can never be increased.  JA 123.  But the court said "the value of these types of crossings may amount to *less* than (or equal to) the statutory defaults in certain circumstances," requiring a "crossing-specific" analysis.  JA 123–124.  It did not explain how a permanent easement could ever be worth $0 or less.

The court also dismissed AAR's other claims, alleging takings for a non-public use, due-process violations, and tortious interference.  AAR does not appeal those rulings.

## SUMMARY OF ARGUMENT

I.    The district court erred by dismissing AAR's ICCTA preemption claim.  The court believed the only applicable preemption theories must be litigated on a crossing-by-crossing basis, requiring individual railroads' participation.  That is wrong.

A.    AAR plausibly alleges that § 56-16.3 is preempted because it discriminates against railroads.

1.    Section 56-16.3 imposes—on railroads alone—a stripped-down facsimile of the eminent-domain procedures that apply to all other Virginia landowners.  Section 56-16.3 jettisons most of the protections afforded other landowners, instead allowing broadband providers to take and permanently occupy railroad property whenever they "deem[] it necessary," with minimal or no compensation and limited grounds for relief.  This stark contrast easily establishes discrimination.

2.    The district court never addressed whether § 56-16.3 singles out railroads because it believed ICCTA actually has no separate discrimination prong.  It held that discrimination is relevant only to a supposed "police powers" exception to express ICCTA preemption.  On this view, a state can use its police powers to *regulate rail transportation* so long as it does not discriminate against or unreasonably burden rail carriage.  JA 116–117 & n.10.

That is not the law.  Statutory text, structure, history, and precedent all show that ICCTA preemption has no "police power" exception.  ICCTA's discrimination and unreasonable-burden prongs are *independent* grounds for implied preemption, not part of an unwritten exception.  No court or STB decision has ever upheld a state law that failed one of

23

these tests but not the others. The district court simply misread dicta and shorthand language from inapt cases.

B.1. AAR also plausibly alleges that § 56-16.3 imposes a cumulatively unreasonable burden on rail transportation. Modifying or upgrading rail facilities often requires removing or relocating nearby crossing installations. Yet crossings under the statute are permanent and cannot be relocated or removed. Each crossing under the statute thus creates a fixed point that constrains the railroads' ability to modify or upgrade their tracks or facilities. And the statute's process is too rushed and cursory to ensure that crossings are properly designed and installed.

2. Despite this obvious cumulative burden, the district court rejected an aggregate unreasonable-burden analysis, holding that this prong must apply crossing-by-crossing. But no case says that, and the court overlooked authorities that show the opposite. The court alternatively dismissed AAR's unreasonable-burden allegations as "speculative," but it never addressed those allegations in detail or considered the statute's relevant restrictions.

II. The district court erred by dismissing AAR's Takings Clause claim. As the court recognized, § 56-16.3 causes compensable takings by

24

allowing third parties to physically occupy railroad property. But the court believed the existence and extent of any unjust compensation would need to be litigated crossing-by-crossing, again requiring the participation of individual railroads. As to each category of crossings the statute covers, that is wrong.

A. For crossings in public rights-of-way—as where a public road crosses a rail line—§ 56-16.3 allows no compensation at all. And by definition, zero dollars is not just compensation for a permanent physical occupation of real property. The court never squarely considered this point because it lumped all kinds of crossings together.

B. For crossings of legally abandoned track, the statute prescribes a fixed fee of $1,000. Although AAR alleged that such permanent occupations will not be worth $1,000 or less, the court relied on an amicus brief to draw inferences against AAR's position. That was improper.

C. For all other crossings, § 56-16.3 sets a default fee of $2,000, which the Commission can increase upon a railroad's petition. As to these, the court made three errors. First, it again improperly drew inferences against AAR. Second, it mistakenly assumed that the availability of *after-the-fact* compensation satisfies the Takings Clause.

Third, the court brushed aside the rule that courts will provide prospective equitable relief if the plaintiff would otherwise have to seek compensation through a series of repetitive proceedings, which is the case here. The court deemed this rule inapt because the amount of just compensation will vary. In doing so, the court confused the *extent* of unjust compensation (which will vary) with its *existence* (which will not). The latter is what triggers the availability of prospective equitable relief, obviating the need for any individual railroad's participation.

D.    Although it should not matter once the mistakes above are corrected, the court also erred by treating *Salerno*'s "no set of circumstances" language as a pleading standard. The facial/as-applied distinction goes to the breadth of the remedy a court ultimately provides based on the plaintiff's proof, not what must be pleaded in the complaint. So if AAR plausibly alleges that some subset of the statute's applications are invalid, its claims cannot be dismissed just because other takings might hypothetically be permissible.

## ARGUMENT

### I.    Standard of review.

This Court reviews a Rule 12(b)(1) dismissal *de novo*. *Deal*, 911 F.3d at 187. "When standing is challenged on the pleadings," as here, the

26

Court "accept[s] as true all material allegations of the complaint and construe[s] the complaint in favor of the complaining party." *Id.* (citation omitted).

## II. The district court erred by dismissing AAR's ICCTA preemption claim.

Count I alleges that ICCTA preempts § 56-16.3. Though the district court dismissed this count on associational-standing grounds, its holding turned on the *merits* of AAR's preemption claims. *See* JA 115–118. On that score, the court misunderstood the law. As explained, ICCTA (1) expressly preempts laws that regulate rail transportation and impliedly preempts laws that (2) unreasonably burden or (3) discriminate against rail transportation. *Supra* p. 6. But the district court's reasoning would gut the first prong, dramatically narrow the second, and erase the third altogether.

### A. Section 56-16.3 is preempted because it discriminates against rail carriers.

ICCTA impliedly preempts any state law that "discriminates against rail transportation." *E.g.*, *Providence & Worcester R.R.—Pet. for Decl. Order*, No. FD 35393, 2011 WL 2076463, at *3 (S.T.B. served May 26, 2011); *accord Dille Rd.*, 94 F.4th at 526. To avoid preemption, a law must be "generally applicable, [and] non-discriminatory," *Delaware*, 859

27

F.3d at 18—that is, "it must address state concerns generally, without targeting the railroad industry." *N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007).  Section 56-16.3 flunks this test.

