No. 24-1399

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

ASSOCIATION OF AMERICAN RAILROADS,

*Plaintiff-Appellant,*

v.

JEHMAL T. HUDSON,

*Defendant-Appellee,*

and

STEPHEN C. BRICH and MICHAEL ROLBAND,

*Defendants.*

―――――――――――

On Appeal from the United States District Court
for the Eastern District of Virginia

―――――――――――

**RESPONSE BRIEF OF APPELLEE**

―――――――――――

JASON S. MIYARES
  *Attorney General*

STEVEN G. POPPS
  *Chief Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

September 25, 2024

ERIKA L. MALEY
  *Solicitor General*

GRAHAM K. BRYANT
RICK W. EBERSTADT
  *Deputy Solicitors General*

*Counsel for Defendant-Appellee*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ............................................................i

TABLE OF AUTHORITIES ................................................... iii

INTRODUCTION ...................................................................1

ISSUES PRESENTED ............................................................3

STATEMENT ........................................................................4

    I.    Factual Background ................................................4

    II.   Procedural History ...............................................10

STANDARD OF REVIEW....................................................14

SUMMARY OF ARGUMENT ...............................................15

    I.    The district court correctly dismissed the Association's takings claim ...........................................................17

        A.    The Association lacks representational standing and cannot state a valid facial Takings Clause challenge...................................................17

            1.    The Association lacks representational standing..........................................17

            2.    The Association did not state a valid facial takings claim.....................................23

        B.    The Association's arguments to the contrary fail .......27

            1.    The Association's arguments that Code § 56-16.3 will categorically provide inadequate compensation misinterpret both the statute and the Takings Clause ...................27

2.      Injunctive relief is unwarranted here ................ 34

II.   The Association's ICCTA claim fails ....................................... 37

A.    The Association failed to state a facial claim of ICCTA preemption ....................................................... 37

1.      ICCTA does not expressly preempt Code § 56-16.3 ....................................................... 38

2.      The Association lacks representational standing for its implied ICCTA preemption claim .................................................................... 42

B.    The Association's facial claim that Code § 56-16.3 unreasonably burdens rail carriage in the aggregate fails .............................................. 45

C.    The Association's discrimination argument also fails ................................................................................ 53

1.      The discrimination test does not apply here because Code § 56-16.3 does not govern rail transportation ....................................................... 54

2.      Code § 56-16.3 is not discriminatory ................. 62

CONCLUSION ..................................................................................... 66

CERTIFICATE OF COMPLIANCE ................................................... 67

CERTIFICATE OF SERVICE ............................................................. 68

## TABLE OF AUTHORITIES

Page(s)

Cases

*25 Residents of Sevier Cnty. v. Arkansas Highway & Transp. Comm'n,*
954 S.W.2d 242 (Ark. 1997) ............................................................. 58

*A&W Props., Inc. v. Kansas City S. Ry.,*
200 S.W.3d 342 (Tex. App. 2006) ...................................................... 57

*Adbul-Mumit v. Alexandria Hyundai, LLC,*
896 F.3d 278 (4th Cir. 2018) ............................................................. 42

*Adrian & Blissfield R.R. Co. v. Village of Blissfield,*
550 F.3d 533 (6th Cir. 2008) ...................................................... *passim*

*American Rocky Mountaineer v. Grand Cnty., Utah,*
568 F. Supp. 3d 1231 (D. Utah 2021) ................................................ 56

*Anderson v. Babb,*
632 F.2d 300 (4th Cir. 1980) ............................................................. 29

*Anglin v. Blue Shield of Virginia,*
693 F.2d 315 (4th Cir. 1982) ............................................................. 14

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................... 15, 31

*Association of Am. R.R. v. South Coast Air Quality Mgmt. Dist.,*
622 F.3d 1094 (9th Cir. 2010) ........................................................... 56

*Barbour v. Garland,*
105 F.4th 579 (4th Cir. 2024) ........................................................... 14

*Bond & Share Co. v. Sec. & Exch. Comm'n,*
303 U.S. 419 (1938) ........................................................................ 24

*Bunn v. Offutt,*
222 S.E.2d 522 (Va. 1976) .......................................................... 49, 50

iii

*Cemetery Ass'n v. Cox*,
    353 F.3d 1319 (11th Cir. 2003) ........................................... 20

*City of Auburn v. U.S. Gov't*,
    154 F.3d 1025 (9th Cir. 1998) ............................................. 60

*City of Lincoln v. Surface Transp. Bd.*,
    414 F.3d 858 (8th Cir. 2005) .............................................. 40

*CSX Transp. Inc. v. Cox Comm. Hampton Roads LLC*,
    3:24-cv-271 (E.D.Va.) ................................................. 13, 14

*CSX Transp., Inc. v. City of Sebree, Kentucky*,
    924 F.3d 276 (6th Cir. 2019) .............................................. 61

*CSX Transp., Inc.—Pet. for Decl. Ord.*, No. FD 35832,
    2016 WL 787578 (STB served Feb. 29, 2016) ................................... 53

*Delaware v. Surface Transp. Bd.*,
    859 F.3d 16 (D.C. Cir. 2017) ......................................... 39, 58

*DiCocco v. Garland*,
    52 F.4th 588 (4th Cir. 2022) .............................................. 14

*Eastern Ala. Ry.—Pet. for Decl. Ord.*, FD 35583,
    2012 WL 758259 (STB served Mar. 9, 2012) .................................. 39

*Edwards v. CSX Transp., Inc.*,
    983 F.3d 112 (4th Cir. 2020) ...................................... *passim*

*Emerson v. Kansas City S. Ry. Co.*,
    503 F.3d 1126 (10th Cir. 2007) ....................................... 43, 56

*Ford v. Destin Pipeline Co., L.L.C.*,
    809 So. 2d 573 (Miss. 2000) .............................................. 32

*Francis v. Giacomelli*,
    588 F.3d 186 (4th Cir. 2009) .............................................. 31

*Franks Inv. Co. LLC v. Union Pac. R. Co.*,
    593 F.3d 404 (5th Cir. 2010) .................................... 43, 44, 60

iv

*Grafton & Upton R.R. Company—Pet. for Decl. Ord.*, FD
　35752, 2014 WL 4658736 (STB served Sept. 19, 2014) ................... 56

*Green Mountain R.R. Corp. v. Vermont*,
　404 F.3d 638 (2d Cir. 2005) ........................................................ 56, 59

*Guild v. Kansas City S. Ry. Co.*,
　541 Fed. Appx. 362 (5th Cir. 2013).................................................... 60

*Hanks v. Wavy Broad., LLC*,
　2012 WL 405065 (E.D. Va. Feb. 8, 2012) .......................................... 14

*Harvey v. Cable News Network, Inc.*,
　48 F.4th 257 (4th Cir. 2022) ............................................................ 15

*Hodel v. Virginia Surface Mining & Reclamation Ass'n Inc.*,
　452 U.S. 264 (1981)........................................................................... 23

*In the Matter of the Petition of City of Spokane Valley*,
　2022 WL 251889 (Wash. U.T.C. Jan. 24, 2022) .......................... 63, 65

*Iowa, Chicago & E.R.R. v. Washington County, IA*,
　384 F.3d 557 (8th Cir. 2004)............................................................. 40

*Island Park, LLC v. CSX Transp.*,
　559 F.3d 96 (2d. Cir. 2009) ........................................................ 42, 60

*Jie Ao & Xin Zhou—Pet. for Decl. Ord.*, FD 35539,
　2012 WL 2047726 (STB served June 6, 2012) ............................ 40, 41

*Kansas City S. Ry. Co. v. Arkansas La. Gas Co.*,
　476 F.2d 829 (10th Cir. 1973)..................................................... 21, 33

*Kaseburg v. Port of Seattle*,
　2015 WL 6449305 (W.D. Wash. Oct. 23, 2015) ................................ 22

*Knick v. Township of Scott*,
　588 U.S. 180 (2019)................................................................. *passim*

*Louisville & Ind. R.R. Co. v. Indiana Gas Co.*,
　829 N.E.2d 7 (Ind. 2005)................................................................... 22

*Marvin Brandt Revocable Trust v. United States*,
    572 U.S. 93 (2014) .................................................................. 22

*Maumee & W. R.R. & RMW Ventures, LLC—Pet. for
    Decl. Ord.*, FD34354,
    2004 WL 395835 (STB served Mar. 3, 2004) ............................... 41, 62

*Moody v. NetChoice, LLC*,
    144 S. Ct. 2383 (2024) .......................................................... 26

*New Orleans & Gulf Coast Ry. Co. v. Barrois*,
    533 F.3d 321 (5th Cir. 2008) ............................................ 40, 48, 50

*New York Susquehanna & W. Ry. Corp. v. Jackson*,
    500 F.3d 238 (3d Cir. 2007) ............................................. 42, 47, 62

*Norfolk S. Ry Co. v. City of Alexandria*,
    608 F.3d 150 (4th Cir. 2010) ..................................... *passim*

*Norfolk S. Ry. Co. v. Dille Rd. Recycling, LLC*,
    94 F.4th 517 (6th Cir. 2024) ............................................ 40, 45, 61

*Norfolk S. Ry. Co. v. Cox Comm. Hampton Roads LLC*,
    3:24-cv-263 (E.D.Va.) ................................................. 13, 14, 30

*Payne v. Taslimi*,
    998 F.3d 648 (4th Cir. 2021) ................................................. 55

*PCS Phosphate Co. v. Norfolk S. Corp.*,
    559 F.3d 212 (4th Cir. 2009) ..................................... *passim*

*Pennell v. San Jose*,
    485 U.S. 1 (1988) ................................................................. 23

*PETA, Inc. v. North Carolina Farm Bureau Federation*,
    60 F.4th 815 (4th Cir. 2023) ................................................. 25

*Pharmaceutical Research & Manufacturers of America v.
    Williams*,
    64 F.4th 932 (8th Cir. 2023) ............................................ 36, 37

*Pittston Co. v. United States*,
   199 F.3d 694 (4th Cir. 1999)..............................................................55

*Preseault v. United States*,
   100 F.3d 1525 (Fed Cir. 1996)....................................................20, 22

*Railroad Comm'n of Tex. v. Pullman Co.*,
   312 U.S. 496 (1941)..........................................................................30

*Rent Stabilization Ass'n of City of New York v. Dinkins*,
   5 F.3d 591 (2d Cir. 1993)..................................................................20

*Sheetz v. County of El Dorado, CA*,
   601 U.S. 267 (2024)..........................................................................18

*Skidmore v. Norfolk S. Ry. Co.*,
   1 F.4th 206 (4th Cir. 2021)...............................................................41

*Students for Fair Admissions, Inc. v. President & Fellows of
   Harv. Coll.*,
   600 U.S. 181 (2023)..........................................................................19

*Thomas Tubbs—Pet. for Dec. Order*, No. FD 35792,
   2014 WL 5508153 (STB served Oct. 31, 2014)............................52, 53

