No. 24-1399

# United States Court of Appeals for the Fourth Circuit

ASSOCIATION OF AMERICAN RAILROADS,

*Plaintiff–Appellant,*

v.

JEHMAL T. HUDSON, in his Individual Capacity and Official Capacity as a Commissioner of the State Corporation Commission of the Commonwealth of Virginia,

*Defendant–Appellee,*

*and*

STEPHEN BRICH, in his Individual Capacity and Official Capacity as the Commissioner of the Virginia Department of Transportation; MICHAEL ROLBAND, in his Individual Capacity and Official Capacity as the Director of the Virginia Department of Environmental Quality,

*Defendants.*

On Appeal from the United States District Court for the Eastern District of Virginia at Richmond, No. 1:23-cv-815-DJN

## REPLY BRIEF FOR APPELLANT ASSOCIATION OF AMERICAN RAILROADS

Raymond A. Atkins
Gordon D. Todd
Tobias S. Loss-Eaton
Lucas W.E. Croslow
Stephen S. Laudone
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
ratkins@sidley.com
(202) 736-8889

*Counsel for Appellant*

# TABLE OF CONTENTS

Table of authorities ...............................................................ii

Introduction ........................................................................ 1

Argument ............................................................................ 2

I.    AAR states an ICCTA preemption claim............................ 2

    A.    Section 56-16.3 is preempted as discriminatory. ................. 2

        1.    ICCTA's discrimination test applies............................ 2

            a.    Discrimination is an independent ground for preemption. ................................... 5

            b.    There is no "police power exception." ................. 9

            c.    Even on Hudson's view, the discrimination test applies. ................................ 14

        2.    Section 56-16.3 is discriminatory. ............................ 15

    B.    Section 56-16.3 is unreasonably burdensome. .................... 17

II.    AAR states a takings claim............................................ 21

    A.    $0 is not just compensation................................... 21

    B.    $1,000 is not just compensation............................. 26

    C.    A multiplicity of Commission proceedings is not an adequate remedy. ............................................. 30

III.    *Salerno* does not state a pleading standard. ................... 32

Conclusion ........................................................................ 33

Certificate of compliance

Certificate of service

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adrian & Blissfield R.R. v. Vill. of Blissfield*,
  550 F.3d 533 (6th Cir. 2008) ............................................................ 4, 5

*Am. Rocky Mountaineer v. Grand Cnty.*,
  568 F. Supp. 3d 1231 (D. Utah 2021) ............................................ 7, 13

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................ 26

*Cedar Point Nursery v. Hassid*,
  594 U.S. 139 (2021) ..................................................................... 24, 28

*Chesapeake W. Ry. v. Forst*,
  938 F.2d 528 (4th Cir. 1991) ............................................................. 29

*Citizens United v. FEC*,
  558 U.S. 310 (2010) ........................................................................... 32

*City of Auburn v. United States*,
  154 F.3d 1025 (9th Cir. 1998) ......................................................... 8, 14

*Columbia Gas Transmission, LLC v. 76 Acres*,
  701 F. App'x 221 (4th Cir. 2017) ...................................................... 27

*Delaware v. STB*,
  859 F.3d 16 (D.C. Cir. 2017) ........................................................... 9, 14

*Di Giovanni v. Camden Fire Ins. Ass'n*,
  296 U.S. 64 (1935) ............................................................................. 31

*Equitable Life Assurance Soc'y v. Wert*,
  102 F.2d 10 (8th Cir. 1939) ............................................................... 31

*Fla. E. Coast Ry. v. City of W. Palm Beach*,
  266 F.3d 1324 (11th Cir. 2001) ......................................................... 10

*Francis v. Giacomelli*,
  588 F.3d 186 (4th Cir. 2009) ............................................................. 26

*Franks Inv. Co. v. Union Pac. R.R.*,
  593 F.3d 404 (5th Cir. 2010)......................................................18

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)......................................................................17

*Green Mountain R.R. v. Vermont*,
  404 F.3d 638 (2d Cir. 2005) ........................................................12

*Hale v. Allinson*,
  188 U.S. 56 (1903)......................................................................31

*Hicks v. Ferreyra*,
  965 F.3d 302 (4th Cir. 2020)......................................................21

*A.W. ex rel. J.W. v. Coweta Cnty. Sch. Dist.*,
  110 F.4th 1309 (11th Cir. 2024) ................................................33

*Jonathan R. ex rel. Dixon v. Justice*,
  41 F.4th 316 (4th Cir. 2022) ......................................................22

*Kansas City S. Ry. v. Ark. La. Gas Co.*,
  476 F.2d 829 (10th Cir. 1973) ....................................................25

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024)..................................................................8

*Loretto v. Teleprompter Manhattan CATV Corp.*,
  458 U.S. 419 (1982)....................................................................24

*Louisville & Ind. R.R. v. Ind. Gas Co.*,
  829 N.E.2d 7 (Ind. 2005)............................................................24

*New Orleans & Gulf Coast Ry. v. Barrois*,
  533 F.3d 321 (5th Cir. 2008)......................................................18

*N.Y. Susquehanna & W. Ry. v. Jackson*,
  500 F.3d 238 (3d Cir. 2007) ....................................................6, 7

*Norfolk S. Ry v. City of Alexandria*,
  608 F.3d 150 (4th Cir. 2010)....................................11, 12, 19, 21

*Norfolk S. Ry. v. Dille Rd. Recycling, LLC*,
  94 F.4th 517 (6th Cir. 2024) ........................................................6

*Otay Mesa Prop., L.P. v. United States*,
  670 F.3d 1358 (Fed. Cir. 2012) ........................................................ 28

*PCS Phosphate Co. v. Norfolk S. Corp.*,
  559 F.3d 212 (4th Cir. 2009) ............................................................ 10

*PhRMA v. Williams*,
  64 F.4th 932 (8th Cir. 2023) ............................................................ 31

*Skidmore v. Norfolk S. Ry.*,
  1 F.4th 206 (4th Cir. 2021) ........................................................... 9, 21