### 1. AAR plausibly alleges that § 56-16.3 discriminates against rail carriers.

"[E]valuating the non-discriminatory prong requires comparing the substance of the [laws] that apply to railroads with those that apply to" others. *N.Y. Susquehanna*, 500 F.3d at 256.  That comparison shows that § 56-16.3 discriminates against railroads.

Section 56-16.3 creates an expedited, ersatz condemnation procedure solely for—as its title says—"[f]iber optic broadband lines crossing railroads."  When a public utility wants to cross any *other* kind of property in Virginia, it must follow the Commonwealth's generally applicable eminent-domain laws.  As explained, those laws provide for a jury trial, require the condemnor to prove legal authority, necessity, and public use, and entitle the landowner to market-based compensation.  *Supra* p. 13.

What's more, if the landowner also has eminent-domain power—like another public utility, including a railroad—the condemnor cannot even *begin* this process until it secures the Corporation Commission's certification that a "public necessity" or "essential public convenience"

requires the taking. Va. Code § 25.1-102. And some broadband providers are not public utilities, so they cannot invoke these procedures at all.

All of that disappears under § 56-16.3: No circuit-court suit, no jury, and no proof of public use or public necessity. A broadband company may take railroad property whenever it "deems it necessary" to do so, *id.* § 56-16.3(B), and a lack of necessity is not grounds for relief. There are no apparent limits on the extent of the property taken. And compensation for some crossings is fixed at an arbitrary amount—or denied altogether. *Id.* § 56-16.3(G), (I), (K). All of this represents power that even the Commonwealth itself does not have as a condemnor.

No more is required to allege discrimination. Section 56-16.3 undisputedly targets rail facilities protected by ICCTA. *Compare* Va. Code § 56-16.3(B), *with* 49 U.S.C. § 10102(9)(A). It saddles railroad property with a weaponized version of eminent domain not applicable to any other property in Virginia. And it does so even though broadband lines need to cross non-rail property too; crossing rail property poses *more* engineering and safety challenges (and thus imposes greater costs) than crossing other kinds of property; and—unlike other property owners—railroads already have established procedures to ensure that crossings can be

completed timely and safely. JA 32 ¶ 61. Virginia thus "fails to require of similarly situated entities" what it requires of railroads. JA 31 ¶ 56.

## 2. The district court mistakenly deemed ICCTA's discrimination prong inapplicable.

The district court never considered whether § 56-16.3 discriminates against railroads compared to other Virginia landowners. Instead, it made three basic legal errors.

1. The court began with the assumption that implied ICCTA preemption requires a "fact-specific inquiry," so a state law can never be impliedly preempted on its face. *See* JA 115–117. But it based that assumption on cases discussing implied preemption under ICCTA's separate unreasonable-burden prong. And while the unreasonable burden prong is sometimes so fact-specific (but not always, *see infra* p. 38), the court's approach makes no sense for a discrimination claim.

ICCTA's discrimination prong impliedly preempts any state law that—on its face or in effect—discriminates against rail transportation. Such a law cannot lawfully apply to railroads. *E.g.*, *Vt. Ry. v. Town of Shelburne*, 287 F. Supp. 3d 493, 505 (D. Vt. 2017) (enjoining enforcement of a discriminatory ordinance against a railroad), *aff'd*, 918 F.3d 82 (2d Cir. 2019). So if such a law *applies only to railroad property*, then it has

30

no valid applications and may be facially enjoined. That describes § 56-16.3. Neither the district court nor the defendants cited any contrary authority.

2.    The court next asserted that the STB has "construe[d] utility easements as not 'discriminatory' against railroads." *See* JA 115–116. That is not correct. To be sure, the STB has said that ICCTA does not expressly preempt one-off easements for "routine, non-conflicting uses" under generally applicable state law. *E.g.*, *E. Ala. Ry.—Pet. for Decl. Order*, No. FD 35583, 2012 WL 758259, at *4 (S.T.B. served Mar. 9, 2012). But AAR's discrimination claim does not involve express preemption, a one-off easement, or a generally applicable law. And the court's cited authorities do not even mention ICCTA's discrimination prong. *See id.*; *cf. Dille Rd.*, 94 F.4th at 526 ("the granting of easements" under "generally applicable" state property law does not implicate the discrimination prong because it does not "target the railroad industry").

3.    Lastly, the court concluded that ICCTA has no separate discrimination prong at all. Discrimination, it said, is relevant only to a purported "police power exception" to express ICCTA preemption. JA 117 n.10. On this view, a "state can exercise its police powers *in a manner*

31

*that regulates rail transportation* unless the regulation discriminates against rail carriers or unreasonably burdens rail carriage." JA 116–117 & n.10 (emphasis added). In other words, a state law that does not directly regulate rail transportation may freely discriminate against or burden railroads. *See id.*

That is badly wrong. State regulation of rail transportation is always and expressly preempted—there is no "police powers exception," which would swallow the rule. The discrimination and unreasonable-burden prongs are *independent* grounds for preemption. No case holds otherwise.

Start with the basic structure of ICCTA preemption. As this Court has recognized, the "express preemption clause focuses specifically on 'regulation.'" *PCS Phosphate*, 559 F.3d at 218 (citation omitted). It gives the STB "exclusive" jurisdiction "over . . . transportation by rail carriers" and expressly preempts state "regulation" in this area. 49 U.S.C. § 10501(b). Thus, on its face, ICCTA "categorically preempts state or local laws and legal processes that would regulate rail transportation directly." *Pet. of Norfolk S. Ry. for Expedited Decl. Order*, No. FD 35949,

2016 WL 750944, at *3 (S.T.B. served Feb. 25, 2016), *aff'd*, *Delaware*, 859 F.3d 16; *see also Edwards*, 983 F.3d at 121.