*Thorpe v. Clarke*,
   37 F.4th 926 (4th Cir. 2022)......................................................25, 26

*Union Pac. R.R. v. Chicago Transit Auth.*,
   647 F.3d 675 (7th Cir. 2011)......................................................40, 52

*U.S. ex rel. Tennessee Valley Auth. v. 1.72 Acres of Land in
   Tennessee*,
   821 F.3d 742 (6th Cir. 2016)............................................................32

*United States v. 33.92356 Acres of Land*,
   585 F.3d 1 (1st Cir. 2009)................................................................32

*United States v. 8.929 Acres*,
   36 F.4th 240 (4th Cir. 2022)......................................................31, 33

*United States v. Hansen*,
  599 U.S. 762 (2023) ............................................................ 24, 25, 27

*United States v. Salerno*,
  481 U.S. 739 (1987) ...................................................... *passim*

*United States v. Virginia Elec. & Power Co.*,
  365 U.S. 624 (1961) ................................................................ 32

*Vermont Ry., Inc. v. Town of Shelburne*,
  918 F.3d 82 (2d Cir. 2019) ............................................... 56, 59

*Washington Legal Found v. Legal Found of Wash.*,
  271 F.3d 835 (9th Cir. 2001) ................................................ 19

*Western Union Tel. Co. v. Penn. R.R. Co.*,
  195 U.S. 540 (1904) ............................................................... 20

*Wise v. Circosta*,
  978 F.3d 93 (4th Cir. 2020) ................................................. 30

*Zayo Group, LLC v. Norfolk S. Ry. Co.*,
  No. 22-1837, 2023 WL 8230499 (4th Cir. Nov. 28, 2023) ....... 37, 42, 44

**Statutes**

49 U.S.C. § 10501 .................................................... *passim*

220 Ill. Comp. Stat. 70/15 ............................................. 7

Iowa Code § 476.27 ....................................................... 7

Mich. Comp. Laws Ann. §§ 462.309, 309(6) (West 2002) ....................... 64

Minn. Stat. § 237.045 .................................................... 7

N.D. Cent. Code § 49-09.1-05 ......................................... 7

Neb. Rev. Stat. § 86-164 ................................................. 7

Va. Code § 12.1-39 .......................................................... 9

Va. Code § 12.1-39 ........................................................ 48

Va. Code § 56-16.3 ............................................................ *passim*

**Other Authorities**

12 M.J., License to Real Property, § 2 ................................... 50

Brian Angelo Lee, *Just Undercompensation: The Idiosyncratic Premium in Eminent Domain*, 113 Colum. L. Rev. 593 (2013) ........................................................ 32

FCC, *Getting Broadband Q/A: What Is Broadband?* (Jan. 25, 2024), https://tinyurl.com/yc8dbjct ...................................... 4

Fed. R. Evid. 201 ..................................................................... 14

INCOMPAS, Comments to the FCC, GN Doc. No. 24-119 (June 6, 2024), https://tinyurl.com/5n8tj8kp ...................... 5

Patrick Larsen, *Internet and Railroad Companies Battle over Track Crossings*, VPM (July 6, 2023), https://tinyurl.com/pt5zxkun ............................................. 5

U.S. Const. Amend. V ............................................................. 17

USDA, *A Case for Rural Broadband* 6 (April 2019), https://tinyurl.com/msfcmf5b ............................................. 5

USDA, *Broadband Resources for Rural America* 3 (October 2021), https://tinyurl.com/4a2phn85 .............................. 4, 5

USDA, *e-Connectivity for All Rural Americans is a Modern-Day Necessity*, https://tinyurl.com/3pbr8f7p ...................... 4

Va. Const. art. IX, § 1 .............................................................. 9

Virginia DHCD, *Broadband Availability Map*, https://tinyurl.com/5d2kfdtf ............................................... 5

Virginia State Fact Sheet, Ass'n of Am. R.R.s (Jun. 2023), https://tinyurl.com/29ubtez6 ............................................. 5

## INTRODUCTION

The Association of American Railroads brought a facial pre-enforcement challenge to Virginia Code § 56-16.3, a new statute creating procedures for broadband internet cables to cross railroad tracks. The district court correctly held that the Association has no valid facial claims under the Takings Clause or the Interstate Commerce Commission Termination Act, 49 U.S.C. §§ 10501 et seq. (ICCTA). And any as-applied claims require the participation of individual railroads and factual allegations about specific applications of the statute, both of which are lacking here.

The Virginia legislature enacted Code § 56-16.3 because large areas of rural Virginia lack access to broadband internet and the critical benefits that it provides. To expand broadband access to rural communities, broadband cables must cross railroad property, which cuts long swathes across the Commonwealth. Lengthy delays and exorbitant fees for such crossings were impeding the expansion of broadband access. The statute therefore authorizes the use of the eminent domain power—the same mechanism by which the railroads were built—for broadband expansion. At the same time, the statute creates protections to ensure that railroads will receive adequate compensation and that broadband

1

crossings will not impede railroad operations or create safety risks. The Association does not come close to showing that "no set of circumstances exists under which the Act would be valid," as it must for its facial pre-enforcement challenge. *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Fifth Amendment's Takings Clause provides a guarantee of adequate compensation, not a prohibition on the exercise of eminent domain. Thus, facial claims to enjoin takings are rarely appropriate: "As long as just compensation remedies are available—as they have been for nearly 150 years—injunctive relief will be foreclosed." *Knick v. Township of Scott*, 588 U.S. 180, 205 (2019). For similar reasons, associational standing is rarely appropriate for takings claims. This case is not one of the rare exceptions. Code § 56-16.3 provides compensation for takings and remedies when disputes over the amount of compensation arise. And given the wide variety of railroad property rights and the value of those rights, the adequacy of compensation cannot be decided as a facial matter without the participation of the actual landowners. The district court therefore correctly held that the Association lacks standing for its takings claim.

The Association's claim that ICCTA preempts Code § 56-16.3 presents similar problems. ICCTA's express facial preemption of laws that govern "rail transportation" does not apply here. 49 U.S.C. § 10501(b). Traffic and utilities must routinely cross railroad property. Courts and the Surface Transportation Board (STB) have long held that ICCTA does not facially preempt provisions governing such crossings. The Association's "[f]acial challenge fails," and its "member railroads would necessarily have to participate in the suit to establish the 'individualized proof' that ICCTA preempts the statute in an as-applied context." JA110.

The Association's speculation regarding problems that could hypothetically arise with the application of Code § 56-16.3 can be addressed if and when such problems actually occur. It provides no basis for facially enjoining the operation of the statute. This Court should affirm.

## ISSUES PRESENTED

1.    Does the Association have representational standing to bring a facial challenge for injunctive relief against Code § 56-16.3 under the Fifth Amendment's Takings Clause, when the statute provides for default fees that can be increased when necessary for just compensation?

3

2.      Does the Association have representational standing to enjoin Code § 56-16.3 as facially preempted by ICCTA, when the Association cannot show that all applications of the state statute would conflict with the federal law?

STATEMENT

## I.      Factual Background

Broadband, or "high-speed," internet allows users to access internet services much more quickly than dial-up access. FCC, *Getting Broadband Q/A: What Is Broadband?* (Jan. 25, 2024), https://tinyurl.com/yc8dbjct. Access to broadband internet is critical for a wide range of services and industries, including health care, education, manufacturing, communication, and agriculture. USDA, *e-Connectivity for All Rural Americans is a Modern-Day Necessity*, https://tinyurl.com/3pbr8f7p. Indeed, "reliable broadband internet service is fundamental to modern American life." USDA, *Broadband Resources for Rural America* 3 (October 2021), https://tinyurl.com/4a2phn85. It not only "ensures rural schoolchildren have equal access to comprehensive educational opportunities," but also "allows rural communities to provide the best health outcomes—at a reasonable cost—to their residents." *Id.* Thus, the U.S. Department of Agriculture has explained that "high-speed broadband isn't just an

amenity, it's essential" to "America's economic competitiveness" and "to ensuring all citizens equal access to opportunity." *Id.* But unfortunately, "much of rural America has yet to be connected," including large areas in rural Virginia. USDA, *A Case for Rural Broadband* 6 (April 2019), https://tinyurl.com/msfcmf5b; see also Virginia DHCD, *Broadband Availability Map*, https://tinyurl.com/5d2kfdtf.

In 2023, Virginia's General Assembly sought to promote the Commonwealth's policy of rapidly expanding broadband internet access to rural areas. Such expansion is impossible without crossing railroad property, which cuts long swathes across the Commonwealth, particularly in rural areas. See Virginia State Fact Sheet, Ass'n of Am. R.R.s (Jun. 2023), https://tinyurl.com/29ubtez6 (depicting 3,413 miles of freight railroad tracks across Virginia). But issues often arose with railroads "holding up any approval of crossing . . . and demanding exorbitant fees" for broadband providers to cross tracks, causing serious delays in expanding broadband access to rural Virginians. Patrick Larsen, *Internet and Railroad Companies Battle over Track Crossings*, VPM (July 6, 2023), https://tinyurl.com/pt5zxkun (quoting Virginia Sen. William Stanley); see also INCOMPAS, Comments to the FCC, GN Doc.

No. 24-119 at 27 (June 6, 2024), https://tinyurl.com/5n8tj8kp (describing "prolonged permitting wait times to cross railroads that sometimes last more than two years—causing massive delays," along with "severe price gouging with little to no transparency").

Virginia's General Assembly therefore passed Code § 56-16.3 to improve the process for crossing railroad property to deliver broadband internet access to rural communities. The statute provides for the exercise of the Commonwealth's eminent domain powers for broadband crossings of rail property, and it creates a process to ensure that railroads receive just compensation and that crossings are accomplished safely without interference to rail operations. See generally Va. Code § 56-16.3.

Specifically, when it is "necessary in the construction of [the broadband service provider's] systems to cross the works of a railroad company," the broadband provider must apply to the railroad. Va. Code § 56-16.3(B). The application must include a license fee, the location of the proposed crossing, the proposed date to begin and finish the work, and "engineering design plans [and] construction plans" for the crossing. *Id.* § 56-16.3(C)(1). The proposed crossing must be "located, constructed, and operated so as not to impair, impede, or obstruct, in any material

degree, the works and operations of the railroad to be crossed." *Id.* § 56-16.3(D). The proposed crossing must also be "controlled by customary and approved appliances, methods, and regulations to prevent damage to the works of the railroad and ensure the safety of its passengers." *Ibid.* The railroad shall conduct "flagging operations and other protective measures that it deems appropriate during the actual construction of fiber optic broadband lines." *Id.* § 56-16.3(F). And the broadband provider must bear all expenses for the proposed crossing, including all expenses related to constructing and installing any fiberoptic cables. *Id.* § 56-16.3(F), (G).