*Thorpe v. Clarke*,
  37 F.4th 926 (4th Cir. 2022) ............................................................ 32

*United States v. 2.33 Acres*,
  704 F.2d 728 (4th Cir. 1983) ............................................................ 29

*United States v. 8.929 Acres*,
  36 F.4th 240 (4th Cir. 2022) ............................................................ 29

*United States v. 97.19 Acres*,
  582 F.2d 878 (4th Cir. 1978) ............................................................ 27

*United States v. Grizzard*,
  219 U.S. 180 (1911) ......................................................................... 28

*United States v. Hansen*,
  599 U.S. 762 (2023) ......................................................................... 32

*United States v. Norman*,
  935 F.3d 232 (4th Cir. 2019) ............................................................ 12

*United States v. VEPCO*,
  365 U.S. 624 (1961) ......................................................................... 27

*Vt. Ry. v. Town of Shelburne*,
  918 F.3d 82 (2d Cir. 2019) ............................................................... 13

*W. Union Tel. Co. v. Pennsylvania R.R.*,
  195 U.S. 540 (1904) ......................................................................... 25

*Woods v. City of Greensboro*,
  855 F.3d 639 (4th Cir. 2017) ............................................................ 17

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
    780 F.3d 597 (4th Cir. 2015)....................................................16

*Zayo Grp., LLC v. Norfolk S. Ry.*,
    No. 22-1837, 2023 WL 8230499 (4th Cir., Nov. 28, 2023).................19

## Statutes

49 U.S.C. § 10102(9)(A) .............................................................14

    § 10501(b) ....................................................................4, 10

Va. Code § 56-16.3(B) .........................................................13, 14

    § 56-16.3(C)(4) ................................................................14

    § 56-16.3(E) ...................................................................14

    § 56-16.3(F) ...................................................................14

    § 56-16.3(G).......................................................22, 24, 30

    § 56-16.3(I) .............................................................26, 30

    § 56-16.3(K)....................................................................22

## Administrative Decisions

*Borough of Riverdale—Pet. for Decl. Order*,
    4 S.T.B. 380 (1999)........................................................8, 17

*Providence & Worcester R.R.—Pet. for Decl. Order*,
    No. FD 35393, 2011 WL 2076463
    (S.T.B. served May 26, 2011)................................................8

*Town of Smithtown—Pet. for Decl. Order*,
    No. FD 36575(1), 2024 WL 757039
    (S.T.B. served Feb. 23, 2024)...............................................7

## Rules

Fed. R. Civ. P. 54(c) ...................................................................33

## INTRODUCTION

Commissioner Hudson has no sound defense of the district court's errors.  He largely side-steps the court's reasoning in favor of new theories, and even then fails to engage with AAR's arguments.  These shifting justifications fail.  AAR has standing to challenge this law aimed directly at its members.

On ICCTA preemption, Hudson offers an unprecedented theory that rides roughshod over the statutory language, ignores the STB's considered interpretation, and invites a circuit split.  The clear purpose of these contortions is to find *some* way to stop this Court from asking whether § 56-16.3 is discriminatory.  But discrimination is a standalone basis for ICCTA preemption, as the STB and at least three circuits recognize.  And it is more than plausible that § 56-16.3—whose perfunctory scheme targets railroads alone—is discriminatory.  It is also plausible that § 56-16.3 will impose a cumulatively unreasonable burden on rail transportation.

On the Takings Clause, Hudson tries to rewrite § 56-16.3.  By his new account, the statute rarely applies; when it does apply, it rarely takes railroad property; and railroads can always seek additional

compensation. None of that is true. This statute exists so broadband companies can occupy railroad property, which they otherwise would need permission to do. Precedent makes clear that the state must pay fair market value for these indefinite physical occupations. And the statute expressly forecloses additional compensation for two of the three crossing categories. On the final category, Hudson cannot dispute that securing just compensation will require a multiplicity of Corporation Commission proceedings, justifying equitable relief.

## ARGUMENT

### I. AAR states an ICCTA preemption claim.

#### A. Section 56-16.3 is preempted as discriminatory.

ICCTA's three-prong preemption test is simple. The statute (1) expressly (or "categorically") preempts laws that manage or govern rail transportation, and it preempts impliedly (or "as applied") laws that (2) discriminate against or (3) unreasonably burden rail transportation. Br. 7–9. Discrimination is thus a standalone ground for preemption, which the complaint plausibly invokes.

##### 1. ICCTA's discrimination test applies.

Hudson agrees with the district court that "ICCTA's discrimination test does not apply here." Resp. Br. 54. He does not, however, defend the

court's assertion that the STB has "construe[d] utility easements as not 'discriminatory' against railroads." *See* JA 115–116; Br. 31. Nor does he defend its view that a state law can never be preempted as discriminatory on its face. *See* Br. 30–31. And he disclaims the court's unprecedented conclusion that a state is free to "regulate[] rail transportation unless the regulation discriminates against rail carriers or unreasonably burdens rail carriage." JA 115; *see* Resp. Br 58. Yet he offers a theory that is almost as drastic, even more convoluted, and equally unsupported.

Like the court below, Hudson says "ICCTA's discrimination test" is not "a freestanding basis" for preemption, but merely part of a supposed "'police power exception' to express ICCTA preemption." Resp. Br. 54. His version of the "police powers exception," however, "does not apply where a law expressly manages or governs rail transportation"; such laws are always expressly preempted. *Id.* at 58. But, he says, state laws that don't manage or govern rail transportation still "may 'regulate certain areas affecting railroad activity'"; these laws are also "expressly preempt[ed]"—*unless* they "fall within the police powers exception," meaning they survive if they are not unreasonably burdensome or discriminatory. *Id.* at 58, 59. Finally, he claims, other laws that

3

"conceivably affect railroads but do not manage or govern rail transport at all" can only be "impliedly preempt[ed] … on an as-applied basis" if they "unreasonably interfer[e]" with rail transportation. *Id.* at 60–61 n.7. According to Hudson, this case belongs in the final category. *Id.* at 61.