And this express preemption clause has no carve-out for state "police powers," nor for laws that *do* regulate but *don't* unreasonably burden or discriminate. *E.g.*, *BNSF Ry. v. Hiett*, 22 F.4th 1190, 1192–93 & n.2 (10th Cir. 2022) (ICCTA preempted a law restricting the duration of blocked grade crossings "because it regulate[d] railroad operations"; state "police powers" did not affect the analysis). The district court's view thus reads into the statute an "exception" that does not exist. And that exception would be vast, since "all provisions for the health, comfort and security of [a state's] citizens are . . . an exercise of the police power." *Hennington v. Georgia*, 163 U.S. 299, 314 (1896).

If Congress meant to caveat the STB's exclusive jurisdiction so dramatically, it would have said so. Instead, it did the opposite. The pre-ICCTA statute explicitly preserved the states' "police power" to impose "reasonable intrastate transportation" requirements. 49 U.S.C. § 10501(c) (1994). But in ICCTA, this "disclaimer regarding residual State police powers [was] eliminated as unnecessary, in view of the Federal policy of occupying the entire field." H.R. Rep. No. 104-311, at 95–

33

96.  "Although States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." *Id.* at 96.  So states "cannot use their police powers to [directly or] indirectly regulate matters reserved to the Board." *Soo Line R.R.— Pet. for Decl. Order*, No. FD 35850, 2014 WL 7330097, at *5 (S.T.B. served Dec. 23, 2014).

ICCTA's discrimination and unreasonable-burden prongs are not further carveouts from a non-existent "police power exception."  Rather, implied or "as-applied" preemption, which comprises these prongs, exists "[i]n addition" to ICCTA's express preemptive effect, to protect and further the statute's uniform deregulatory regime.  *See Providence & Worcester*, 2011 WL 2076463, at *3; *Edwards*, 983 F.3d at 121 & n.12; *PCS Phosphate*, 559 F.3d at 220–21.

That is why the STB consistently describes these prongs as alternative, standalone grounds for preemption.  The agency recently reiterated that "state and local governments" can "exercis[e] their police powers so long as the challenged statute or regulation would not [1] unreasonably burden rail transportation, [2] discriminate against rail carriers,

34

or [3] impinge on the Board's jurisdiction." *Town of Smithtown—Pet. for Decl. Order*, No. FD 36575(1), 2024 WL 757039, at *3 (S.T.B. served Feb. 23, 2024). Thus, even "generally applicable laws" that do not squarely regulate rail transportation are preempted if they "are applied in a discriminatory manner, [or] unreasonably restrict the railroad from conducting its operations." *Friends of the Aquifer*, 5 S.T.B. 880 (2001); *CSX Transp.—Pet. for Decl. Order*, No. FD 34662, 2005 WL 1024490, at *4 (S.T.B. served May 3, 2005).

Courts agree. For example, in analyzing whether ICCTA preempted a pedestrian-crossing ordinance, the Sixth Circuit first held that the ordinance did *not* regulate rail transportation. *Adrian Blissfield*, 550 F.3d at 540 & n.6. On the district court's view here, that should have been the end of the matter. But the Sixth Circuit went on to "apply the as-applied-preemption analysis," which mandates that such non-regulatory laws cannot be "unreasonably burdensome" or "discriminate against railroads." *Id.* at 541 (citation omitted). The court held on the merits that the ordinance was not discriminatory. *Id.* at 541–42. Indeed, to AAR's knowledge, no STB or court decision has *ever* upheld a state law that failed one of these tests but not the others.

Cases referring to a "police power exception" are not actually saying anything different. This is just inartful shorthand for the uncontroversial point that ICCTA usually does not preempt generally applicable, even-handed applications of state or local police power. "[W]here cases have made reference to a state's police power . . . the premise for the discussion is inevitably that the state retains its traditional police power in terms of public health and safety *except* where the state's actions regulate rail transportation." *A&W Props., Inc. v. Kansas City S. Ry.*, 200 S.W.3d 342, 347 (Tex. App. 2006) (collecting cases); *accord Am. Rocky Mountaineer v. Grand Cnty.*, 568 F. Supp. 3d 1231, 1239–40 (D. Utah 2021).

Thus, these cases hold merely that ICCTA rarely preempts "[e]lectrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, *non-discriminatory* regulations." *Green Mountain R.R. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (emphasis added); *accord Delaware*, 859 F.3d at 18; *N.Y. Susquehanna*, 500 F.3d at 252–53. These cases do not approve laws that regulate or target railroads or rail property, and none of them reads an "exception for a state's police power" into ICCTA. *A&W Props.*, 200 S.W.3d at 347.

36

In holding otherwise, the district court misread *Norfolk Southern Railway v. City of Alexandria*, 608 F.3d 150 (4th Cir. 2010). *See* JA 116. *Alexandria* held that ICCTA preempted a local ordinance restricting truck traffic at a railroad facility. 608 F.3d at 159. The city had argued that even if the ordinance regulated rail transportation, it was enforceable under the city's "police powers." *Id.* at 160; *see* Opening Br. 27, *Norfolk S. Ry. v. City of Alexandria*, No. 09-1566(L), 2009 WL 2240583 (4th Cir. July 27, 2009) (urging a "police power" "exception to ICCTA preemption"). The railroad did not dispute the city's framing; it simply argued that the ordinance was "not a proper exercise" of the police power. *See* Br. of Appellees 11, 25 n.15, *Norfolk S. Ry. v. City of Alexandria*, No. 09-1566(L), 2009 WL 2627150 (4th Cir. Aug. 27, 2009).

This Court agreed with the railroad, holding that the ordinance "unreasonably burden[ed] rail carriage." 608 F.3d at 160. The Court's brief analysis relied on the cases just discussed—which make clear that "even pedestrian regulations like building codes must be applied in a manner that does not discriminate against railroad operations." *See N.Y. Susquehanna*, 500 F.3d at 253–54 (cited in *Alexandria*, 608 F.3d at 160). To be sure, *Alexandria* said the ordinance "cannot escape ICCTA

37

preemption under the police power exception." 608 F.3d at 160. But the existence of any such exception was neither disputed nor dispositive. At most, the Court *assumed* an exception existed. And questions that are neither "brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

In short: ICCTA preempts state laws that regulate *or* discriminate against *or* unreasonably burden rail transportation. There is no "police power exception." The district court thus erred by refusing to apply ICCTA's discrimination prong to § 56-16.3, which plainly singles out railroads for disfavored treatment.