Above and beyond paying these expenses, the broadband provider also must pay the railroad company a license fee as compensation for the crossing. Va. Code § 56-16.3(C)(1), (G). The statute sets a default $2,000 license fee for most crossings, allowing the broadband and railroad companies to agree to a different amount. *Id.* § 56-16.3(G).[1] The statute establishes a lower default license fee in two circumstances: first, the

---

[1] This default amount exceeds the compensation provided under similar statutes in several other states. See, *e.g.*, N.D. Cent. Code § 49-09.1-05 ($1,750); Iowa Code § 476.27(2)(b) (same); Minn. Stat. § 237.045 (6)(1) ($1,250); Neb. Rev. Stat. § 86-164 (same); 220 Ill. Comp. Stat. 70/15 ($1,500).

default license fee "shall not exceed $1,000" for crossings of legally abandoned rail track, *id.* § 56-16.3(I), and second, a license fee is not required where the crossing occurs "within a public right-of-way," *id.* § 56-16.3(K). The statute also sets a default of $5,000 for direct expenses paid to the railroad by the provider. *Id.* § 56-16.3(G).

The statute's default fees are just that—defaults. The railroad and broadband provider may negotiate different fees. Va. Code § 56-16.3(G). If the parties cannot agree, then the railroad company may petition an independent state agency, the State Corporation Commission (SCC), to order additional compensation. *Ibid.*

Upon receipt of a broadband company's completed application, the railroad company has 15 days in which to ask for clarifications or additional information; the broadband service provider must provide any requested additional information within 10 days. Va. Code § 56-16.3(C)(3). At that point, if the application complies with the statutory requirements, the railroad company is to approve it within 35 days unless it concludes that: (1) the proposed crossing would cause undue hardship for the railroad company, (2) the crossing would pose an imminent likelihood of danger to public health or safety, or (3) the

proposed license fee would not adequately compensate the railroad for the right to cross railroad land. *Id.* § 56-16.3(H). Under any of these circumstances, the railroad company may petition the SCC for relief. *Ibid.*

The SCC is an independent agency whose commissioners are chosen by the Virginia legislature. Va. Const. art. IX, § 1. The SCC has plenary power to "make any necessary findings of fact and determinations related to the adequacy of compensation, the existence of undue hardship on the railroad company, or the imminent likelihood of danger to public health or safety, as well as any relief to be granted, including any amount to which the railroad company is entitled in excess of the license fee." Va. Code § 56-16.3(H). The SCC may also "employ expert engineers" to "examin[e] the location, plans, specifications, and descriptions of appliances and the methods proposed to be employed" and "consider[] any modifications that the railroad company desires to offer." *Ibid*. If the SCC rejects the railroad's petition, the railroad may appeal by right to the Supreme Court of Virginia. *Id.* § 12.1-39.

## II.    Procedural History

Shortly after the law's enactment, the Association filed this facial pre-enforcement challenge to Code § 56-16.3. Dkt. 1. The Association's operative Amended Complaint sought declaratory and injunctive relief striking down the statute as violating the Fifth Amendment's prohibition on takings without just compensation and preempted by ICCTA, among other claims. JA13-55. Defendants moved to dismiss the Amended Complaint, arguing that the Association lacked representational standing because its claims required the participation of individual members and that the Association's claims failed on the merits, among other points. Dkt. 48.[2]

The district court dismissed the complaint. JA91-169. It explained that "facial challenges typically require 'a showing that no set of circumstances exists under which the [law] would be valid, *i.e.*, that the law is unconstitutional in all of its applications.'" JA109. Further, for an

---

[2] The Amended Complaint named SCC Commissioner Jehmal Hudson, Virginia Department of Transportation Commissioner Stephen Brich, and Department of Environmental Quality Director Michael Rolband. JA13-14. The district court dismissed Commissioner Brich and Director Rolband on sovereign-immunity grounds, and the Association appealed only as to its claims against Commissioner Hudson. ECF 10 at 2.

organization to establish that it has "representational" standing to raise claims on behalf of its members, it must demonstrate that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." JA104. The court held that the Association's Takings Clause and ICCTA claims both fail under these principles.

The Association could not state a claim that the statute was facially unconstitutional because "nothing about the establishment of a presumptive licensing fee (pursuant to a statute that authorizes railroads to seek additional compensation) lies in inherent tension with the Takings Clause's just-compensation requirement." JA123. And it could not establish representational standing because "[w]ith railroad property in Virginia ranging from public rights-of-way to legally abandoned track to heavily used corridors with no existing rights-of-way, determining just compensation would necessarily qualify as a fact-specific inquiry." JA122. Because "determining what, if any, just compensation is due to the owner of the property taken" would depend on specific facts regarding the property taken and its value, the takings claim "necessarily requires the participation of the individual members."

JA122-123. The court therefore dismissed the takings claim for lack of representational standing.

The court also dismissed the ICCTA preemption claim for similar reasons. First, the court held that because Code § 56-16.3 does not manage or govern "rail transportation," it is not expressly preempted, and the Association did not state a claim that "no set of circumstances exists in which Va. Code § 56-16.3 could operate without conflicting with ICCTA." JA110. The court explained that, for example, the statute would apply to mutually-agreed-upon crossings, abandoned crossing projects, and successful appeals to the SCC, none of which would present any preemption issues. JA113-114. Moreover, the Association's arguments that the crossings would create undue burdens "blatantly disregard the statute's express language" requiring that crossings not impair or impede railroad operations. JA115. The court also held that the statute is not facially invalid on the ground that it "discriminates" against railroads; the "'discriminatory' prong" does not apply because Code § 56-16.3 does not regulate rail transportation at all. JA116. Because "only as-applied challenges survive," the Association's "member railroads would necessarily have to participate in the suit to establish the 'individualized

proof' that ICCTA preempts the statute in an as-applied context." JA110. The district court therefore granted the motion to dismiss the claim.

While the motion to dismiss this case was pending, two of the Association's members filed separate challenges to Code § 56-16.3 in both state and federal court. CSX Transportation, Inc. (CSXT) and Norfolk Southern Railway Company (NS) each filed a petition with the SCC challenging proposed crossings on the grounds, among other things, that the statute violated the Takings Clause by providing inadequate compensation and that it was unduly burdensome because it was preempted by ICCTA. *Pet. of CSX Transp. Inc.*, PUR-2024-66, SCC (Ex. A); *Pet. of Norfolk Southern Railway Co.*, PUR-2024-65, SCC (Ex. B). Both parties also filed substantially similar claims in federal court. *CSX Transp. Inc. v. Cox Comm. Hampton Roads LLC*, 3:24-cv-271 (E.D.Va.); *Norfolk S. Ry. Co. v. Cox Comm. Hampton Roads LLC*, 3:24-cv-263 (E.D.Va.). The SCC held that the challenged crossings did not constitute an undue burden, and that issues regarding the adequacy of compensation would be decided after the crossings were completed. SCC

Order of June 14, 2024, PUR-2024-66 (Ex. C); SCC Order of June 14, PUR-2024-65 (Ex. D).[3]

Both railroads appealed to the Supreme Court of Virginia, where the cases are currently pending. Expedited Motion to Stay the June 14 Order, PUR-2024-65 (Ex. E); Notice of Appeal, PUR-2024-66 (Ex. F). The district court held the individual federal suits in abeyance pending the Supreme Court of Virginia's ruling, noting that its construction of the state statute "would likely be dispositive for some (or all) of the claims before this Court." *CSX Transp. Inc. v. Cox Comm. Hampton Roads LLC*, 3:24-cv-271 (E.D.V.A.), Dkt. 29; *Norfolk S. Ry. Co. v. Cox Comm. Hampton Roads LLC*, 3:24-cv-263 (E.D.V.A.), Dkt. 39.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal of a complaint for lack of standing. *DiCocco v. Garland*, 52 F.4th 588, 591 (4th

---

[3] This Court can properly take judicial notice of SCC filings and orders. Fed. R. Evid. 201; *Barbour v. Garland*, 105 F.4th 579, 584 n.1 (4th Cir. 2024) ("In reviewing the Rule 12(b)(6) dismissal of the Complaint in these proceedings, we may properly take judicial notice of the filings in [separate] litigation, as those filings are matters of public record."); *Anglin v. Blue Shield of Virginia*, 693 F.2d 315, 316 n.1 (4th Cir. 1982) (filings with Virginia's State Corporation Commission are "matters of public record"); see also *Hanks v. Wavy Broad., LLC*, 2012 WL 405065, at *4 (E.D. Va. Feb. 8, 2012) (same).

Cir. 2022). "In ruling on a motion to dismiss, the court accepts as true all well-pleaded facts in a complaint and construes them in the light most favorable to the plaintiff." *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 268 (4th Cir. 2022) (cleaned up and internal quotation omitted). The Court, however, does not credit legal conclusions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## SUMMARY OF ARGUMENT

The Association lacks representational standing for as-applied claims and cannot state valid facial claims. The Takings Clause provides a guarantee of adequate compensation, not a right against the exercise of eminent domain. Thus, facial challenges seeking to enjoin takings are rarely proper; instead, landowners may sue for additional compensation, if needed, after the taking occurs. For similar reasons, representational standing is rarely appropriate for takings claims. Such claims require the participation of the landowners and factual allegations regarding the specific property taken and its value.

This case is no exception to these principles. Railroad property interests vary greatly, as does their value. Not every application of the statute will constitute a taking at all, much less an unconstitutional one. The statute provides for compensation, and the Association did not allege

facts demonstrating that the compensation will always be constitutionally inadequate. The license fees set forth in the statute are defaults; railroads and broadband providers can agree to higher amounts, and railroads can petition the SCC for additional compensation when disputes occur. The Association's conclusory allegation that the default license fees will be "generally" inadequate does not support its facial claim for injunctive relief. That allegation also appears to rest on a misinterpretation of the amount of compensation that is constitutionally required.

The district court also correctly dismissed the Association's ICCTA claim. ICCTA does not facially preempt Code § 56-16.3 because the statute does not govern "transportation by rail carriers." 49 U.S.C. § 10501(b)(1). States and localities routinely provide for crossings of railroad lines—including by utilities—and courts and the STB have long held that ICCTA does not facially preempt such provisions. As-applied preemption challenges that Code § 56-16.3 is unduly burdensome cannot be brought in a facial pre-enforcement suit, nor can they proceed without the participation of individual members. The Association's speculation as to the potential cumulative impact of hypothetical future burdens is

especially insufficient given that the statute expressly prohibits crossings from impeding railroad operations. Finally, the Association misconstrues the "discrimination" aspect of the ICCTA preemption test. It is inapplicable here because Code § 56-16.3 does not govern rail transportation at all; in any event, the statute is not discriminatory. This Court should affirm.

## ARGUMENT

## I.    The district court correctly dismissed the Association's takings claim

### A.    The Association lacks representational standing and cannot state a valid facial Takings Clause challenge

#### 1.    The Association lacks representational standing

The district court correctly dismissed the Association's claim that Code § 56-16.3 should be enjoined on its face under the Fifth Amendment's Takings Clause. The Association cannot state a valid representational claim for injunctive relief; rather, individual landowners must participate and can seek damages if particular takings are inadequately compensated.