Hudson thus envisions a sliding scale.  At the top are state laws that manage or govern rail transportation, which are expressly preempted as improper "regulation[s] of rail transportation."  49 U.S.C. § 10501(b).  In the middle are laws that do not manage or govern rail transportation but are somehow still expressly preempted as improper "regulation[s]" thereof—except they're actually *not* preempted unless they flunk the "police power exception" by discriminating or unreasonably burdening.  At the bottom are all other laws, which still cannot unreasonably burden rail transportation but can, for some reason, freely discriminate against it.

Hudson's need for this elaborate theory is obvious.  It lets him explain away the many cases saying that ICCTA preempts laws that "discriminate against railroads," *e.g.*, *Adrian & Blissfield R.R. v. Vill. of Blissfield*, 550 F.3d 533, 541 (6th Cir. 2008), while stopping the Court

from asking whether *this* law discriminates. Regardless, Hudson is wrong.

### a. Discrimination is an independent ground for preemption.

Hudson cites no cases holding, or even suggesting, that discrimination is *not* a standalone ground for implied ICCTA preemption. He cites no case upholding a state law that discriminated against railroads because it did not "regulate" them. And he cannot explain the many decisions recognizing discrimination as an independent preemption prong.

Hudson brushes aside *Adrian & Blissfield* because the discrimination claim there failed. Resp. Br. 57–58. But it failed *on the merits*. Br. 35. The Sixth Circuit first held that the sidewalk ordinance at issue was not expressly preempted because it did not intrude on the "exclusive federal regulation of railroads." 550 F.3d at 540. Instead of stopping there, as Hudson would require, the court then "appl[ied] the as-applied-preemption analysis," under which a law survives "as long as (1) it is not unreasonably burdensome, and (2) it does not discriminate against railroads." *Id.* at 541 (cleaned up). The court ultimately deemed the law non-discriminatory because it did not "require something of the Railroad that it does not require of similarly situated entities." *Id.* at 541–42.

*Adrian & Blissfield* reflects the correct three-prong test, under which discrimination is a standalone basis for implied or "as applied" preemption. As Hudson admits, the Sixth Circuit "upheld the challenged ordinance as not discriminatory *under an as-applied analysis*"—which he concedes is an independent ground for preemption. Resp. Br. 58 (emphasis altered); *see id.* at 65 (citing *Adrian & Blissfield* to note the possible argument that a "law is discriminatory as applied"). In other words, "actions that are not categorically preempted can be preempted as applied," including if they "discriminate against railroads." *See Norfolk S. Ry. v. Dille Rd. Recycling, LLC*, 94 F.4th 517, 523, 526 (6th Cir. 2024).

Hudson also does not try to explain *Jackson*. There, the Third Circuit explained that "a state law that affects rail carriage"—not regulates, but merely *affects*—is preempted if it "discriminate[s] against" or "unreasonably burden[s]" rail transportation. *N.Y. Susquehanna & W. Ry. v. Jackson*, 500 F.3d 238, 254 (3d Cir. 2007) (cited in *Norfolk S. Ry v. City of Alexandria*, 608 F.3d 150, 160 (4th Cir. 2010)). Thus, "even pedestrian regulations like building codes"—which do not manage or govern rail transportation, but can affect it when they apply to railroad facilities—"must be applied in a manner that does not discriminate against railroad

operations to avoid preemption." *Id.* at 253. "The non-discriminatory prong is particularly useful," the court noted, "in determining whether a state is regulating principally to discriminate against a specific industry." *Id.* at 254.

The Third Circuit thus considered whether the solid-waste regulations at issue were preempted as discriminatory. *See id.* at 256. This required "comparing the substance of the solid waste regulations that apply to railroads with those that apply to similar industries." *Id.* Ultimately, the record was insufficient, so the court remanded for a more detailed assessment of whether the regulations were "impermissibly discriminatory." *Id.* So, like *Adrian & Blissfield*, "*Jackson* uses an as-applied preemption analysis" to analyze discrimination as an independent basis for preemption. *Am. Rocky Mountaineer v. Grand Cnty.*, 568 F. Supp. 3d 1231, 1240 n.64 (D. Utah 2021).

Nor does Hudson address the STB's consistent view. The agency has long held that "state and local governments" can "exercis[e] their police powers *so long as* the challenged statute or regulation would not [1] unreasonably burden rail transportation, [2] discriminate against rail carriers, *or* [3] impinge on the Board's jurisdiction." *Town of Smith-*

*town—Pet. for Decl. Order*, No. FD 36575(1), 2024 WL 757039, at *3 (S.T.B. served Feb. 23, 2024) (emphases added).  This is a disjunctive test. In other words:  "In addition" to "categorically preempt[ing]" state laws that "have the effect of managing or governing rail transportation," ICCTA also preempts a law that "directly targets or discriminates against rail transportation." *Providence & Worcester R.R.—Pet. for Decl. Order*, No. FD 35393, 2011 WL 2076463, at *3 (S.T.B. served May 26, 2011).

This doctrine reflects ICCTA's overarching purpose of "prevent[ing] a patchwork of state and local law and regulation from unreasonably interfering with interstate commerce." *Id*.  Indeed, the STB's predecessor agency was long empowered to preempt state rail regulation that "unjustly discriminated against or imposed an undue burden on interstate commerce." *City of Auburn v. United States*, 154 F.3d 1025, 1029 n.6 (9th Cir. 1998).  ICCTA continues and expands that principle.

The STB's interpretation of ICCTA preemption was "issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024); *see, e.g.*, *Borough of Riverdale—Pet. for Decl. Order*, 4 S.T.B. 380 (1999).  And this Court consistently relies on the STB's preemption

decisions.  *See Skidmore v. Norfolk S. Ry.*, 1 F.4th 206, 213 (4th Cir. 2021).  Yet Hudson ignores all five STB decisions discussed in the opening brief on this point, *see* Br. 35–36—even as he asks this Court to reject the agency's considered view.