## B. AAR plausibly alleges that § 56-16.3 is preempted because it unreasonably burdens rail transportation.

ICCTA also impliedly preempts "state or local action" that "would unreasonably interfere with railroad operations or property that is subject to the Board's jurisdiction." *Tenth Ave. Neighbors—Pet. for Decl. Order*, No. FD 36654, 2024 WL 2105647, at *3 (S.T.B. served May 9, 2024); *see PCS Phosphate*, 559 F.3d at 220–21 (collecting cases). The district court wrongly rejected this theory too.

1.   For two reasons, § 56-16.3 will impose a cumulatively unreasonable burden on rail transportation.  That is, the statute's applications, in the aggregate, will unreasonably burden railroads.

First, the statute allows broadband providers to occupy railroad property permanently.  The easements taken have no fixed duration.[3] And—unlike when railroads and utilities negotiate crossing arrangements—the statute makes no provision for relocating broadband crossings, temporarily or permanently, if future railroad needs require it.  A railroad cannot move or alter a statutory crossing to conduct track maintenance, to build new track or other railroad facilities, to accommodate other crossing installations, or even to address a derailment or other emergency.  *See* JA 22, JA 33 ¶¶ 28, 64.  Once a crossing is installed under § 56-16.3, it is apparently there to stay.

Second, the statute mandates a process too rushed and cursory to ensure that crossings are responsibly located, properly engineered, and

---

[3] One broadband provider has argued in the Corporation Commission that the statute contemplates "a license (not an easement)."  *See* Consol. Resp. to Expedited Mots. to Stay 10, *Norfolk S. Ry. v. Cox Commc'ns Hampton Roads LLC*, No. PUR-2024-65 (Va. S.C.C. June 26, 2024), https://shorturl.at/HQTzY; *but see supra* n.2.  But no party has disputed in any forum that the statute allows indefinite occupations.

safely installed.  As noted, a railroad has just 15 days after receiving an application to request additional information or clarification, which the provider has 10 days to supply, Va. Code § 56-16.3(C)(3), and the railroad "shall approve" the application "within 35 days" of receipt, *id.* § 56-16.3(C)(4).  That is not enough time for a railroad to conduct an engineering and design review, schedule flagging or inspector services, or engage with the broadband service provider about necessary changes to the application.  JA 37 ¶ 87.

A railroad can avoid a crossing installation only by petitioning the Corporation Commission for relief based on "undue hardship" or an "imminent likelihood of danger."  Va. Code § 56-16.3(H).  A deficient or incomplete application is not grounds for relief.[4]  Nor is an extremely complex application.  A railroad cannot insist on compliance with its engineering, design, or safety standards.  It does not matter if the railroad might later need to remove or relocate a crossing.  And once a crossing is

---

[4] In one recent proceeding, Norfolk Southern petitioned the Commission for relief because (among other things) the applications at issue "failed to invoke the statute and were substantively deficient."  Order 2–3, *Norfolk S. Ry. v. Cox Commc'ns Hampton Roads LLC*, No. PUR-2024-65 (Va. S.C.C. June 14, 2024), https://shorturl.at/707rG. The agency declined to address that argument, apparently because it is not one of the statutory grounds for relief.  *See id.*

installed, the statute does not require broadband providers to notify or coordinate with railroads for future maintenance, repairs, or relocations.

It is more than plausible that this scheme will unreasonably burden rail transportation, and the court below erred in denying AAR an opportunity to prove its case. Courts and the STB have long recognized that "it can never be stated with certainty at what time any particular part of a right of way may become necessary for railroad uses." *Union Pac. R.R. v. CTA*, 647 F.3d 675, 681 n.7 (7th Cir. 2011) (citation omitted). ICCTA thus preempts any state-law occupations of railroad property "that would interfere with rail use, *present or future.*" *Skidmore*, 1 F.4th at 214 (citation omitted). This rule "ensure[s] that sufficient space is left available for more tracks and other rail facilities to be added, as needed." *City of Creede—Pet. for Decl. Order*, No. FIN 34376, 2005 WL 1024483, at *6 (S.T.B. served May 3, 2005); *see* JA 34 ¶ 71 (describing the continual need to upgrade, expand, or modify the rail network).

And an immovable underground or aerial crossing—let alone dozens or hundreds of them—can interfere with rail use in the same way as a surface occupation. Routine railroad upgrades or construction projects often require removing or relocating crossing installations in the same

area, either temporarily or permanently.  JA 34 ¶ 71.  So if those hundreds of crossings cannot be removed or relocated, then a railroad cannot undertake those projects.  In turn, every crossing installation under the statute will become a fixed point that a railroad must forever work around when expanding or upgrading its facilities.  This is precisely the kind of "death by a thousand cuts" that this Court and the STB have warned against.  *Skidmore*, 1 F.4th at 217.

The statute's perfunctory process simply exacerbates the problem; 35 days is already too short.  And after the 15- and 10-day windows to request and supply additional information, a railroad could have as little as 10 days to evaluate a (hopefully) complete application for potential future conflicts and safety issues—regardless of the crossing's complexity.  *See* Va. Code § 56-16.3(C)(3)–(4).  As AAR alleged, that simply is not enough time.  JA 37 ¶ 87.

Given all this, AAR has alleged that § 56-16.3 will unreasonably burden rail transportation by producing an ever-expanding web of hastily designed, questionably installed, and permanently immovable crossings on railroad property.

2.    The district court, however, deemed a cumulative analysis improper.  Circuit precedent, the court said, mandates "an intensive inquiry into the factual impact of the challenged action," which the court took to require a crossing-by-crossing focus.  *See* JA 117–118.