The Taking Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. The Takings Clause does not prohibit the government from taking

private property; to the contrary, eminent domain is a core sovereign power of States. See *Sheetz v. County of El Dorado, CA*, 601 U.S. 267, 273 (2024). The Takings Clause prohibits the government only from taking private property "without paying for it." *Knick*, 588 U.S. at 185. Thus, no claim under the Takings Clause arises until the "government takes private property without paying for it." *Id.* at 189.

The Association's pre-enforcement challenge seeking to enjoin all takings under Code § 56-16.3 is therefore invalid. Because the Association does not allege that any taking has yet occurred—much less an uncompensated taking—no Takings Clause claim has arisen. *Knick*, 588 U.S. at 189. And because the Takings Clause provides only a right to compensation, "equitable relief is generally unavailable" "[s]o long as the property owner has some way to obtain compensation after the fact." *Knick*, 588 U.S. at 185, 201.

The Association's speculation that the default license fees under Code § 56-16.3 might be inadequate, and that broadband providers and the SCC could then refuse to provide just compensation, see JA37-41 ¶¶ 97-110, cannot support its facial claim. It impermissibly depends upon hypotheticals about undetermined crossings, their value, and the SCC's

potential future actions. Without "identifying any actual railroad property," it is "impossible to know whether the value of that property will exceed the default compensation"—much less whether, if so, the railroad will be unable to obtain just compensation. JA121. The complaint therefore fails to state a facial takings claim.

For similar reasons, the Association cannot establish its representational standing. The Association does not allege that Code § 56-16.3 will injure it personally; it does not claim to own property that could be subject to a taking under the statute. Instead, the Association seeks to bring suit on behalf of its members "who operate in Virginia." JA16 ¶ 9. To establish representational standing, the Association must show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 199 (2023).

The Association cannot meet this standard. "[D]etermining what, if any, just compensation is due to the owner of the property taken" is a fact-specific question that "necessarily requires the participation of the individual members." JA122-123 (quoting *Washington Legal Found v.*

*Legal Found of Wash.*, 271 F.3d 835, 850 (9th Cir. 2001)); see *Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003) (rejecting representational standing in a challenge to a state law that capped the fee for transferring burial rights in a cemetery to $50); *Rent Stabilization Ass'n of City of New York v. Dinkins*, 5 F.3d 591, 596 (2d Cir. 1993) (rejecting representational standing in a Takings Clause claim because "we would have to engage in an *ad hoc* factual inquiry for *each* landlord who alleges that he has suffered a taking.").

What constitutes adequate compensation for any taking under Code § 56-16.3 is a fact-specific question. As the district court explained, "railroad property comes in all shapes and sizes, subject to differing ownership rights and varying valuations across the thousands of miles of track that span the Commonwealth." JA122. Indeed, the Association itself alleged that its members hold "various property interests including . . . fee simple, leaseholds, and easements." JA25; see *Preseault v. United States*, 100 F.3d 1525, 1534-37 (Fed Cir. 1996) (*en banc*) (engaging in detailed inquiry to determine that the railroad held only an easement, despite deed purporting a transfer in fee). Further, railroads often hold property rights only to the surface of the land. See, *e.g.*, *Western Union*

*Tel. Co. v. Penn. R.R. Co.*, 195 U.S. 540, 570 (1904). Along with variations in the types of property interests, the value of those interests will also vary greatly, "[w]ith railroad property in Virginia ranging from public rights-of-way to legally abandoned track to heavily used corridors with no existing rights-of-way." JA122; *cf. Kansas City S. R. Co. v. Arkansas La. Gas Co.*, 476 F.2d 829, 834-35 (10th Cir. 1973) (discussing how values vary depending on the railroad's property interest).

The Association's conclusory allegations that Code § 56-16.3's default fees for crossings "[g]enerally speaking" would be inadequate cannot paper over the fact-specific nature of the question. JA40 ¶¶ 105-107. The Association cannot state a claim that the statute provides inadequate compensation without the participation of individual members alleging specific facts about particular property interests that will be taken and their value, which the complaint wholly lacks. See pp.24-27, *infra*.

Further, some applications of the statute will not involve a taking. Code § 56-16.3 applies every time "a broadband service provider deems it necessary in the construction of its systems to cross the works of a railroad company." Va. Code § 56-16.3(B). But when a railroad's property

21

interest was conveyed by easement, for example, the railroad will typically have no property interest if its tracks are now abandoned. See *Marvin Brandt Revocable Trust v. United States*, 572 U.S. 93, 105 (2014) (rights associated with an easement dissolve upon abandonment); *Preseault*, 100 F.3d at 1548-49 (similar). Likewise, if a railroad holds only surface rights to the land, a subsurface or aerial broadband crossing may not take the railroad's property. See generally *Kaseburg v. Port of Seattle*, 2015 WL 6449305, at *1 (W.D. Wash. Oct. 23, 2015) (differentiating subsurface, surface, and aerial rights that a railroad might possess).

Or if the Commonwealth already holds a public-right-of-way that covers utility cable crossings, adding another utility cable across the right-of-way will not "take" any property interest from the railroad. See, *e.g.*, *Louisville & Ind. R.R. Co. v. Indiana Gas Co.*, 829 N.E.2d 7, 12 (Ind. 2005) (placing a pipeline within a public-right of way "does not place an additional burden on the land," and so "the [r]ailroad is not entitled to compensation"). The Association's own amicus confirms these points, explaining that "[g]enerally, railroads do not charge an 'occupancy' fee or 'license' fee for installations within the confines of a public right of way,"

22

or "where the railroad holds only an easement interest." RailPros Amicus Br. 6, dkt. 71.

Given these variables, "determining just compensation would necessarily qualify as a fact-specific inquiry," requiring the participation of individual landowners making specific factual allegations showing that a property interest was taken and its value. JA122. Indeed, the Supreme Court has warned that it is "particularly important in takings cases to adhere to our admonition that 'the constitutionality of statutes ought not be decided except in an actual factual setting that makes such a decision necessary.'" *Pennell v. San Jose*, 485 U.S. 1, 10 (1988) (quoting *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 294-95 (1981)). The Association therefore lacks representational standing.

### 2. The Association did not state a valid facial takings claim

The Association's allegations are particularly insufficient because it attempts to bring a facial challenge. Facial challenges are highly disfavored because they ask the Court "to enter into a speculative inquiry for the purpose of condemning statutory provisions the effect of which in concrete situations, not yet developed, cannot now be definitely

perceived." *Bond & Share Co. v. Sec. & Exch. Comm'n*, 303 U.S. 419, 443 (1938). Thus, a facial claim fails unless the plaintiff can show that "no set of circumstances exists under which the Act would be valid." *Salerno*, 481 U.S. at 745; see *United States v. Hansen*, 599 U.S. 762, 769 (2023) (same).

The Association fails to meet this standard; it "[c]annot show that Va. Code § 56-16.3 facially violates the Takings Clause's just-compensation requirement in all circumstances." JA123. Again, not all applications of Code § 56-16.3 will constitute a taking at all, much less an inadequately compensated one. See pp.22-23, *supra*. Indeed, the Association's own allegations that "'[g]enerally speaking,' the statutory caps on compensation for the railroads will fall below crossings' market value . . . implicitly concede[] that instances will arise where the statutory caps suffice to provide just compensation to railroads." JA123.[4] "[N]othing about the establishment of a presumptive licensing fee (pursuant to a statute that authorizes railroads to seek additional

---

[4] The Association contends that it alleged that every crossing "will always be worth more than" the statutory defaults. Br. 52-53. But that is not a reasonable inference from the Complaint's repeated use of the phrase "[g]enerally speaking" when discussing the easements' value. JA40 ¶¶ 105-107. In any event, conclusory allegations about the adequacy of compensation cannot suffice to support a facial takings claim. See pp.19-22, *supra*.

compensation) lies in inherent tension with the Takings Clause's just-compensation requirement." JA123. Thus, "railroads would need to demonstrate the crossing-specific nature of inadequate compensation" through an as-applied challenge brought by the landowners. JA124.

Relying on *PETA, Inc. v. North Carolina Farm Bureau Federation*, 60 F.4th 815 (4th Cir. 2023), and *Thorpe v. Clarke*, 37 F.4th 926 (4th Cir. 2022), the Association argues that *Salerno* does not set forth "a pleading standard that facial challenges must satisfy." Br. 60-63. But both cases preceded the Supreme Court's decision in *Hansen*, which reiterated that—outside the First Amendment overbreadth context—plaintiffs bringing a facial challenge "must establish that *no set of circumstances exists* under which the statute would be valid." *Hansen*, 599 U.S. at 769 (quoting *Salerno*, 481 U.S. at 745); see JA108-109. In any event, neither *PETA* nor *Thorpe* is apposite here. *PETA* was a First Amendment overbreadth challenge, which is an exception to the *Salerno* rule. See *PETA*, 60 F.4th at 834; *Hansen*, 599 U.S. at 769. And *Thorpe* was a putative class action involving claims for damages as well as injunctive relief. 37 F.4th at 931. If the plaintiffs could not demonstrate their entitlement to a facial injunction, the court could still award narrower

relief, and so dismissal of the complaint was unwarranted. *Thorpe*, 37 F.4th at 947.

This case is quite different. The Association sought *only* facial relief for the Taking Clause claim at issue here (Count II): a "judgment against all Defendants declaring that Virginia Code Ann. § 56-16.3 violates the Takings Clause . . . and is therefore unconstitutional," and "[p]ermanent injunctive relief restraining all Defendants . . . from prospectively taking any action to give effect to Virginia Code Ann. § 56-16.3." JA54-55. The Association brought no claim seeking damages for any particular taking. JA55. And any such claim would necessarily require the involvement of the individual members whose property was taken. See pp.19-23, *supra*. Thus, the district court correctly dismissed Count II upon finding that the Association could not state a facial claim and lacked representational standing.[5]

---

[5] To the extent the Association argues that the court could have awarded facial relief enjoining specific provisions of Code § 56-16.3, that argument also fails. As discussed further below, the Association cannot establish that any provision of the statute will be unconstitutional in every application and therefore cannot state a facial claim as to any provision. See pp.28-34, *infra*. And the "plainly legitimate sweep" standard that the Association cites is part of the First Amendment overbreadth doctrine. See Br. 63, citing *Moody v. NetChoice, LLC*, 144 S.

Of course, nothing in the district court's ruling bars individual railroads from bringing claims for compensation concerning particular crossings. Indeed, two of the Association's members currently have such claims pending before the SCC. See p.13-14, *supra*. The Association's speculative facial challenge fails to state a claim, and the district court correctly dismissed it.

### B.    The Association's arguments to the contrary fail

The Association's arguments rest on misinterpretations of both Code § 56-16.3 and the Takings Clause. This is not one of the rare cases where a takings claim could be brought for facial injunctive relief.