In short, as the D.C. Circuit explained after surveying "all of the circuits," including this Court, "state or local statutes or regulations are preempted categorically if they have the effect of managing or governing rail transportation." *Delaware v. STB*, 859 F.3d 16, 19 (D.C. Cir. 2017) (cleaned up).  Laws with "a more remote or incidental effect on rail transportation" usually are not expressly preempted—but they still must be (i) not "unreasonably burden[some]" and (ii) "non-discriminatory." *Id.* at 18–19.

For Hudson to be right, the Third, Sixth, and D.C. Circuits and the STB must be wrong.  He does not and cannot make that showing.

### b.    There is no "police power exception."

Because discrimination is an independent, *implied* ground for ICCTA preemption, it does not ultimately matter whether there is a "police power exception" to *express* ICCTA preemption.  But because it helps

9

understand some authorities that discuss discrimination, AAR explains that no such exception exists.

1. The statute states no exceptions. To preserve the STB's "exclusive … jurisdiction," ICCTA's remedies "with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b). So if state laws "regulat[e] … rail transportation," they are preempted. *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 218 (4th Cir. 2009). Far from saving police powers, Congress *deleted* the prior statute's police-powers language. Br. 33–34. Hudson has no answer.

The text also forecloses Hudson's claim that there are *two kinds* of express ICCTA preemption, one categorical (for regulations that "manage or govern" rail transportation) and one subject to an unwritten "police power exception" (for other regulations). *See* Resp. Br. 54, 59. Again, the statute just refers to "regulation." 49 U.S.C. § 10501(b). And "managing or governing" is not a separate test—it is how the STB and courts identify preempted regulation. *PCS Phosphate*, 559 F.3d at 218. The phrase "managing or governing" comes straight from the dictionary definition of "regulation." *See Fla. E. Coast Ry. v. City of W. Palm Beach*, 266 F.3d

1324, 1331 (11th Cir. 2001) (citing Black's Law Dictionary 1286 (6th ed. 1990)).

Nothing in the statute supports Hudson's effort to neutralize ICCTA's discrimination prong by shoehorning it into an unwritten exception to an unmentioned subcategory of express preemption.

2.    On precedent, Hudson accuses AAR of arguing that "none of the courts that have applied the police powers exception—including this one—meant what they said." Resp. Br. 57.  But there are no such cases. Hudson cites no STB or court decision upholding a state law that was found to regulate rail transportation because it satisfied such an exception.  To AAR's knowledge, none exists.

Hudson's lead case is *Alexandria*.  Resp. Br. 54.  There, this Court invalidated the trucking ordinance at issue because it had "the effect of managing or governing"—it "regulated"—"'transportation by a rail carrier,' as defined by the ICCTA."  608 F.3d at 157–60 (cleaned up).  *Alexandria* then discussed a "police power exception," holding that the ordinance was also unreasonably burdensome.  *Id.* at 160.  But these references to an "exception" were dicta.  Br. 37–38.  Hudson disagrees (at 55), but he cannot dispute that the existence of any such exception was

irrelevant to *Alexandria*'s outcome. *See* 608 F.3d at 160. Nor can he contest that the parties never disputed whether such an exception exists. *See* Br. 37–38. And statements on non-dispositive issues "not briefed and argued to the court" are dicta. *United States v. Norman*, 935 F.3d 232, 240 (4th Cir. 2019).

*Alexandria* also pointed to a line of cases that inartfully used the phrase "police power exception" to refer to the "as applied" implied preemption analysis that governs when express preemption does *not* apply—not to some unwritten carveout.

This phrase grew out of a passage in *Green Mountain Railroad v. Vermont* musing that it "*appears* that states and towns may exercise traditional police powers" that "*seem* to withstand preemption" in certain situations. 404 F.3d 638, 643 (2d Cir. 2005) (emphases added). But the Second Circuit ultimately invalidated the environmental-permitting law at issue, rejecting the state's invocation of its "historic police powers" because ICCTA "reflects clear congressional intent to preempt state and local regulation of integral rail facilities." *Id.* at 645. Thus, "*Green Mountain* does not hold that a [state law] directly regulating railways which relates to health and safety [or police powers] survives preemption"; the

12

"traditional police powers" passage was "dictum." *Rocky Mountaineer*, 568 F. Supp. 3d at 1239—40. "Other courts which have quoted this language in *Green Mountain* have done so in the context of an as-applied analysis." *Id.* at 1240.

Hudson rejoins that, in *Vermont Railway v. Town of Shelburne*, the Second Circuit framed its analysis around "the Town's assertion of a police powers exception to preemption." 918 F.3d 82, 88 (2d Cir. 2019); Resp. Br. 56–57. But *Vermont Railway* recognized that even "generally applicable" state laws like "[e]lectrical, plumbing and fire codes" must be "non-discriminatory" to withstand ICCTA preemption. 918 F.3d at 88. And it affirmed the invalidation of a facially neutral salt-storage ordinance "because it discriminate[d] against the Railway." *Id.* at 84. If even plumbing codes and salt-storage rules are preempted if they discriminate against railroads, a law that directly targets and burdens "the works of a railroad company," *see* Va. Code § 56-16.3(B), should face the same scrutiny.

Read in context, these cases show that "[t]here is no exception" of the sort Hudson claims. *Rocky Mountaineer*, 568 F. Supp. 3d at 1239. And many other cases (including ones he cites) reject invocations of

"police power" as a basis to interfere with rail facilities or operations. *E.g.*, *Delaware*, 859 F.3d at 20; *City of Auburn*, 154 F.3d at 1031.