But the court just assumed "the challenged action" must be a specific crossing; none of its cited cases say that.  *PCS Phosphate* addressed whether voluntary agreements can create an unreasonable burden.  559 F.3d at 221–22.  *Edwards* merely noted the unreasonable-burden analysis without applying it.  983 F.3d at 121 n.12.  So did *Zayo Group, LLC v. Norfolk Southern Railway*, No. 22-1837, 2023 WL 8230499, at *4 (4th Cir. Nov. 28, 2023).  In *City of Alexandria*, by contrast, this Court found an unreasonable burden based on the hauling ordinance's general effects, without discussing its application to any particular truck transit.  *See* 608 F.3d at 160.

Other precedent confirms that a cumulative analysis is proper.  The STB, for example, ruled that tort claims alleging that a railroad's embankment design caused flooding "would unduly burden interstate commerce"—not because the particular claims would adversely affect rail operations, but because allowing *this kind of claim* would "interfer[e] with

43

the railroad's ability to uniformly design, construct, maintain, and repair its railroad line[s]" across the country. *Thomas Tubbs—Pet. for Decl. Order*, No. FD 35792, 2014 WL 5508153, at *5 (S.T.B. served Oct. 31, 2014), *aff'd*, *Tubbs v. STB*, 812 F.3d 1141 (8th Cir. 2015); *see also City of Cayce v. Norfolk S. Ry.*, 706 S.E.2d 6, 11–12 (S.C. 2011) (agreeing with AAR's argument as amicus that the court should consider "the interference with rail transportation operations throughout the national rail network").

Further, as this Court recognized, ICCTA's unreasonable-burden analysis draws from Commerce Clause doctrine. *See PCS Phosphate*, 559 F.3d at 221. And in that context, courts analyze the cumulative burden that would result if similar laws were adopted across the rail network—not just the burden of the specific application at issue. *See S. Pac. Co. v. Arizona*, 325 U.S. 761, 773–74 (1945) (state train-length limit was invalid because of the "confusion and difficulty with which interstate operations would be burdened under the varied system of state regulation"). As the D.C. Circuit put it in analyzing a similar preemption provision: "In assessing the burden, it is appropriate for us to consider *the practical and cumulative impact*" of such laws. *CSX Transp. v. Williams*, 406 F.3d 667, 673 (D.C. Cir. 2005) (per curiam) (emphasis added).

The district court's view also makes no sense. Why would ICCTA—whose purpose is to ensure minimal, uniform rail regulation—preempt a single burdensome application of a particular law, while leaving untouched a law whose *more* burdensome impact is spread more widely? *Cf. Green Mountain*, 404 F.3d at 642–44 (state permitting processes are preempted because "by their nature they unduly interfere with interstate commerce," even though some permits "could be promptly approved without the slightest imposition on rail operations"). The court gave no answer.

Finally, the court said that, even if a cumulative analysis were proper, AAR's allegations were too "speculative" to plead a cumulatively unreasonable burden. JA 118–119. But the court addressed none of the points just explained. *See* JA 119. In particular, it never considered whether the crossings' permanent nature presents problems that temporary, negotiated crossings do not.

The court also emphasized the statute's instruction that a crossing be "located, constructed, and operated so as not to impair, impede, or obstruct, in any material degree, the works and operations of the railroad to be crossed." Va. Code § 56-16.3(D); JA 119. But this language appears

45

unenforceable—this is not one of the narrow grounds for relief from the Commission. Moreover, the statute's abbreviated timeframes preclude any proper evaluation. And when a crossing is proposed, no one can know for certain whether it will "impair, impede, or obstruct" future operations. Yet the statute makes no provision for addressing such conflicts when they later arise.

It is at least plausible that § 56-16.3 will, in the aggregate, unreasonably burden rail transportation.

## III. The district court erred by dismissing AAR's Takings Clause claim.

Count II alleges that § 56-16.3 violates the Takings Clause by denying just compensation for the takings it creates. *See* JA 22–41, JA 43–46, JA 50 ¶¶ 27–110, 126–143, 158. As with Count I, the district court erred by dismissing this claim for lack of standing.

A constitutional taking includes any "government-authorized physical invasion." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150–51 (2021) (citation omitted). A "railroad's right of way . . . is private property" that "cannot be appropriated in whole or part except upon the payment of compensation." *W. Union Tel. Co. v. Pa. R.R.*, 195 U.S. 540, 570 (1904); *see* JA 120 (recognizing that AAR properly alleged *per se* physical

takings); JA 25–26 ¶ 38.  And "a property owner acquires an irrevocable right to just compensation immediately upon a taking."  *DeVillier v. Texas*, 601 U.S. 285, 291 (2024) (citation omitted); *Knick v. Twp. of Scott*, 588 U.S. 180, 189–94 (2019).

Virginia (or the broadband provider) must therefore pay a railroad just compensation for each crossing under § 56-16.3 no later than the crossing's installation.  Otherwise, it violates the Constitution.  And just compensation means the "market value of the property," measured by its "highest and best" use.  *See United States v. 8.929 Acres*, 36 F.4th 240, 253 (4th Cir. 2022) (citations omitted).

So, as the district court recognized, railroads will "suffer unjust compensation" in violation of the Takings Clause if "the value of the crossed property . . . exceed[s] the statutory default fees."  JA 121.  But the court held that AAR cannot make this claim "in all circumstances" because "railroad property comes in all shapes and sizes, subject to differing ownership rights and varying valuations."  JA 122–123.  Thus, the court believed member railroads must litigate this issue on a crossing-by-crossing basis.  JA 122, JA 124.

47

That misunderstands the statutory scheme and AAR's claims. To start, crossings under § 56-15.3 differ significantly from the voluntary crossings that railroads and utilities have long negotiated. Crossings under the statute are permanent, and there is no provision for relocating a crossing, temporarily or permanently, if the need arises. By contrast, negotiated crossing agreements have limited durations and include provisions to prevent this kind of future conflict with rail operations. *See* JA 22, JA 33 ¶¶ 28, 64.