### 1.    The Association's arguments that Code § 56-16.3 will categorically provide inadequate compensation misinterpret both the statute and the Takings Clause

The Association's arguments that its facial claim is proper because Code § 56-16.3 will categorically take property without providing adequate compensation misunderstand both the statute and the constitutional requirement.

---

Ct. 2383, 2397 (2024). Because the Association brings no First Amendment claim here, it must show that the statute has *no* constitutional applications. *Hansen*, 599 U.S. at 769-70.

First, the Association misinterprets the statute as creating "caps" on compensation. Br. 14-15. The statute creates default fees; the broadband provider and railroad may agree to a different fee. See pp.7-8, *supra*. Or, if they cannot agree, the SCC will review the dispute and decide what compensation is adequate. See pp.8-10, *supra*. Indeed, for most crossings, the Association later concedes that the statute sets a "default fee of $2,000," not a cap. Br. 53-54.

The statute also sets a default fee for crossings over abandoned tracks and public rights-of-way. The statute states that "the license fee shall not exceed $1,000" for crossings over abandoned tracks "notwithstanding the provisions of subsection G." Va. Code § 56-16.3(I). And it states that a broadband provider shall not "be required to pay a license fee" for crossings in public rights-of-way "notwithstanding the provisions of subsection G." Va. Code § 56-16.3(K). Subsection G sets the default fee at $2,000 for other crossings. The ability to petition for additional compensation is not contained in subsection G, but rather in subsection H, which provides that "the railroad company may petition the Commission for relief" when "the license fee is not adequate compensation for the proposed crossing." Thus, Code § 56-16.3(H)

permits a railroad to petition the SCC for additional compensation whenever it contends that the default fee is insufficient.

The Association also misconstrues "within a public right of way" in Code § 56-16.3(K) as applying when railroads "retain their property interests above and below" the right-of-way. Br. 49. If the public right-of-way, for instance, only permits surface pedestrian or motor vehicle crossings, then an aerial or subsurface crossing by a broadband provider would not be "within" the public right-of-way. The typical default $2,000 fee, rather than the default $0 fee, would therefore apply. Conversely, where the Commonwealth already holds a public right-of-way permitting aerial or subsurface cable crossings, then conducting an additional such crossing under Code § 56-16.3(K) would not "take" property from the railroad. See pp.22-23, *supra*. Thus, it is simply not the case that "the statute always takes something and pays nothing." Br. 49. Rather, the statute pays nothing when it takes nothing.

To the extent the statutory provisions are ambiguous, such ambiguities must be resolved to avoid constitutional issues. *Anderson v. Babb*, 632 F.2d 300, 308 (4th Cir. 1980). And here, the Supreme Court of Virginia sits poised to determine how to interpret these provisions under

Virginia law, making a federal construction that could create constitutional issues particularly improper.[6] See pp.14, *supra*.

In addition, the Association fails to show that the default fees will always—or even "generally," JA40—provide constitutionally inadequate compensation. Again, not all applications of the statute will even constitute takings. See pp.22-23, *supra*. If a railroad's property interest was extinguished when the railroad abandoned the property, for instance, then the $1,000 default fee would be a significant *overpayment*. See p.22, *supra*; RailPros Amicus Br. 6, dkt. 71. The Association's argument that the easements are more valuable because they are "permanent" and "immovable" also misconstrues the statute. Br. 48. The

---

[6] The district court's judgment should be affirmed on the ground that representational standing is lacking. Should this Court determine, however, that the proper disposition of the Association's claims turns on questions of the proper interpretation of Code § 56-16.3, it would be appropriate to abstain until the Supreme Court of Virginia interprets the statute to avoid "decid[ing] an issue by making a tentative answer which may be displaced tomorrow by a state adjudication." *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941); see *Wise v. Circosta*, 978 F.3d 93, 101 (4th Cir. 2020) (*en banc*) (cleaned up). As the district court recently held when abstaining from similar claims in cases brought by individual railroads, a dispute over the meaning of Code § 56-16.3 "presents a textbook example of where *Pullman* abstention should apply." *Norfolk Southern*, 3:24-cv-263 Dkt. 39 (Aug. 1, 2024 Order) at 4.

statute provides only a "license" to the broadband provider and allows for the cables to be moved should they interfere with the railroad's operations in the future. See pp.49-50, *infra*. And the Association's allegations that the default fees "[g]enerally speaking" would be inadequate are entirely conclusory and thus need not be taken as true. See, *e.g.*, Br. 52-53 (citing JA40); *Iqbal*, 556 U.S. at 678; *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

The Association also misconstrues the amount of compensation that the Takings Clause requires. It argues that the Takings Clause requires that just compensation here be measured by the property's "highest and best" use, which it suggests equates to what the railroad would have monopolistically charged in the absence of the statute. Br. 47 (quoting *United States v. 8.929 Acres*, 36 F.4th 240, 253 (4th Cir. 2022)); see also JA50.

That argument is mistaken. The Constitution does not require the government to pay whatever the property owner would have charged in the absence of eminent domain. Indeed, such a rule would entirely fail to solve the problem of owners using a monopolistic position to vastly over-charge when a project needed for public use must cross a particular piece

of private property. See, *e.g.*, *Ford v. Destin Pipeline Co., L.L.C.*, 809 So. 2d 573, 577 (Miss. 2000) (declining to hear evidence of a sale value in an eminent domain case when that evidence represented a "business necessity created by the circumstances" of a "holdout seller causing a distorted price" (cleaned up, citation omitted)); Brian Angelo Lee, *Just Undercompensation: The Idiosyncratic Premium in Eminent Domain*, 113 Colum. L. Rev. 593, 620-21 (2013) ("[T]he entire purpose of governments' having [eminent domain] power is to enable the state to overcome holdouts— that is, to avoid having to pay that inflated selling price to the condemnee in exchange for the property.").

Rather, as here, when the government takes only an easement or license, adequate compensation is the amount that the license or easement has *diminished* the fair market value of the land. In other words, adequate compensation is "the difference between the value of the property before and after the Government's easement was imposed." *United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 632 (1961); *U.S. ex rel. Tennessee Valley Auth. v. 1.72 Acres of Land in Tennessee*, 821 F.3d 742, 756 (6th Cir. 2016) (noting that the "before-and-after method has also been widely adopted by other circuits" (citing *United*

32

*States v. 33.92356 Acres of Land*, 585 F.3d 1, 9 (1st Cir. 2009) (collecting cases))). The value of a parcel of railroad property with a two-inch broadband cable buried underground will generally be little different than the value of the property without such a cable. See, *e.g.*, *Kansas City S. Ry. Co.*, 476 F.2d at 832 (observing that a similar procedure to lay gas lines below railroad tracks "did not interfere in any way with the use by the Railway Companies of their respective rights of way").

*8.929 Acres*, 36 F.4th at 253, is inapposite. Br. 47. That case involved a government taking all property rights to the entirety of three parcels of property. *8.929 Acres*, 36 F.4th at 249. That involves a different method of accounting for fair market value than does Code § 56-16.3, which takes only a limited property interest for a cable crossing, allowing the railroad to continue using the property as before. See pp.6-8, *supra*. Moreover, *8.929 Acres* itself explains that a different rule "may be appropriate in cases involving highly unique circumstances," including cases that involve "properties that are seldom, if ever, sold in the open market." 36 F.4th at 254 (citing "public facilities" like "roads or sewers" as examples). Railroads—private properties created through eminent

domain that cross long and continuous overlapping tracts of land throughout the Commonwealth—are exactly such a property.

The Association cannot show that every possible application of Code § 56-16.3, or any of its subsections, would provide constitutionally inadequate compensation. *Salerno*, 481 U.S. at 745. Therefore, its facial challenge seeking to enjoin the statute fails.

### 2.   Injunctive relief is unwarranted here

The Association's argument that its claim for injunctive relief is appropriate because monetary damages would be insufficient also fails. Br. 54-60.

Citing *Knick*, the Association argues that a Takings Clause claim arises "immediately upon a taking." Br. 47, 54-56. But far from supporting its claim, this argument highlights its deficiency. The complaint contains no allegations that any taking has occurred, and *Knick* shows that the Association's claim is premature. *Knick*, 588 U.S. at 185 ("A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it."). And *Knick* further explains that "[a]s long as just compensation remedies are available . . . injunctive relief will be foreclosed." *Id.* at 205. The

Association's argument that injunctive relief is necessary to avoid "rampant Takings Clause violations" therefore fails. Br. 54.

In any event, the Association is mistaken that Code § 56-16.3 only provides for compensation after a taking. The license fee must be paid *before* the crossing. Va. Code § 56-16.3(C)(1) ("The broadband service provider's application shall include . . . the license fee."). The broadband provider and railroad can agree on a higher license fee where needed. *Id.* § 56-16.3(G). Even where disputes arise, if a railroad believes the proffered license fee is inadequate, it may reject the crossing application and petition the SCC. And although the SCC has discretion to consider "the issue of compensation . . . after the commencement or completion of the work," it may alternatively order additional compensation to be paid *before* the crossing. Va. Code § 56-16.3(H). The possibility that the SCC may order additional compensation after a taking is far from establishing that a facial injunction is appropriate. *Knick*, 588 U.S. at 185 (the government need not "provide compensation in advance of a taking . . . : So long as the property owner has some way to obtain compensation after the fact, governments need not fear that courts will enjoin their activities").

The Association's arguments primarily rely on an out-of-circuit case involving entirely different circumstances. Br. 57-59 (discussing *Pharmaceutical Research & Manufacturers of America v. Williams*, 64 F.4th 932, 942 (8th Cir. 2023) (*PhRMA*). But in addition to being nonbinding, that case is also inapposite. In *PhRMA*, the government required insulin manufacturers to provide free insulin to certain state residents, and it imposed monthly fines between $200,000 and $600,000 against manufacturers who did not comply. 64 F.4th at 936, 945. The court held that, "in the specific context of [that] case," inverse condemnation actions could not provide an adequate remedy, because the statute would inevitably require manufacturers to "litigate a multiplicity of suits," perhaps an "indefinite number," the "imminence" of which was "not hypothetical or speculative." *Id.* at 942, 943, 945 (citations omitted). And these repetitive lawsuits, all involving the same product, would be "utterly pointless" because "every dollar paid would then entitle that entity to seek compensation for the same amount." *Id.* at 946.

Thus, *PhRMA* involved a situation in which every application of the statute constituted the same uncompensated taking of the same fungible product. Here, by contrast, railroads' property interests and the value of

those interests will vary immensely, and the statute provides for default compensation that can be increased where necessary. See pp.20-23, 28-31, *supra*. Thus, many applications of the statute will not involve uncompensated takings. The Association also has not demonstrated that the number of lawsuits to seek just compensation here would come close the "indefinite number" in *PhRMA*. 64 F.4th at 943 (citation omitted). And the dispute resolution provisions of Code § 56-16.3 provide an appropriate means of resolving the limited number of disputes that may arise. Prospective relief is foreclosed. *Knick*, 588 U.S. at 185.