### c.   Even on Hudson's view, the discrimination test applies.

Even if Hudson's theory were correct, § 56-16.3 would be preempted as discriminatory.  As noted, he says only laws that "do not manage or govern rail transport at all" avoid ICCTA's discrimination inquiry.  Resp. Br. 60.  Section 56-16.3 is not such a law.  It  applies only and directly to "the works of a railroad company," Va. Code § 56-16.3(B), which undisputedly fall under ICCTA, *see* 49 U.S.C. § 10102(9)(A).  And it requires railroads to take various steps, including allowing the indefinite installation of fiber equipment across their rail lines, with real safety implications.  *See* Va. Code § 56-16.3(C)(4), (E), (F); *see* Br. 9–10.  And again, Hudson admits that even "generally applicable" laws like "electric, building, fire, and plumbing codes" must be "non-discriminatory" if they "affect[] railroad activity."  Resp. Br. 58–59.  A law that explicitly governs railroad activities and facilities must meet the same requirements.

Hudson's contrary argument relies on cases discussing "routine" one-off utility easements under generally applicable eminent-domain law—precisely the kind of scheme Virginia rejected here.  Resp. Br. 61–

14

62. None of those authorities suggests that a law like § 56-16.3 is immune from a discrimination analysis. *See* Br. 31.

### 2. Section 56-16.3 is discriminatory.

Hudson admits that ICCTA's discrimination test forbids Virginia from "targeting the railroad industry." Resp. Br. 62. He does not dispute § 56-16.3's many departures from the eminent-domain scheme that applies to other property—all to the railroads' detriment. *See* Br. 13–18, 28–29. Yet he says AAR fails to allege discrimination because, "unlike [with] most other property owners," "broadband access [is] impossible without multiple [railroad] crossings," which supposedly creates "a unique obstacle" to the state's broadband-expansion policy. Resp. Br. 63–65. In support, Hudson cites (i) a news article *about this litigation* quoting supporters of § 56-16.3 and (ii) regulatory comments by an internet-provider trade association, asserting "massive delays" by railroads. *See id.* at 5–6, 64; *id.* at ix (invoking various extra-record factual materials).

This is improper. At the pleading stage, "the court accepts as true all well-pleaded facts in a complaint and construes them in the light most favorable to the plaintiff." Resp. Br. 15. AAR has alleged that broadband lines need to cross non-rail property too; crossing rail property poses *more*

engineering and safety challenges (and thus imposes greater costs) than crossing other kinds of property; and—unlike other property owners—railroads already have established procedures for these crossings. JA 32 ¶ 61. AAR has also alleged that its members promptly process broadband crossing applications; broadband companies cause significant delays in the approval process; and crossings that do not conform to railroad standards can interfere with rail operations, undermine rail infrastructure, and create safety hazards. JA21–23 ¶¶ 23–29. Hudson cannot contradict these allegations based on conflicting claims in media reports and advocacy documents. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015).

Hudson also says a law is not discriminatory just because it is railroad-specific, citing *Adrian & Blissfield* and a decision by a state utilities commission. But no similarly situated entities could exist in those cases because *only* railroads have "streets or sidewalks lying between the[ir] rails," Resp. Br. 64, or "warning devices at [road-rail] crossing[s]," *id.* at 65. Here, broadband lines must cross non-rail property too. JA 32 ¶ 61.

And if Hudson believes a state law survives preemption so long as the underlying "concerns" are not discriminatory, Resp. Br. 64, he is

mistaken. ICCTA requires that a law "be applied and enforced in a non-discriminatory manner," *Riverdale*, 4 S.T.B. 380, tracking the broader principle that federal preemption focuses on "the effects of the [state] law," not its "professed purpose," *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 105–06 (1992).

Beyond that, in a discrimination case, "evidentiary determinations regarding whether the comparators' features are sufficiently similar to constitute appropriate comparisons generally should not be made" at the pleading stage. *See Woods v. City of Greensboro*, 855 F.3d 639, 650 (4th Cir. 2017). In race-discrimination cases, for example, "[t]he similarly situated analysis typically occurs in the context of establishing a *prima facie* case of discrimination [at summary judgment], not at the 12(b)(6) stage." *Id.* at 651. Because AAR "has pleaded sufficient facts to justify an inference, plausibly and reasonably indulged, that [Virginia] treated [railroads] differently from the way it has treated [all other property owners] under arguably similar circumstances," *id.*, it states a claim.

## B. Section 56-16.3 is unreasonably burdensome.

Section 56-16.3 also triggers the unreasonable-burden prong of implied ICCTA preemption. The statute's dozens or hundreds of indefinite

17

occupations of railroad property, combined with its rushed review process, will cumulatively impose an unreasonable burden on rail transportation. Br. 39–46.

On the law governing this claim, Hudson says AAR "does not dispute that as-applied preemption issues necessarily require the participation of member railroads." Resp. Br. 37–38. Of course AAR disputes that. As explained, the unreasonable-burden analysis often addresses specific factual situations, but it can also consider the cumulative burden across the whole rail network, requiring no individual railroad's participation. *See* Br. 30, 43–46.

Hudson points to the Fifth Circuit's statement in *Franks* that "an as-applied challenge would need to address specific crossings." *Franks Inv. Co. v. Union Pac. R.R.*, 593 F.3d 404, 415 (5th Cir. 2010) (en banc); Resp. Br. 44. But there, the challenge was about four specific, existing crossings, which a landowner sought to preserve under generally applicable state property law. *See* 593 F.3d at 406. Thus, the railroad necessarily had to show an unreasonable burden from those specific crossings. *See id.* at 414; *New Orleans & Gulf Coast Ry. v. Barrois*, 533 F.3d 321, 335 (5th Cir. 2008) (similar). And *Zayo Group, LLC v. Norfolk Southern*

18

*Railway* did not analyze unreasonable burden at all.  No. 22-1837, 2023 WL 8230499, at *4 (4th Cir. Nov. 28, 2023); *contra* Resp. Br. 44.