Section 56-15.3 thus takes valuable, perpetual easements from the railroads. And it does so with minimal or no compensation, depending on the type of crossing. The statute prescribes three crossing categories, with varying compensation amounts and procedures: (A) crossings in public rights-of-way ($0, fixed); (B) crossings over legally abandoned track ($1,000, fixed); and (C) all other crossings ($2,000, alterable by the Corporation Commission). As to each category, the statute violates the Takings Clause.

48

### A. AAR plausibly alleges that $0 is not just compensation for a permanent, immovable easement across a rail line in a public right-of-way.

The first category—crossings in public rights-of-way, as where a public road crosses a rail line—is the simplest. Although railroads retain their property interests above and below public crossings, JA 40 ¶ 102, the statute bars *any* compensation for these takings: "[I]n no case shall a broadband service provider be required to pay a license fee for . . . a crossing . . . within a public right-of-way." Va. Code § 56-16.3(K). This bar applies "[n]otwithstanding" the railroad's ability to petition the Corporation Commission for relief. *Id.*

Thus, for this type of crossing, the statute always takes something and pays nothing. And when the government either "den[ies] just compensation in fact" or "refus[es] to provide procedures through which compensation may be sought, it violates the Constitution." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 717 (1999) (plurality).

Even so, the district court rejected AAR's arguments. It lumped together the statute's three different categories of crossings, compensated and uncompensated, and construed the complaint *against* AAR. AAR alleged that, "[g]enerally speaking, neither the market value nor

49

the highest and best use of any crossing easement of railroad property is valued at $2,000 or less today"—let alone $1,000 or $0. *See* JA 40 ¶¶ 105–107. The court took this allegation to "implicitly concede[] that instances will arise where the statutory caps suffice to provide just compensation." JA 123.

For the $0 category of crossings, that conclusion makes no sense. A taking cannot be justly compensated *when there is no compensation.* And "judicial experience and common sense," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), teach that a permanent property interest cannot be worth nothing.

In assuming otherwise, the court pointed to an amicus brief noting that "[g]enerally, railroads do not charge an 'occupancy' fee or 'license' fee for installations within the confines of a public right of way." D. Ct. Dkt. 71 at 6; *see* JA 122, JA 124 n.14. But an amicus brief is not a pleading, and the court could not rely on it to contravene AAR's claims.

Anyway, the amicus brief was not describing all crossing installations, only "simple aerial crossings." *See* D. Ct. Dkt. 71 at 5–7. More importantly, the brief described the kind of voluntarily negotiated crossing that includes the right to move or remove the installation if

necessary. As noted, the permanent occupations under § 56-16.3 will be very different. The fact that some railroads may forego fees for certain temporary occupations subject to negotiated, railroad-protective terms hardly suggests that an *involuntary*, *perpetual, immovable* occupation is categorically valueless.[5] The amicus brief's observation does, however, belie broadband providers' claims that railroads charge "extortionate" crossing fees. *E.g.*, D. Ct. Dkt. 57 at 5 n.9.

In short, the public-right-of-way provision, § 56-16.3(K), facially violates the Takings Clause because it denies any compensation for every taking thereunder. The court's contrary conclusion defies reason.

**B.     AAR plausibly alleges that $1,000 is not just compensation for a permanent, immovable easement across legally abandoned track.**

The second category is crossings of legally abandoned track. *See* Va. Code. § 56-16.3(I). Abandonment is a regulatory concept; it refers to the end of exclusive federal regulatory authority over a rail line. *See* 49 U.S.C. § 10903. Thus, a railroad that holds the land under an abandoned line in fee simple still owns that land and may "convert the real estate to

---

[5] Indeed, CSX charges a $500 fee for crossings within public rights-of-way. *See* Am. Compl. ¶ 84, *CSX Transp. v. Cox Commc'ns Hampton Roads LLC*, No. 3:24-cv-271-DJN (E.D. Va. May 3, 2024) (Dkt. 11).

other uses." *Wis. Cent. Ltd. v. STB*, 112 F.3d 881, 885 (7th Cir. 1997) (citation omitted). And while abandonment can sometimes trigger the loss of a property interest under state law—as when a railroad holds only an easement that reverts to the landowner if rail use ends—that scenario is irrelevant here. If property no longer belongs to a railroad, § 56-16.3 never comes into play.

For crossings of abandoned track, compensation is fixed at $1,000. Again, this is a hard cap—the Commission cannot increase the amount. Va. Code. § 56-16.3(I). And adding insult to injury, the statutory figures are not inflation-adjusted, so at present this fee actually equals just $960 in March 2023 dollars (when the statute was passed).

Again, AAR alleged that "[g]enerally speaking, neither the market value nor the highest and best use of any crossing easement" is $1,000 or less. *See* JA 40 ¶ 106. And again, the court took this allegation as "implicitly conced[ing]" that compensation will sometimes be sufficient "because the value of these types of crossings may amount to *less* than (or equal to) the statutory" amount. JA 123.

That is not a reasonable inference. The complaint refers to "*any* crossing easement" then or previously existing, including contractually

52

negotiated crossings—which are temporary and include relocation provisions. *See* JA 22 ¶ 28, JA 40 ¶¶ 105–107. The complaint did not purport to describe crossings under § 56-16.3, which do not exist yet. But as to those, basic "common sense," *see Iqbal*, 556 U.S. at 664, supports the sensible inference that a perpetual, immovable, and involuntary occupation of real property will always be worth more than $1,000 (or $960 and falling).

The district court was wrong to infer otherwise just because the complaint includes the word "[g]enerally." Rather, the court's duty— which it never acknowledged—was to draw "all reasonable inferences in favor of" AAR. *Carey v. Throwe*, 957 F.3d 468, 474 (4th Cir. 2020). Under the correct standard, AAR has at least "nudged [its] claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), by alleging that the statute always denies just compensation for crossings of abandoned track.