## II.   The Association's ICCTA claim fails

### A.   The Association failed to state a facial claim of ICCTA preemption

The district court correctly held that the Association failed to allege a valid claim that ICCTA facially preempts Code § 56-16.3. JA119. It also correctly held that any as-applied ICCTA claims would require a "fact-intensive inquiry" and "necessitate participation by individual member railroads," and therefore the Association lacked representational standing. JA119-120 (quoting *Zayo Group, LLC v. Norfolk S. Ry. Co.*, No. 22-1837, 2023 WL 8230499 at *5 (4th Cir. Nov. 28, 2023) (unpublished)). The Association does not dispute that as-applied preemption issues

necessarily require the participation of member railroads. See Br. 30. Thus, the only question is whether the Association adequately alleged a facial preemption claim. It did not.

### 1. ICCTA does not expressly preempt Code § 56-16.3

ICCTA regulates rail transportation, as well as the construction, operation, and abandonment of rail tracks and facilities. 49 U.S.C. § 10501(b). The law grants the STB "exclusive" jurisdiction over "transportation by rail carriers" and includes an express preemption clause providing that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." *Id.* ICCTA has both "express and implied preemptive effects." *Edwards v. CSX Transp., Inc.*, 983 F.3d 112, 121 (4th Cir. 2020).

ICCTA facially preempts only "regulation of rail transportation"— that is, "those state laws that may reasonably be said to have the effect of 'managing' or 'governing' rail transportation." *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009); see *Adrian & Blissfield R.R. Co. v. Village of Blissfield*, 550 F.3d 533, 540 (6th Cir. 2008) (explaining that state laws are "categorically" or "facially"

preempted only if they "would directly conflict with exclusive federal regulation," such as those that could prevent a railroad from using rail lines). Few state laws fall within the "narrowly tailored" express ICCTA preemption provision. *PCS Phosphate Co.*, 559 F.3d at 218; see *Delaware v. Surface Transp. Bd.*, 859 F.3d 16, 18 (D.C. Cir. 2017) ("[A]ll of the circuits have concluded that [ICCTA preemption] does not encompass everything touching on railroads." (cleaned up)). Consequently, ICCTA does not facially preempt "the continued application of laws having a more remote or incidental effect on rail transportation." *Ibid.*

Laws providing easements for routine crossings of railroad property that do not prevent railroads from using that property for rail transportation do not "regulat[e] . . . rail transportation" and are not facially preempted. 49 U.S.C. § 10501(b). Because railroad property tends to be contiguous strips stretching long distances, both traffic and public utilities frequently need to cross railroad tracks; the use of eminent domain powers to secure nonexclusive easements for such crossings is "routine." See *Eastern Ala. Ry.—Pet. for Decl. Ord.*, FD 35583, 2012 WL 758259, at *4 (STB served Mar. 9, 2012). And "it is often possible for an easement that crosses over, under, or across a [railroad]

right-of-way, to co-exist with active rail operations without necessarily interfering with the latter." *Jie Ao & Xin Zhou—Pet. for Decl. Ord.*, FD 35539, 2012 WL 2047726, at *7 (STB served June 6, 2012).

It is well-established that such "routine, non-conflicting uses of railroad property like non-exclusive easements for at-grade crossings and power lines . . . are generally not preempted unless, for some reason, they impede rail operation or pose undue safety risks." *Norfolk S. Ry. Co. v. Dille Rd. Recycling, LLC*, 94 F.4th 517, 527 (6th Cir. 2024). Thus, "in the context of railroad crossings . . . categorical preemption does not apply," and a fact-specific "'as-applied' analysis should be used." *Union Pac. R.R. v. Chicago Transit Auth.*, 647 F.3d 675, 679-80 (7th Cir. 2011); see *Adrian*, 550 F.3d at 540 ("Routine crossing disputes," "despite the fact that they touch the tracks in some literal sense," "are *not* typically preempted." (quoting *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 333 (5th Cir. 2008)); *City of Lincoln v. Surface Transp. Bd.*, 414 F.3d 858, 863 (8th Cir. 2005) (noting that "it is well established that nonconflicting, nonexclusive easements across railroad property are not preempted if they do not hinder rail operations or pose safety risks"); *Iowa, Chicago & E.R.R. v. Washington County, IA*, 384 F.3d 557, 561-62

40

(8th Cir. 2004) (similar); *Jie Ao*, 2012 WL 2047726, at *7 (similar); *Maumee & W. R.R. & RMW Ventures, LLC—Pet. for Decl. Ord.*, FD34354, 2004 WL 395835, at *2 (STB served Mar. 3, 2004) (similar).

Code § 56-16.3 is not facially preempted because it does not regulate "transportation by rail carriers." 49 U.S.C. § 10501(b)(1). Rather, the crossings can co-exist with rail operations, presenting at most the type of "remote or incidental impact on rail transportation" that "ICCTA does not preempt." *Norfolk S. Ry Co. v. City of Alexandria*, 608 F.3d 150, 158 (4th Cir. 2010); see *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 214-15 (4th Cir. 2021) (holding that ICCTA preempts claims that "would remove the land at issue from the national railway system and deprive [the railroad] of the ability to use the land to support its rail transportation operations"; actions under which "the railroad could still use the land for rail transportation" are typically not preempted).

Perhaps recognizing the weight of these authorities, the Association does not appear to press on appeal any argument that ICCTA expressly preempts Code § 56-16.3. See Br. 3 (describing its challenges as falling under implied preemption). It thus waives any argument that the statute

41

is expressly preempted on its face. *Adbul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 290 (4th Cir. 2018).

> ## 2. The Association lacks representational standing for its implied ICCTA preemption claim

The Association lacks representational standing for its claim that ICCTA impliedly preempts Code § 56-16.3. As the district court correctly held, implied ICCTA preemption claims require a "fact-intensive inquiry" and accordingly "necessitate participation by individual member railroads." JA119-120 (quoting *Zayo*, 2023 WL 8230499 at *4).

ICCTA "*impliedly* preempt[s]" state laws and actions "if, in application, they have the effect of 'unreasonably interfer[ing]' with railroad transportation." *Edwards*, 983 F.3d at 121 (quoting *PCS Phosphate*, 559 F.3d at 220-21). But this implied preemption analysis involves "a fact-intensive inquiry." *Id.* at 121 n.12 (quoting *PCS Phosphate*, 559 F.3d at 221). Thus, cases adjudicating implied ICCTA preemption claims have involved railroads challenging a state law's application to a definite factual scenario, not facial pre-enforcement challenges to entire statutes. See, *e.g.*, *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 103-06 (2d. Cir. 2009) (conducting factual inquiry specific to the crossing at issue for implied preemption analysis); *New York*

*Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3d Cir. 2007) (describing implied preemption analysis for crossing easements as "a fact-intensive inquiry"); *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1133 (10th Cir. 2007) (observing that determining whether ICCTA impliedly preempted application of the challenged state laws required "a factual assessment . . . as to whether requiring the Railroad to remedy the injury claimed by the Landowners would have the effect of preventing or unreasonably interfering with railroad transportation").

Accordingly, the Association cannot bring an implied ICCTA preemption claim under representational standing; "the STB's fact-specific approach of determining whether a law or action has the effect of unreasonably interfering with the railroad" requires a detailed analysis of the particular circumstances. *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 414 n.6 (5th Cir. 2010) (*en banc*). Such a fact-specific analysis necessitates the participation of individual railroads. See, *e.g.*, *Edwards*, 983 F.3d at 121-22 (surveying cases and determining that implied preemption analysis requires examination of specific factual scenarios involving individual instances of railroad activity); JA119-120.

43

"General" allegations that crossings can cause "safety, drainage, and maintenance issues" are insufficient to hold that a state law governing crossings is facially preempted—a successful implied preemption claim "would need to address specific crossings." *Franks*, 593 F.3d at 415. Thus, until a broadband provider "has actually sought . . . an 'easement,' the scope of the ICCTA's preemption cannot be fully measured and any interference with the railroad is speculative." *Zayo*, 2023 WL 8230499 at *5 (holding that a preemption challenge was premature because "[i]t is only in the condemnation proceeding itself that the railroad's property may be affected and thus potentially preempted by the ICCTA.").

The district court correctly held that the Association's attempt to bring a facial implied preemption claim under representational standing "runs headlong into" this Circuit's "requirement of a fact-intensive inquiry" before determining whether ICCTA impliedly preempts a state law. JA118. The Association cannot establish representational standing to assert "a facial, pre-enforcement challenge on . . . speculative grounds." JA119-120.

44

B.  **The Association's facial claim that Code § 56-16.3 unreasonably burdens rail carriage in the aggregate fails**

The Association argues that ICCTA impliedly preempts Code § 56-16.3 on its face because "the statute's applications, in the aggregate," "will impose a cumulatively unreasonable burden on rail transportation." Br. 39. This facial claim fails because it is overly speculative and cannot show that the law will unreasonably interfere with rail transportation in all applications, particularly given the statute's plain language protecting railroads from such unreasonable interference. JA118; *Salerno*, 481 U.S. at 745. And whether particular applications of the law may unreasonably interfere with rail transportation is a fact-specific inquiry that cannot be brought under representational standing because it "necessitate[s] participation by individual member railroads." JA120.

Again, ICCTA impliedly preempt laws that "have the effect of 'unreasonably interfer[ing]' with railroad transportation." *Edwards*, 983 F.3d at 121 (quoting *PCS Phosphate*, 559 F.3d at 220-21). As this Court and others "have recognized, the determination of whether the action constitutes an 'unreasonable interference' requires a factual assessment." *PCS Phosphate*, 559 F.3d at 221; see also *Dille Rd.*

45

*Recycling*, 94 F.4th at 526-27 ("However you slice it, the question is one of reasonableness based on the specific facts of the case."); see generally pp. 42-45, *supra*. Such claims necessarily cannot be resolved in facial challenges brought on a representational basis. Indeed, the Association cites no case or STB decision that *facially* strikes down a statute as an unreasonable interference under ICCTA; unreasonable interference must be assessed in an as-applied challenge. See generally Br. 38-46.

In any event, Code § 56-16.3 does not unreasonably interfere with railroads on its face. The Association's "facial, pre-enforcement challenge on the speculative grounds that the statute will unreasonably burden rail transportation in the aggregate, ignor[es] that the statute itself provides explicit protections *against* undue burdens and safety risks while giving railroads a pathway to block broadband crossings via the SCC petition process." JA114, JA118-119. Given the protections for railroads built into the statute, the Association cannot "establish that no set of circumstances exists under which" Code § 56-16.3 "would be valid." *Salerno*, 481 U.S. at 745.