Hudson addresses just two of the opening brief's authorities applying a cumulative approach.  He admits that *Alexandria* found preemption based on "the ordinance's general effects" without discussing its application to any particular truck transit.  Resp. Br. 52.  But he says *Alexandria* involved only "categorical express preemption," not an unreasonable-burden claim.  *Id.*  Not so—as explained, the Court *also* held that the ordinance would "unreasonably burden rail carriage."  608 F.3d at 160.  As to *Tubbs*, Hudson's only answer is that the factual record was more developed.  Resp. Br. 53.  He does not deny that the STB found implied preemption based on the cumulative effect of allowing such claims across the whole rail network.  *See* Br. 43.

Hudson does not address the other cases at all.  *See id.* at 43–45.  Nor can he explain why ICCTA would forbid crossing-specific unreasonable burdens but allow statewide ones.  *Id.* at 45.  The proper analysis is cumulative.

On the burden § 56-16.3 will create, Hudson emphasizes that a railroad can raise safety or operational concerns with the Corporation

19

Commission. Resp. Br. 47. That is little comfort. In Norfolk Southern's and CSX's proceedings, the Commission heard no evidence, held no hearing, and denied relief without explanation. *See* Doc. 25-2, AD33–43. In any event, this possibility does not help address *future* conflicts. Again, routine railroad projects often require removing or relocating nearby crossing installations, temporarily or permanently. Br. 41–42. Raising concerns before a crossing is installed cannot address such later-developing conflicts.

Hudson replies that the statute "imposes an ongoing duty" on the broadband provider "to move the broadband cable as necessary." Resp. Br. 47. But if such a duty exists, it is unenforceable. Br. 45–46. Hudson offers no response.

If Hudson means a railroad could ask the Commission to force a broadband company to move an existing installation—which the statute does not say—he has jumped from the frying pan into the fire. A scheme in which a railroad must ask permission from a state agency before it can undertake a construction project or adjust its operations is unquestionably preempted. As this Court explained, "requiring a rail carrier to obtain a locally issued permit before conducting rail operations … impose[s] an

unreasonable burden." *Alexandria*, 608 F.3d at 160. So either the statute's protections are unenforceable—meaning it creates precisely the "death by a thousand cuts" scenario that triggers preemption, *see Skidmore*, 1 F.4th at 217—or its ask-for-permission enforcement mechanism makes the scheme even more egregious.

AAR plausibly alleges that § 56-16.3 will unreasonably burden rail transportation.

## II.  AAR states a takings claim.

Each type of crossing under § 56-16.3 violates the Takings Clause.

### A.  $0 is not just compensation.

Section 56-16.3(K) facially violates the Takings Clause by denying any compensation for crossings in public rights-of-way. Br. 49–51.

Hudson offers three responses. *First*, he says the statute "sets a default fee" for these crossings, "not a cap," so railroads can seek compensation. Resp. Br. 28. This argument is forfeited. AAR explained below that, for crossings "in public rights-of-way … there is no right to seek just compensation." *See* D. Ct. ECF 58 at 6, 35; JA43 ¶ 128. No defendant disputed the point. It is too late now. *E.g.*, *Hicks v. Ferreyra*, 965 F.3d 302, 310 (4th Cir. 2020).

Anyway, Hudson is wrong. The statute imposes "fixed caps for crossings at public rights of way." JA123. "Notwithstanding the provisions of subsection G"—which governs fees—"in no case shall a broadband service provider be required to pay a license fee for … a crossing … within a public right-of-way." Va. Code § 56-16.3(K). Hudson rejoins that the "ability to petition for additional compensation is not contained in subsection G, but rather in subsection H." Resp. Br. 28. But subsection H applies *by way of subsection G.* Subsection G governs the fee to be paid "unless (i) otherwise agreed … or (ii) the railroad company has petitioned the Commission as described in subsection H." Va. Code § 56-16.3(G). So when the statute says "in no case" is a fee required for a public right-of-way crossing "[n]otwithstanding the provisions of subsection G," the railroad cannot "petition[ ] the Commission as described in subsection H." This category of crossing is always uncompensated—meaning such takings are unconstitutional.[1]

---

[1] Hudson suggests in a footnote that, if the fee-cap provisions "are ambiguous," the Court should abstain. Resp. Br. 29 & 30 n.6. This afterthought—based on an argument that did not even occur to any defendant below—does not overcome the federal courts' "oblig[ation] to decide [federal issues] in all but exceptional circumstances." *Jonathan R. ex rel. Dixon v. Justice*, 41 F.4th 316, 321 (4th Cir. 2022) (cleaned up).

*Second*, Hudson says that if a public right-of-way confers only surface rights, an aerial or subsurface crossing would not be "within" the public right-of-way, and would thus avoid the $0 fee cap.  Resp. Br. 29.  Again, this argument is forfeited.  No defendant made such a claim below.  *See* D. Ct. ECF 48 at 23; D. Ct. ECF 72 at 15.  Regardless, this argument has no bearing on § 56-16.3(K)'s validity.  *Whenever* subsection (K) applies, it forbids compensation.  So if any crossings within public rights-of-way involve takings, they violate the Constitution.

*Third*, Hudson claims many such crossings do not involve takings.  In his view, if a public right-of-way already allows "aerial or subsurface" crossings, then "an additional such crossing under Code § 56-16.3(K) would not 'take' property from the railroad." Resp. Br. 22, 29.  But crossings under § 56-16.3 are not uses of an existing right-of-way.  If they were, the broadband company would not need the new statute; it could proceed under the existing easement.  Virginia passed § 56-16.3 precisely to confer a *new* right to install crossings on railroad property.

Beyond that, Hudson ignores the Supreme Court's instruction that a "government-authorized physical invasion[ ]"—as when a state requires landowners to "allow cable companies to install equipment on

23

their properties"—"constitutes a *per se* taking." *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150–51 (2021); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 430 (1982). As the district court recognized, these "installations of broadband infrastructure on railroads' property" involve "a *per se* physical taking." JA120. Hudson's contrary claim relies on a case addressing a state-law "license rent issue," not a takings question. *See Louisville & Ind. R.R. v. Ind. Gas Co.*, 829 N.E.2d 7, 12 (Ind. 2005).