## C. AAR plausibly alleges that the $2,000 default fee for other crossings does not avoid rampant Takings Clause violations, warranting injunctive relief.

The third category includes all other crossings, for which the statute sets a default fee of $2,000. Va. Code § 56-15.3(G). Only for this third

category can a railroad petition the Commission for additional compensation if "the license fee is not adequate." *Id.* § 56-15.3(H).

In addressing this category, the district court made three errors. The first is the same error just discussed: The court construed the complaint against AAR to discern an admission that such crossings are sometimes worth $2,000 or less. *See* JA 40 ¶ 105. That was a mistake, for the reasons already explained.

Second, the court emphasized that "railroads can petition for greater compensation" for these crossings. *See* JA 123–124. But this ignores that, even if the Commission *eventually* awards full market-value compensation, this scheme still creates rampant Takings Clause violations.

Again, the constitutional right to just compensation is triggered "immediately upon a taking." *DeVillier*, 601 U.S. at 291 (citation omitted). Thus, "a violation of the Takings Clause [occurs] as soon as a government takes [private] property for public use without paying for it." *Knick*, 588 U.S. at 189. In turn, the existence of "an available procedure that will result in compensation" does not avoid a constitutional violation if property will be taken in the meantime. *Id.*

54

That is what will happen here.  Section 56-16.3 contemplates that crossings will be completed—meaning takings will occur—before any compensation disputes are resolved.  A crossing "shall be [completed] within 30 days of the approval of the crossing application." Va. Code § 56-16.3(E).  By contrast, the Commission has 90 days to resolve "any petition by the railroad company."  *Id.* § 56-16.3(H).  And if compensation is the railroad's sole objection, "then the issue of compensation may be considered by the Commission after the commencement or completion of the work."  *Id.*  The statute thus lets the Commission defer compensation issues until after the taking—and allows little time to do anything else.

Sure enough, in the first two proceedings under the statute, the Commission determined that "the issue of additional compensation . . . should be considered after the completion of the work."  Order 4, *Norfolk S.*, No. PUR-2024-65 (footnote omitted); *accord* Order 4, *Pet. of CSX Transp.*, No. PUR-2024-66 (Va. S.C.C. June 14, 2024), https://shorturl.at/oazpg.  So not only can the Commission delay deciding compensation until after a taking has already occurred; that is its stated policy.

At best, then, petitioning the Commission for increased compensation is an after-the-fact remedy for Takings Clause violations.  It does not

55

prevent the violations from occurring. And because (as explained above) the default $2,000 fee for these permanent physical occupations will not be sufficient, every crossing in this category will violate the Takings Clause by causing a taking without contemporaneous just compensation. Nor will this be a rare event; according to a defense-side amicus below, there will be at least "hundreds of such crossings." D. Ct. Dkt. 57, at 4.

The district court never addressed this point. It appeared to assume that this after-the-fact compensation process could satisfy the Takings Clause. *See* JA 124 (asserting that the Commission's "process for resolving broadband crossing proposals falls far from presenting no set of circumstances under which railroads would enjoy just compensation"). As just explained, that is wrong.

That brings us to the court's third error: Brushing aside AAR's argument that the statute's deficient compensation regime warrants prospective equitable relief. *See* JA 124 n.14.

Usually, the "availability of subsequent compensation"—while not preventing a Takings Clause violation—means a "equitable remedy [is] not available" against uncompensated or undercompensated takings. *See Knick*, 588 U.S. at 198–200. But this is not a constitutional doctrine; it

is just an application of the well-worn rule that equitable relief is not available if the plaintiff already has an adequate remedy. *See id.*

And a remedy is *not* adequate if the plaintiff must pursue a "multiplicity" of serial proceedings to secure complete relief. *See Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 70 (1935) ("Avoidance of the burden of numerous suits at law between the same or different parties, where the issues are substantially the same, is a recognized ground for equitable relief in the federal courts."); *accord Hale v. Allinson*, 188 U.S. 56, 78 (1903); *United States v. Colvard*, 89 F.2d 312, 313–15 (4th Cir. 1937); 11A Charles A. Wright et al., *Federal Practice and Procedure Civil* § 2944 (3d ed.). To be adequate, a remedy "must be as complete, practical and efficient as that which equity could afford." *PhRMA v. Williams*, 64 F.4th 932, 942 (8th Cir. 2023) (citation omitted), *reh'g denied*, No. 21-1731, 2023 WL 3313605 (May 9, 2023). Having to bring repeated proceedings to address continuing or repetitive wrongs does not qualify. *See id.* at 943.

*PhRMA* shows how this rule applies to a series of repetitive takings. That case addressed a takings challenge to a Minnesota law requiring drug companies to provide free insulin to certain residents. *Id.* at 936.

57

The Eighth Circuit held that "Minnesota's inverse condemnation procedure does not afford insulin manufacturers an adequate remedy." *Id.* at 945. "Forcing a party to engage in repetitive lawsuits indefinitely seems to be precisely the sort of legal inadequacy that would make equitable relief an available and preferred method of redress." *Id.* at 942. "An inverse condemnation action to reimburse a manufacturer for each discrete alleged taking is incapable of compensating the manufacturers for the repetitive, future takings that will occur," while "equitable relief would protect manufacturers from those future harms." *Id.* at 945.

So too here. Because § 56-16.3's $2,000 default fee is too low—and because the statute requires railroads to petition separately for additional compensation for each individual crossing—securing just compensation would require the kind of multiplicity of proceedings that equitable relief is available to prevent. In other words, the Commission's after-the-fact compensation scheme is not an adequate remedy.

Even so, the district court brushed aside *PhRMA* in a footnote. The court said *PhRMA* "dealt with a fixed, thirty-day supply of the *same* medical product . . . whereas here, railroad crossings will necessarily differ."

58

JA 124 n.14. "Determining adequate compensation will thus necessarily constitute a fact-intensive inquiry[.]" *Id.*

That response wrongly conflates the *extent* of unjust compensation with its *existence*. In assessing whether prospective equitable relief is available against § 56-16.3—and thus whether AAR has associational standing for its takings claim—the court's task was not "[d]etermining [the amount of] adequate compensation" for any crossings, JA 124 n.14, but assessing whether railroads will receive just compensation before crossings occur. As already explained, the answer is no.