Indeed, the Virginia legislature carefully designed the statute to avoid interference with rail operations and to prevent safety risks. See

46

Va. Code § 56-16.3(D). Any proposed crossing must be "located, constructed, and operated so as not to impair, impede, or obstruct, in any material degree, the works and operations of the railroad to be crossed." *Ibid.* The crossing also must "prevent damage to the works of the railroad and ensure the safety of its passengers." *Ibid.* This imposes an ongoing duty that prohibits the unduly burdensome or dangerous crossings that the Association hypothesizes. See JA38, JA118-119. The statute thus does not impede a railroad's use of its tracks or ability to carry freight, or otherwise burden "rail carriage." *City of Alexandria*, 608 F.3d at 160. It is certainly not "so draconian" as to "prevent[] the railroad from carrying out its business." *Jackson*, 500 F.3d at 254.

The statute also ensures that a neutral adjudicator will resolve any disputes about railroad operations or safety: if the railroad believes that a "proposed crossing will cause undue hardship on the railroad company" or a "public health or safety" risk, then the railroad may petition the SCC for relief. Va. Code § 56.1-16.3(H). The Association concedes that if the railroad "petitions the Corporation Commission," then the railroad's filing "prevents the crossing from going forward during the Commission proceedings." Br. 15-16. The SCC, assisted by "expert engineers," will

47

"reject[], approv[e], or modify[]" the planned crossing if the railroad's concerns are well-founded. Va. Code § 56-16.3(H). And if the railroad disagrees with the SCC's decision, it can appeal the question to the Supreme Court of Virginia. *Id.* § 12.1-39; see JA119. Indeed, some of the Association's members have already done so. See pp.13-14, *supra.*

Code § 56-16.3 does not "unreasonably burden rail carriage." *City of Alexandria*, 608 F.3d at 160. And given the statute's extensive protections for railroads, the Association cannot show that there is "*no* set of circumstances*" under which the statute is consistent with ICCTA. *Salerno*, 481 U.S. at 745. The Association has no valid facial ICCTA claim and lacks representational standing to assert an as-applied claim. JA120.

The Association's arguments to the contrary fail. It first argues that broadband crossings under Code § 56-16.3 will be unreasonably burdensome because they create "permanent" fixtures that could impede railroads in the future when they "conduct track maintenance," "build new track," or even "address a derailment." Br. 39. But this speculation about hypothetical future problems cannot demonstrate "that *all* crossings unreasonably interfere with railroad operations," *Barrois*, 533 F.3d at 335; see *Salerno*, 481 U.S. at 745.

In any event, the Association again misreads Code § 56-16.3. The statute requires broadband providers to "operate[]" the crossing "so as not to impair, impede, or obstruct, in any material degree, the works and operations of the railroad," and to "control[]" the crossing "to prevent damage to the works of the railroad and ensure the safety of its passengers." Va. Code § 56-16.3(D). These provisions impose ongoing duties on broadband providers that resolve the Association's hypothetical concerns. For instance, if the location of the broadband cable became an obstruction to railroad operations after the crossing was constructed, such as by preventing construction of "new track or other railroad facilities," Br. 39, Code § 56-16.3(D) would obligate the broadband provider to move the broadband cable as necessary. See Code § 56-16.3(D).

Nothing in the statute provides that crossings are "permanent" and "immovable." Br. 4. To the contrary, the statute requires broadband providers to pay a "license fee." Va. Code § 56-16.3(A). A "license" is "a right, given by some competent authority to do an act which without such authority would be illegal." *Bunn v. Offutt*, 222 S.E.2d 522, 525 (Va.

49

1976) (quoting 12 M.J., License to Real Property, § 2, p. 148). A license is not a "grant which creates any interest or estate in [the] land." *Ibid.*

The Association also contends that Code § 56-16.3 is unreasonably burdensome because it does not provide adequate time to review applications. Br. 40, 42. Again, that argument cannot support the Association's facial challenge because the Association cannot show that the default periods will be too short for "*all* crossings." *Barrois*, 533 F.3d at 335. To the contrary, the Association's own amicus explained that railroads are typically able to approve crossings within that default period for straightforward crossings. RailPros Amicus Br. 5-6, dkt. 71. If particular crossings require a longer time period, the railroad and broadband provider may "mutually agree[] upon" a "later date." Va. Code § 56-16.3(E). Or, if they are unable to agree, the railroad may petition the SCC on the ground that the proposed timing for the crossing will create an "undue hardship" or safety risk. *Id.* § 56-16.3(H).

The Association's argument that railroads will have insufficient time also rests on its misperception that Code § 56-16.3 could require it to approve an incomplete application. The statute requires every application to include specified information. Va. Code § 56-16.3(C)(1); see

p.7, *supra*. The railroad "may request additional information or clarification from the broadband service provider within 15 days," and the "broadband service provider shall respond within 10 days." *Id.* § 56-16.3(C)(3). The railroad need only approve an application within the 35-day period set forth in Code § 56-16.3(C)(4) if the provider has complied with its statutory obligations to provide the required information under Code §§ 56-16.3(C)(1) and (C)(3). Those requirements upon broadband providers, coupled with the railroad's option to petition the SCC for review by additional experts, undermine the Association's speculative concerns about the 35-day period. Br. 40. The statute does not unreasonably burden rail carriage, much less do so in all applications. *Salerno*, 481 U.S. at 745.

The Association's speculation that the statute could be unreasonably burdensome "in the aggregate" does not support its facial claim. Br. 43-46. As the district court explained, the Association cannot bring a "facial, pre-enforcement challenge on the speculative grounds that the statute will unreasonably burden rail transportation in the aggregate," particularly given "that the statute itself provides explicit protections *against* undue burdens and safety risks while giving

railroads a pathway to block broadband crossings via the SCC petition process." JA119. Recognizing "a facial challenge on the grounds that the statute could 'unreasonably burden' railroads in the aggregate would vitiate the exacting standard of the *Salerno* 'no set of circumstances' test." JA119.

The Association's "aggregate burden" argument is also contrary to ICCTA's implied preemption analysis, which involves a "fact-intensive inquiry," *Edwards*, 983 F.3d at 121 n.12, that "necessarily varies with the facts of the case and the specific property," *Union Pac. R.R.*, 647 F.3d at 679-80; see pp.42-45, *supra*. The Association argues that *City of Alexandria* did not apply the ordinance to any particular track but instead discussed the ordinance's general effects. Br. 43. But that case involved ICCTA's categorical express preemption test; the Association brings no express preemption claim here. See *City of Alexandria*, 608 F.3d at 156, 157; see also p.42, *supra*.

The Association also points to *Thomas Tubbs—Pet. for Dec. Order*, No. FD 35792, 2014 WL 5508153, at *5 (STB served Oct. 31, 2014). Br. 43-44. But *Tubbs* did not hold that ICCTA can facially preempt every application of a state law based on speculation as to its aggregate burden.

2014 WL 5508153, at *1-4. To the contrary, the STB held that ICCTA preempted particular "state tort claims" against an individual railroad "based on alleged harms stemming directly from the actions of a rail carrier . . . in designing, constructing, and maintaining an active rail line." *Id.* at *4. Where, "unlike in *Tubbs*, the facts have not been fully developed," the proper course is to wait until the "facts have been developed" before determining the question of "as applied preemption." *CSX Transp., Inc.—Pet. for Decl. Ord.*, No. FD 35832, 2016 WL 787578, at *5 (STB served Feb. 29, 2016).

The district court correctly rejected the Association's facial claim of a cumulative unreasonable burden. This Court should affirm.

## C. The Association's discrimination argument also fails

Finally, the Association's argument that ICCTA preempts Code § 56-16.3 because the statute discriminates against rail carriers fails for two reasons. Br. 28-38. First, ICCTA's discrimination test is part of an exception to express preemption, not a free-standing basis for implied preemption. It therefore does not apply here. Second, Code § 56-16.3 does not discriminate against rail carriers.

53

### 1. The discrimination test does not apply here because Code § 56-16.3 does not govern rail transportation

First, ICCTA's discrimination test does not apply here. As this Court has explained, the issue of discrimination is part of the "police power exception" to express ICCTA preemption. *City of Alexandria*, 608 F.3d at 160. "[S]tate and local governments may act, pursuant to their general police powers, to regulate certain areas affecting railroad activity"; such an action is "preempted *unless* it can be classified as a permissible exercise of the City's police powers." *City of Alexandria*, 608 F.3d at 158. When the State exercises its police powers in a way that "affect[s] railroad activity," then the law falls within the "police power exception" to "ICCTA preemption" unless it unreasonably burdens rail carriage or "discriminate[s] against rail carriers." *Id.* at 160.

The Association argues that no police power exception exists and that "discrimination" is instead a freestanding basis for holding that ICCTA impliedly preempts a state law. Br. 36, 38. This argument is contrary to this Court's precedent recognizing "the police power exception" to "ICCTA preemption." *City of Alexandria*, 608 F.3d at 160.

The Association dismisses the discussion in *City of Alexandria* as sloppy dicta. Br. 37-38.

But the discussion was "integral to the analytical foundations" of this Court's analysis. *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999). The Court "first" analyzed whether the City's ordinance "regulated 'transportation by a rail carrier,' as defined by the ICCTA." *City of Alexandria*, 608 F.3d at 159. Then, having determined that the ordinance did regulate rail transportation, the Court next considered whether the ordinance nevertheless "escape[d] ICCTA preemption under the police power exception." *City of Alexandria*, 608 F.3d at 160. Under the Association's view, the entire second part of this Court's analysis was superfluous—it should have stopped after holding that the ordinance regulated rail transportation. That this Court ultimately struck down the ordinance on the ground that it "unreasonably burden[ed] rail carriage" and was "thus preempted, notwithstanding the police powers," *id.* at 160, demonstrates that the police-powers-exception analysis was "necessary to the outcome" of that case," *Payne v. Taslimi*, 998 F.3d 648, 654-55 (4th Cir. 2021).

Numerous other cases have likewise recognized "the police powers exception to preemption by the ICCTA." *Vermont Ry., Inc. v. Town of Shelburne*, 918 F.3d 82, 87 (2d Cir. 2019); see also, *e.g.*, *Association of Am. R.R. v. South Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1097, 1098 (9th Cir. 2010) (observing that "ICCTA does not preempt" "generally applicable regulations . . . that do[] not unreasonably burden railroad activity," but holding exercise of police powers at issue preempted because it "ha[d] the effect of managing or governing rail transportation"); *Emerson*, 503 F.3d at 1132-34 (although "maintenance is an integral part of running a railroad, we do not agree that any state or local regulation of such maintenance . . . is necessarily preempted" under police powers exception); *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 643 (2d Cir. 2005) (concluding that "states and towns may exercise traditional police powers over the development of railroad property" through "generally applicable, non-discriminatory regulations"); *American Rocky Mountaineer v. Grand Cnty., Utah*, 568 F. Supp. 3d 1231, 1239 (D. Utah 2021) (discussing the "police power exception to preemption"); *Grafton & Upton R.R. Company—Pet. for Decl. Ord.*, FD 35752, 2014 WL 4658736, at *7 (STB served Sept. 19,

56

2014) (STB recognizing "the local police power exception to federal preemption" under ICCTA).