Similarly, Hudson argues more broadly that "some applications of the statute will not involve a taking," as when "a railroad holds only surface rights"; in that situation, he says, "a subsurface or aerial broadband crossing may not take the railroad's property." Resp. Br. 21–22. This argument again mistakes an assertion about the statute's scope for a defense of its validity. The statutory scheme applies whenever a broadband company "locates its fiber optic broadband line within a railroad right-of-way." Va. Code § 56-16.3(G). On Hudson's own reading of "within," Resp. Br. 29, the statute applies only when a crossing *would* take the railroad's property; a crossing above or below a surface-only right-of-way, with no

24

impact on the railroad's actual property interest, would not be "within" it.[2]

What's more, this argument overlooks the Supreme Court's explanation that a "railroad right of way is a very substantial thing"; even a right-of-way based on a less-than-fee interest has "the attributes of the fee, perpetuity and exclusive use and possession"; "it is … an interest in the land, special and exclusive in its nature." *W. Union Tel. Co. v. Pennsylvania R.R.*, 195 U.S. 540, 570 (1904). So, as Hudson's own cases recognize, railroads necessarily have "substantial surface *and subsurface rights*," which preclude any intrusions that could "interfere[] with the construction, maintenance and operation of the railroad." *Kansas City S. Ry. v. Ark. La. Gas Co.*, 476 F.2d 829, 835 (10th Cir. 1973) (emphasis added). AAR alleges that these crossings will do exactly that. *See* JA 34, 37–39 ¶¶ 67, 71, 83–96.

Whatever § 56-16.3(K)'s precise scope, it effects uncompensated takings in violation of the Constitution.

---

[2] To support these arguments, Hudson repeats the district court's error of relying on an out-of-context snippet from an amicus brief, *see* Resp. Br. 22–23, ignoring the opening brief's explanation on this point, Br. 50–51.

**B.    $1,000 is not just compensation.**

On  crossings of legally abandoned track under § 56-16.3(I), Hudson similarly says the $1,000 fee is a default, not a cap.  Resp. Br. 28.  Again, this argument is both forfeited and wrong.  As above, the $1,000 cap applies "[n]otwithstanding" subsection G, cutting off the option to seek increased compensation.  Va. Code § 56-16.3(I).  The statute thus imposes "fixed caps for crossings at … legally abandoned track."  JA123.

And this fixed cap—$1,000, or $957 after inflation so far—is too low.  As AAR alleged:  "Generally speaking, neither the market value nor the highest and best use of any crossing easement" is $1,000 or less, let alone when the easement permits an indefinite occupation that the railroad lacks discretion to terminate or relocate.  *See* JA 40 ¶ 106; Br. 52–53.  Hudson says this allegation is conclusory, Resp. Br. 21, 24 n.4, but this is not "a legal conclusion couched as a factual allegation," *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), or a "naked assertion[] of wrongdoing," *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (cleaned up).[3]

---

[3] If the words "[g]enerally speaking" undermine AAR's claims, AAR asks that the Court either constructively amend the complaint to omit them or remand so AAR can file an amended complaint doing so.

26

Hudson also emphasizes "the fact-specific nature" of determining just compensation for a crossing. Resp. Br. 21. Like the district court, he wrongly conflates the extent of unjust compensation with its existence. For present purposes, it does not matter *how much* each individual crossing is worth—only that they are worth more than $1,000. *See* Br. 59.

Alternatively, Hudson says AAR invokes the wrong measure of value. He says for "an easement or license, adequate compensation is the amount that the license or easement has *diminished* the fair market value of the land"—the "before-and-after method" of valuation. Resp. Br. 32. But while some authorities "prefer[ ] the before and after rule" for "a partial taking," "this circuit measures damages as *the fair market value of the parcel actually taken* plus the severance damages, if any, to the [remainder] of the tract." *United States v. 97.19 Acres*, 582 F.2d 878, 881 (4th Cir. 1978) (emphasis added); *see Columbia Gas Transmission, LLC v. 76 Acres*, 701 F. App'x 221, 227 (4th Cir. 2017) (applying this rule to gas-pipeline easements).

Hudson's contrary argument relies on *United States v. VEPCO*, but that case holds only that a "before and after" approach is "acceptable," not that it is required. 365 U.S. 624, 632 (1961). In other cases, the

Supreme Court has applied the same approach as this Court, looking to "the market value of that part of the tract appropriated, [and] the damage to the remainder resulting from that taking." *United States v. Grizzard*, 219 U.S. 180, 183 (1911). AAR appropriately alleged the value of what would be taken.

It does not matter whether these occupations are deemed "licenses," Resp. Br. 49–50, or "easements," Br. 15. A state "cannot absolve itself of takings liability by appropriating the [owner's] right to exclude in a form that is a slight mismatch from state easement law." *Cedar Point*, 594 U.S. at 155. And because these crossings are indefinite and cannot be terminated by the railroad, Br. 39 n.3, they are "permanent" takings. *See Otay Mesa Prop., L.P. v. United States*, 670 F.3d 1358, 1367 (Fed. Cir. 2012); *contra* Resp. Br. 30–31.

But even under Hudson's valuation theory, his conclusion is wrong. He says a rail line's value "will generally be little different" before and after a crossing. Resp. Br. 33. His sole support for that claim is a snippet describing the facts of a case addressing common-law trespass, not just compensation. *See id.* (citing *Kansas City*, 476 F.2d at 832). And Hudson

overlooks that the fee a railroad could charge for a broadband crossing is itself part of the property's value.