In turn, it does not matter whether any individual crossings are undercompensated by a dollar, a thousand dollars, or a million dollars. The key fact is that securing full compensation—whatever that amount may be—will require a multiplicity of repetitive petitions for relief. Those repetitive proceedings may involve factual variations, but there will be "a community of interest among them in the questions of law and fact involved in the general controversy." *Hale*, 188 U.S. at 78. No more is required to allow equitable relief.[6]

---

[6] Although the Commission proceedings are not actually judicial actions, JA 154, it was undisputed below that having to bring a multiplicity of these petitions could justify injunctive relief.

The upshot is this:  AAR plausibly alleges that $2,000 is not just compensation for any crossings in this category.  The ability to seek increased after-the-fact compensation does not avoid the constitutional problem.  And the need to do so, in repetitive serial proceedings, triggers the rule allowing prospective equitable relief.  Thus, no individual member's participation is required for AAR to seek equitable relief against the statute's enforcement on Takings Clause grounds.

## D. The district court mistook the facial-challenge analysis for a pleading standard.

For the reasons above, AAR plausibly alleges that § 56-16.3 has no valid applications—it denies just compensation for every crossing in each of the three categories.  Thus, under the district court's own reasoning, dismissal was improper because no individual member's participation is required.  *See* JA 121.

But even if this Court concludes that *some* crossings under § 56-16.3 may be permissible, reversal is still warranted.  The district court mistook *Salerno*'s "no set of circumstances" formulation for a pleading standard that facial challenges must satisfy.  JA 107, JA 121.  But the facial/as-applied distinction "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint."  *Citizens United*

*v. FEC*, 558 U.S. 310, 331 (2010). So whether a challenge is "facial" depends on "the relief that would follow." *See Doe v. Reed*, 561 U.S. 186, 194 (2010). That question aside, "[t]here is no single distinctive category of facial, as opposed to as-applied, litigation." *PETA, Inc. v. N.C. Farm Bureau Fed'n*, 60 F.4th 815, 835 (4th Cir. 2023) (citation omitted), *cert. denied*, 144 S. Ct. 325 (2023).

*Thorpe v. Clarke* illustrates the district court's error. There, prisoners alleged a due-process claim because a prison program did "not provide *many* prisoners with any real opportunity" to leave segregation. 37 F.4th 926, 947 (4th Cir. 2022). Just as the court here seized on the word "[g]enerally" in analyzing AAR's takings claim, *see* JA 123, the *Thorpe* defendants relied on the word "many" to argue that the plaintiffs failed to allege "no set of circumstances" in which the program would be valid. 37 F.4th at 947. This Court rejected that argument, emphasizing that whether the program had any valid applications went to "the breadth of the [proper] remedy." *Id.* (quoting *Citizens United*, 558 U.S. at 331). And the remedy would ultimately depend on "whether the evidence presented justifies broad relief," not on "the Complaint's brief observation" that "many" instead of all prisoners were deprived of their rights. *See id.*

The same is true here. For example, if AAR pleads that the statute violates the Takings Clause by denying any compensation whatsoever for crossings in public rights-of-way, *see supra* § II.A, then Count II cannot be dismissed just because other takings might be permissible. In holding otherwise, the district court wrongly relied on a snippet of dicta from a First Amendment challenge to a criminal law, *see United States v. Hansen*, 599 U.S. 762, 769 (2023), and two out-of-circuit cases that (by its own admission) involved the scope of injunctions, not Rule 12 motions, *see* JA 108. Those cases are inapt.

And a pleading-stage dismissal based on *Salerno* plus the individual-participation prong of associational standing, *see* JA 107, JA 110, is particularly inappropriate because this prong is prudential, not constitutional. *See United Food & Com. Workers v. Brown Grp.*, 517 U.S. 544, 556–57 (1996). It addresses only "administrative convenience and efficiency," not Article III standing. *Id.* So if an associational plaintiff satisfies the first two prongs and alleges that the challenged law is invalid in at least some "subset" of applications, then "concerns about the details of injunctive relief may be addressed" after the merits are adjudicated. *See AAR v. Randolph*, No. 2:23-cv-1154, 2024 WL 664359, at *9 (E.D. Cal.

Feb. 16, 2024) (rejecting arguments to dismiss an ICCTA preemption challenge based on *Salerno* and the individual-participation prong).

Finally, even if *Salerno* controlled, it is less rigid than the district court thought. *Salerno* requires a plaintiff to show "that no set of circumstances exists under which the law would be valid, *or . . . that the law lacks a plainly legitimate sweep.*" *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (emphasis added) (cleaned up). So the existence of *some* lawful applications would not defeat AAR's claims even under *Salerno*.

## CONCLUSION

The Court should reverse the dismissal of Counts I and II in AAR's amended complaint.

## REQUEST FOR ORAL ARGUMENT

Because this case has significant implications for the national rail network and an important federal regulatory regime, AAR believes oral argument would assist the Court in resolving this appeal.

July 22, 2024                          Respectfully submitted,

                                    /s/ *Raymond A. Atkins*
                                   Raymond A. Atkins
                                   Gordon D. Todd
                                   Tobias S. Loss-Eaton
                                   Lucas W.E. Croslow
                                   Stephen S. Laudone
                                   SIDLEY AUSTIN LLP
                                   1501 K Street, N.W.
                                   Washington, D.C. 20005
                                   ratkins@sidley.com
                                   (202) 736-8889

                                   *Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,352 words (as determined by the Microsoft Word word-processing system used to prepare it), excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.     This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

## CERTIFICATE OF SERVICE

I certify that, on July 22, 2024, this brief was filed with the Clerk of the Court through the appellate CM/ECF system, which will send notice to all registered counsel of record.

*/s/ Raymond A. Atkins*
Raymond A. Atkins