The Association's attempt to distinguish cases recognizing the police power exception to ICCTA preemption is unavailing. See Br. 36-38. The Association primarily relies on one state intermediate appellate court's description of its own reading of a handful of state and district court cases. Br. 36 (citing *A&W Props., Inc. v. Kansas City S. Ry.*, 200 S.W.3d 342, 347 (Tex. App. 2006)). It fails to engage with the Second Circuit's recognition of the exception in *Vermont Railway*. At bottom, the Association asks this Court to accept that none of the courts that have applied the police powers exception—including this one—meant what they said.

Further, the Association fails to cite a single case holding that discrimination is a "standalone" basis to conclude that ICCTA impliedly preempts a state law on its face. Br. 34. No case the Association cites— or of which Defendant is aware—holds that a law does *not* regulate rail transportation but is nevertheless facially invalid because it discriminates against rail carriers. Br. 34-35. Although *Adrian* analyzed whether a crossing ordinance was discriminatory, it refused to apply

"categorical[]" or "facial[]" preemption and upheld the challenged ordinance as *not* discriminatory under an as-applied analysis. 550 F.3d at 542.

The Association's concern that the district court "read into" ICCTA a "vast" "carve-out" granting States free rein to regulate railroads is unfounded. Br. 33. The police power exception is part of the test for determining whether a provision "manage[s]" or "govern[s]" rail transportation. See, *e.g.*, *25 Residents of Sevier Cnty. v. Arkansas Highway & Transp. Comm'n*, 954 S.W.2d 242, 244 (Ark. 1997) (holding ICCTA preempted state law regulating closure of railroad agency stations because "station agencies are related 'facilities' within" ICCTA's language governing "'transportation by rail carriers' and the discontinuation of their carriers' related facilities"). The police powers exception does not apply where a law expressly manages or governs rail transportation on its face. See, *e.g.*, *Delaware*, 859 F.3d at 19 (law prohibiting trains from idling at night categorically preempted).

But some laws enacted under "general police powers" may "regulate certain areas affecting railroad activity," including, "for example, local electric, building, fire, and plumbing codes," *City of Alexandria*, 608 F.3d

58

at 158, or "direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements," *Green Mtn. R.R. Corp.*, 404 F.3d at 643. Although these exercises of police power do not directly "'manag[e]' or govern[] rail transportation," ICCTA nevertheless expressly preempts them if they do not fall within the police powers exception. *City of Alexandria*, 608 F.3d at 158.

The ordinance in *City of Alexandria* was just such a law. It did not directly manage or govern rail transportation because it was a safety regulation that generally "govern[ed] the transportation within the City of 'bulk materials.'" *Id.* at 155. But despite "commendably seek[ing] to enhance public safety," the ordinance was preempted because it had the effect of regulating rail transportation under the police powers test—it "unreasonably burden[ed] rail carriage" by giving the City "the power to halt or significantly diminish" rail operations. *Id.* at 160; see also, *e.g.*, *Vermont Ry.*, 918 F.3d at 84, 88 (holding enforcement of ordinance governing storage and handling of hazardous substances including road salt against railroad transloading facility preempted under ICCTA because it did not satisfy the "police powers exception to preemption");

59

*City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1027, 1031 (9th Cir. 1998), as amended (Oct. 20, 1998) (holding "state and local environmental review laws" preempted by ICCTA despite being exercises of "traditional state police power" because they gave "local authorities . . . the ability to . . . "prevent[] [the railroad] from constructing, acquiring, operating, abandoning, or discontinuing a line").

Finally, other state and local laws might conceivably affect railroads but do not manage or govern rail transport at all; for those laws, the police powers exception is inapplicable, and the only question is whether ICCTA impliedly preempts the law on an as-applied basis. See *Island Park*, 559 F.3d at 105, 110 (holding that "the state action in this case does not interfere with railroad operations" and was therefore "not pre-empted under ICCTA"); *Franks*, 593 F.3d at 408, 415 ("We conclude, though, that the presumption [against preemption of police powers] need not be invoked in this case. Even without analyzing how that presumption might limit the preemptive effect of this enactment, we decide that preemption does not apply."); *Guild v. Kansas City S. Ry. Co.*, 541 Fed. Appx. 362, 367-68 (5th Cir. 2013) (holding that ICCTA did not expressly preempt negligence claim for railroad's damage to property

because state negligence law did not "manage or govern rail transportation").

In this case, there is no need to consider discrimination because Code § 56-16.3 does not regulate transportation by a rail carrier at all. See pp.39-42, *supra*. Unlike the ordinance at issue in *City of Alexandria*, which this Court held "regulated 'transportation by a rail carrier'" because it directly restricted the railroad's transloading operations, 608 F.3d at 159, Code § 56-16.3 does not constrain a railroad's operations or otherwise regulate transportation. Rather, it authorizes a narrow exercise of eminent domain to take a non-exclusive easement—precisely the kind of "routine, non-conflicting uses of railroad property like non-exclusive easements for at-grade crossings and power lines . . . [that] are generally not preempted unless, for some reason, they impede rail operation or pose undue safety risks."[7] *Dille Rd. Recycling*, 94 F.4th at

---

[7] Whether a law has the effect of impeding rail operations or posing a safety risk as applied is the test for implied preemption. See, *e.g.*, *Edwards*, 983 F.3d at 121 ("[S]tate laws and actions may be impliedly preempted if, in application, they have the effect of 'unreasonably interfer[ing]' with railroad transportation." (quoting *PCS Phosphate*, 559 F.3d at 220-21)); *CSX Transp., Inc. v. City of Sebree, Kentucky*, 924 F.3d 276, 283 (6th Cir. 2019). That analysis differs from the "burden" prong of the police powers exception because it applies to all provisions, regardless

527; *Maumee*, 2004 WL 395835, at *2; see pp.39-41, *supra*. And as discussed, the statute contains ample protections to prevent interference with rail operation or safety risks. See pp.47-48, *supra*. Significantly, the Association "'cites no cases supporting the application of the police power exception test—including the discrimination prong—to an exercise of eminent domain' to effectuate easements that allow railroads continued access to their property." JA117 n.10. The district court therefore correctly held that the Association's discrimination argument is misplaced. JA118.

### 2.    Code § 56-16.3 is not discriminatory

In any event, Code § 56-16.3 does not discriminate against railroads. "To pass the non-discrimination prong, a state regulation 'must address state concerns generally, without targeting the railroad industry.'" *Adrian*, 550 F.3d at 541 (quoting *Jackson*, 500 F.3d at 254). The fact that a state law "applies specifically to railroads does not make it discriminatory[;]" rather, a railroad must demonstrate that the law treats it in a discriminatory fashion compared to "similarly situated

---

of whether they govern rail transportation or are exercises of police powers.

entities." *Adrian*, 550 F.3d at 541-42. Alternatively, the railroad must produce "evidence that local bodies could target railroads with the statute at issue in order to cause indefinite delays for railroad operations." *Id.* at 542.

The Association's allegations fail to make these showings. As an initial matter, the Association has not demonstrated that Code § 56-16.3 treats railroads differently than "similarly situated entities," *Adrian*, 550 F.3d at 541-42, because it failed to allege any other similarly situated entities in the first place. The Association contends that the statute is discriminatory because it treats railroad property differently than it treats other property. Br. 28-30. But "the fact that [a law] applies specifically to railroads does not make it discriminatory." *Adrian*, 550 F.3d at 541; *In the Matter of the Petition of City of Spokane Valley*, 2022 WL 251889, at *5 (Wash. U.T.C. Jan. 24, 2022) (holding that a "statute's exclusive application to railroads" does not "make it discriminatory"). Rather, a law is discriminatory only if it treats *similarly situated* entities differently. *Adrian*, 550 F.3d at 541-42.

Railroads, by their nature, are unlike most other property owners. As this case illustrates, railroads occupy a unique position with respect

63

to broadband development into rural areas: railroad land creates lengthy, interconnected, and unsurpassable tracts across Virginia that would make broadband access impossible without multiple crossings. See pp.5-6, *supra*. Because the Association has not identified any similarly situated entity, Br. 28-30, its discrimination challenge fails.

*Adrian* held that a law that exclusively governed railroads was not discriminatory under ICCTA. There, the law required a "railroad"—and only a railroad—to "construct and thereafter maintain . . . the streets or sidewalks lying between the rails," and provided that if the railroad failed to do so, "the local unit of government may cause the sidewalk to be constructed at the expense of the railroad." Mich. Comp. Laws Ann. §§ 462.309, 309(6) (West 2002). The court held that the law was not discriminatory even though it "applie[d] specifically to railroads." *Adrian*, 550 F.3d at 541; *id.* at 541-42 ("This is not an instance in which the state has chosen to require something of the Railroad that it does not require of similarly situated entities."). Rather, the court examined the "concerns that animated the . . . sidewalk construction" law, concluding that they applied only to the railroad "because the railroad bisects the town and pedestrian walkways are needed for public safety." *Id.* at 542. Thus,

because the law that affected only the railroad "addresse[d] a general state concern," it did "not discriminate against the Railroad." *Id.*; *City of Spokane Valley*, 2022 WL 251889, at *5 (statute that required railroads to pay for "warning devices at the crossing" is not discriminatory because "the statute addresses a general state concern").

As in *Adrian*, Code § 56-16.3 is not discriminatory because railroads occupy a unique position that serves as a unique obstacle to a general state concern. Like the concern for pedestrian safety in *Adrian*, Virginia's concern for expanding broadband internet access is a "general state concern" that Code § 56-16.3 effectuates. *Adrian*, 550 F.3d at 542. And Virginia's statute addressing that general concern does not discriminate against railroads simply because it applies specifically to them based on their unique landowning position. *Adrian*, 550 F.3d at 542.

Finally, the Association does not even attempt to argue that the law is discriminatory as applied. See *Adrian*, 550 F.3d at 542; Br. 28-30. Nor could the Association raise such a claim in a facial pre-enforcement challenge based on representational standing. See pp.42-45, *supra*. The Association's facial ICCTA claim fails, and it lacks standing to assert an as-applied ICCTA preemption claim. JA119-120.

## CONCLUSION

This Court should affirm the judgment of the district court.

Respectfully submitted,

JEHMAL T. HUDSON

By: */s/ Erika L. Maley*
    ERIKA L. MALEY
     *Solicitor General*

JASON S. MIYARES              GRAHAM K. BRYANT
  *Attorney General*          RICK W. EBERSTADT
STEVEN G. POPPS             *Deputy Solicitors General*
  *Chief Deputy Attorney General*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-2071 – Telephone
(804) 786-1991 – Facsimile
SolicitorGeneral@oag.state.va.us

September 25, 2024          *Counsel for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,766 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century typeface.

*/s/ Erika L. Maley*

Erika L. Maley

67

## CERTIFICATE OF SERVICE

I certify that on September 25, 2024, I electronically filed the foregoing brief with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Erika L. Maley*
Erika L. Maley