Fair market value includes all "reasonably probable" uses of the property that have "real market value." *See United States v. 8.929 Acres*, 36 F.4th 240, 253 (4th Cir. 2022). The complaint shows that broadband crossings are reasonably probable and have real value—after all, that's why § 56-16.3 exists. *See* JA20–21, 41 ¶¶ 22–23, 108 (describing "hundreds" of crossings since 2021 subject to "fair market value" fees). In other words, a rail corridor's pre-taking value includes the reasonably probable value of licensing a broadband crossing, which the taking destroys. *See United States v. 2.33 Acres*, 704 F.2d 728, 730 (4th Cir. 1983) ("the fair market value after the taking would reflect any diminution in value by reason of the taking"). And Hudson's suggestion that rail corridors are too "unique" to value, Resp. Br. 33–34, is doubly wrong: The market for *crossings* is well-established, and anyway, Virginia has long "calculated fair market value" for "railroad land" by using nearby land as a comparator. *Chesapeake W. Ry. v. Forst*, 938 F.2d 528, 529 (4th Cir. 1991).

Hudson thus offers no basis to depart from the basic rule that an owner is entitled to fair market value for what is taken. Because AAR plausibly alleges that this value is higher than $1,000 for this category of crossings, § 56-16.3(I) violates the Takings Clause.

Finally, Hudson says a railroad may "have no property interest if its tracks are now abandoned." Resp. Br. 22, 30. But again, the statute comes into play only when the broadband company wants to cross railroad property. Br. 52. If a railroad's property interest were extinguished, the broadband company would not be trying to "locate[] its fiber optic broadband line within a railroad right-of-way." Va. Code § 56-16.3(G).

## C. A multiplicity of Commission proceedings is not an adequate remedy.

For all other crossings, the statute sets a default fee (not a cap) of $2,000. Va. Code § 56-16.3(G). As above, the complaint plausibly alleges that these crossings are always worth more. *See* Br. 54.

Hudson responds "the SCC has discretion" to "order additional compensation to be paid *before* the crossing," which would avoid any takings violation. Resp. Br. 35. This response ignores the Commission's stated policy to delay deciding compensation until after a taking has already occurred. *See* Br. 55. And after-the-fact compensation does not satisfy

the Takings Clause. *Id.* at 54. So the only question is whether § 56-16.3 provides an adequate remedy for these takings by requiring railroads to petition the Commission for additional, after-the-fact compensation for each crossing. The answer is no, so injunctive relief is justified. *See PhRMA v. Williams*, 64 F.4th 932 (8th Cir. 2023); Br. 57–60.

Hudson emphasizes that "every application of the statute" in *PhRMA* "constituted the same uncompensated taking of the same fungible product." Resp. Br. 36. But he does not explain why that should matter. Equitable relief is available to avoid "the burden of numerous [proceedings] between the same or different parties, where the issues are substantially the same." *Di Giovanni v. Camden Fire Ins. Ass'n*, 296 U.S. 64, 70 (1935). The suits need not be carbon copies; "a community of interest among them in the questions of law and fact involved in the general controversy" is enough. *Hale v. Allinson*, 188 U.S. 56, 78 (1903). Nor does equitable relief require an "indefinite number" of proceedings, Resp. Br. 37; as few as "six actions" can "constitute a 'multiplicity of suits'" justifying an injunction. *E.g.*, *Equitable Life Assurance Soc'y v. Wert*, 102 F.2d 10, 15 (8th Cir. 1939).

In sum, railroads can secure just compensation for this category of crossings only though a multiplicity of after-the-fact Commission proceedings. That is not an adequate remedy.

## III. *Salerno* does not state a pleading standard.

Hudson says *United States v. Hansen* "reiterated that [non-First Amendment] plaintiffs bringing a facial challenge" must satisfy *Salerno*. Resp. Br. 25. But *Hansen*—a post-conviction criminal appeal addressing a First Amendment overbreadth challenge—says nothing about what civil plaintiffs must plead. *See* 599 U.S. 762, 767–69 (2023). By contrast, *Citizens United v. FEC* squarely held that the facial-challenge test does not dictate "what must be pleaded in a complaint," 558 U.S. 310, 331 (2010)—which *Hudson* ignores.

Hudson says *Thorpe v. Clarke* is distinguishable because, even if the plaintiffs were not "entitle[d] to a facial injunction, the court could still award narrower relief" in the form of damages. Resp. Br. 25–26 (citing 37 F.4th 926, 931, 947 (4th Cir. 2022)). Incorrect. Dismissal was improper there—even though the plaintiffs did not allege "no set of circumstances" under which the challenged program "would be valid"—because "the evidence presented" might "justif[y] broad relief implicating

the entire" program or "damages *and a tailored injunction*."  37 F.4th at

947 (emphasis added).

These cases reflect that a "final judgment should grant the relief to

which each party is entitled, even if the party has not demanded that

relief in its pleadings."  Fed. R. Civ. P. 54(c).  A complaint thus states a

claim "if it alleges facts that establish that the plaintiff is entitled to any

relief that the court can grant."  *A.W. ex rel. J.W. v. Coweta Cnty. Sch.*

*Dist.*, 110 F.4th 1309, 1315 (11th Cir. 2024).  By plausibly alleging that

§ 56-16.3 is *at least partly* invalid—even if it may have valid applica-

tions—AAR states a claim for relief.  Br. 62.

## CONCLUSION

The Court should reverse the dismissal of Counts I and II.

October 23, 2024                          Respectfully submitted,

                                          /s/ *Raymond A. Atkins*
                                          Raymond A. Atkins
                                          Gordon D. Todd
                                          Tobias S. Loss-Eaton
                                          Lucas W.E. Croslow
                                          Stephen S. Laudone
                                          SIDLEY AUSTIN LLP
                                          1501 K Street, N.W.
                                          Washington, D.C. 20005
                                          ratkins@sidley.com
                                          (202) 736-8889

                                          *Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,467 words (as determined by the Microsoft Word word-processing system used to prepare it), excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.      This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

**CERTIFICATE OF SERVICE**

I certify that, on October 23, 2024, this brief was filed with the Clerk of the Court through the appellate CM/ECF system, which will send notice to all registered counsel of record.


　　　　　　　　　　　　　　 */s/ Raymond A. Atkins*
　　　　　　　　　　　　　　 Raymond A. Atkins